# Exhibit 6

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**Form 10-K**

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended: December 31, 2025

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

Commission file number: **000-54435**

**VPR BRANDS, LP**
(Exact name of registrant as specified in its charter)

| **Delaware** | **45-1740641** |
|:---:|:---:|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1141 Sawgrass Corporate Parkway, Sunrise, FL** | **33323** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(954) 715-7001**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol** | **Name of each exchange on which registered** |
|:---:|:---:|:---:|
| N/A | N/A | N/A |

Securities registered pursuant to Section 12(g) of the Act:

**Common units representing limited partner interests**
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (Sec. 229.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated Filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b).

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of June 30, 2025 (the last business day of the registrant's most recently completed second fiscal quarter), the aggregate market value of the registrant's common units held by non-affiliates of the registrant was $91,746,806. For purposes of this disclosure, units held by persons who hold more than 5% of the outstanding units and units held by executive officers and members of the registrant's general partner of the registrant have been excluded because such persons may be deemed to be affiliates. This determination of executive officer or affiliate status is not necessarily a conclusive determination for other purposes.

The number of the registrant's voting and non-voting common units representing limited partner interests outstanding as of March 31, 2026 was 91,746,806.

Documents incorporated by reference: None

**VPR Brands, LP**
**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **PART I** | | 1 |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 15 |
| Item 1B. | Unresolved Staff Comments | 31 |
| Item 1C. | Cybersecurity | 31 |
| Item 2. | Properties | 32 |
| Item 3. | Legal Proceedings | 32 |
| Item 4. | Mine Safety Disclosures | 32 |
| **PART II** | | 33 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 33 |
| Item 6. | [Reserved] | 33 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 37 |
| Item 8. | Financial Statements and Supplementary Data | 37 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 37 |
| Item 9A. | Controls and Procedures | 37 |
| Item 9B. | Other Information | 38 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 38 |
| **PART III** | | 39 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 39 |
| Item 11. | Executive Compensation | 42 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 42 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 43 |
| Item 14. | Principal Accounting Fees and Services | 52 |
| **PART IV** | | 53 |
| Item 15. | Exhibits, Financial Statement Schedules | 53 |
| Item 16. | Form 10-K Summary | 57 |
| **SIGNATURES** | | 58 |

i

***Forward-Looking Statements***

*In addition to historical information, this Annual Report on Form 10-K contains forward-looking statements. Forward-looking statements are those that predict or describe future events or trends and that do not relate solely to historical matters. You can generally identify forward-looking statements as statements containing the words "believe," "expect," "will," "anticipate," "intend," "estimate," "project," "assume" or other similar expressions, although not all forward-looking statements contain these identifying words. All statements in this report regarding our future strategy, future operations, projected financial position, estimated future revenue, projected costs, future prospects, and results that might be obtained by pursuing management's current plans and objectives are forward-looking statements. You should not place undue reliance on our forward-looking statements because the matters they describe are subject to known and unknown risks, uncertainties and other unpredictable factors, many of which are beyond our control. Important risks that might cause our actual results to differ materially from the results contemplated by the forward-looking statements are contained in "Item 1A. Risk Factors" and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" of this Annual Report on Form 10-K and in our subsequent filings with the Securities and Exchange Commission (the "SEC"). Our forward-looking statements are based on the information currently available to us and speak only as of the date on which this report was filed with the SEC. We expressly disclaim any obligation to issue any updates or revisions to our forward-looking statements, even if subsequent events cause our expectations to change regarding the matters discussed in those statements. Over time, our actual results, performance or achievements will likely differ from the anticipated results, performance or achievements that are expressed or implied by our forward-looking statements, and such difference may be significant and materially adverse to our security holders.*

*In this Annual Report on Form 10-K, unless the context otherwise requires, the terms "VPR Brands," the "Company," "we," "our" and/or "us," refer to VPR Brands, LP.*

ii

**PART I**

**Item 1. Our Business**

We are a company engaged in the electronic cigarette, electronic cigar, personal vaporizer and pocket lighter industry. We own a portfolio of electronic cigarette, personal vaporizer patents, several trademarks and pocket lighter patents which are the basis for our efforts to:

- Design, market and distribute a line of pocket lighters under the "DISSIM" brand;

- Design, market and distribute a line of vaporizers for essential oils, concentrates, and dry herbs under the "HONEYSTICK" brand;

- Design, market and distribute a line of hemp derived cannabidiol products under the "GOLD LINE" brand;

- Design, market and distribute electronic cigars and popular vaporizers under the GRANDFADDA brand;

- Prosecute and enforce our patent and trademark rights;

- License our intellectual property; and

- Develop private label manufacturing programs.

**Electronic Cigarettes, Personal Vaporizers and Medical Vaporizers for Cannabis Use**

"Electronic cigarettes" or "e-cigarettes," are battery-powered products that enable users to inhale nicotine vapor without smoke, tar, ash, or carbon monoxide. Electronic cigarettes look like traditional cigarettes and, regardless of their construction are comprised of three functional components:

- A mouthpiece, which is a small plastic cartridge that contains a liquid nicotine solution;

- The heating element that vaporizes the liquid nicotine so that it can be inhaled; and

- The electronics, which include: a lithium-ion battery, an airflow sensor, a microchip controller and an LED, which illuminates to indicate use.

When a user draws air through the electronic cigarette, the air flow is detected by a sensor, which activates a heating element that vaporizes the solution stored in the mouthpiece/cartridge, the solution is then vaporized and it is this vapor that is inhaled by the user. The cartridge contains either a nicotine solution or a nicotine-free solution, either of which may be flavored.

We have developed a line of electronic cigarette e-liquids which were previously sold under the brand name "Vapor X", "Krave" and "Helium." We plan to develop a complete line of disposable and rechargeable electronic personal vaporizers for cannabis and hemp extract oils under the "HRB" brand.

Disposable electronic vaporizers feature a one-piece construction that houses all the components and is utilized until the nicotine or nicotine-free solution is depleted.

Rechargeable electronic vaporizers feature a rechargeable battery and replaceable cartridge or pod. The cartridges or pods are changed when the solution is depleted from use.

1

Personal vaporizers are similar in form and function to electronic cigarettes but typically have a larger form factor and are used to vaporize solutions that are not nicotine-based and may include flavors and or flavor combinations. They are most widely used for cannabis and hemp extracts.

Personal vaporizers or vaporizers typically feature a tank and a chamber, a heating element and a battery. The vaporizer user fills the tank with a liquid solution or the chamber with wax, dry herb or leaf. The vaporizer battery can be recharged and the tank and chamber can be refilled.

Medical vaporizers for cannabis use function similarly to electronic cigarettes and vaporizers but have unique design characteristics to enable patients to vape the different forms of cannabis. Generally, these forms are essential oils, concentrates, as well as dry herb. This results in a similar effect but it is cannabis concentrates being vaporized instead of nicotine liquid or a flavored cartridge, so the design has to be changed to vaporize these different textures.

We have developed a line of vaporizers that are for use with medical cannabis under the "HONEYSTICK" brand. These vaporizers are designed for sale in the medical and recreational cannabis markets and currently feature mainly vaporizers for essential oils and concentrates. We plan to launch and develop more units for dry herb and cannabis extracts, and continue to expand the line to offer more innovative technology that is high performance and convenient. We also conduct most of our private label production for cannabis oriented vaporizers.

We have developed and commercialize a "vapor cigar" product designed to emulate certain attributes of a premium cigar smoking experience, including form factor, draw characteristics and tobacco-profile flavoring. This product is marketed as an adult-only offering under the Grandfadda® brand and is currently limited to tobacco-variant flavors. Our ability to develop, manufacture, distribute and market this product is subject to evolving federal, state and local laws and regulations applicable to vapor products, including potential restrictions on flavors, advertising, distribution and shipping, which could adversely affect sales and profitability.

**The U.S. Market for Electronic Cigarettes and Medical Cannabis Vaporizers**

Electronic cigarettes are generally marketed as an alternative to traditional tobacco-burning cigarettes. Because electronic cigarettes offer a "smoking" experience without the burning of tobacco leaf, electronic cigarettes offer users the ability to satisfy their nicotine cravings without the byproducts of smoke, tar, ash or carbon monoxide. In many cases electronic cigarettes are not subject to the use prohibitions of tobacco-burning cigarettes and therefore, may be used in more places than conventional cigarettes. Certain states, cities, businesses, providers of transportation and public venues in the U.S. have already banned the use of electronic cigarettes, however, and others are considering banning the use of electronic cigarettes. We cannot provide any assurances that the use of electronic cigarettes will not be banned anywhere traditional tobacco-burning cigarette use is banned.

We believe that the market for medical and recreational cannabis products, including cannabis vape products, continues to expand as the legal climate within the U.S. has resulted in more states permitting recreational and/or medical cannabis use. Vape products are growing as a delivery device because they allow very convenient, effective and discrete ways of delivery that minimize, odor and exposure. Vape products also allow for the vaporization of all textures of cannabis, which allows for effective dosing.

The U.S. Supreme Court has ruled that it is the federal government that has the right to regulate and criminalize cannabis, even for medical purposes. Therefore, federal law criminalizing the use of marijuana preempts state laws that legalize its use for medicinal purposes.

The U.S. federal government regulates drugs through the Controlled Substances Act of 1970, as amended (the "CSA"), which places controlled substances, including cannabis, in a schedule. Cannabis is classified as a Schedule I controlled substance. A Schedule I controlled substance is defined as a substance that has no currently accepted medical use in the United States, a lack of safety for use under medical supervision and a high potential for abuse. The U.S. Department of Justice (the "DOJ") defines Schedule I drugs, substances or chemicals as "drugs with no currently accepted medical use and a high potential for abuse." However, the U.S. Food and Drug Administration (the "FDA") has approved Epidiolex, which contains a purified form of the drug cannabidiol ("CBD"), a non-psychoactive ingredient in the cannabis plant, for the treatment of seizures associated with two epilepsy conditions. The FDA has not approved cannabis or cannabis compounds as a safe and effective drug for any other condition. Moreover, pursuant to the Agriculture Improvement Act of 2018 (the "Farm Bill"), CBD remains a Schedule I controlled substance under the CSA, with a narrow exception for CBD derived from hemp with a tetrahydrocannabinol ("THC") concentration of less than 0.3%.

2

We maintain our operations so as to remain in compliance with the CSA. Even in those jurisdictions in which the manufacture and use of medical marijuana has been legalized at the state level, the possession, use and cultivation all remain violations of federal law that are punishable by imprisonment and substantial fines, and the prescription of marijuana is a violation of federal law. Moreover, individuals and entities may violate federal law if they intentionally aid and abet another in violating these federal controlled substance laws or conspire with another to violate them.

The inconsistencies between federal and state regulation of cannabis were addressed in a memorandum (the "Cole Memo") which then-Deputy Attorney General James Cole sent to all U.S. District Attorneys in 2013 outlining certain priorities for the DOJ relating to the prosecution of cannabis offenses. The Cole Memo acknowledged that, notwithstanding the designation of cannabis as a Schedule I controlled substance at the federal level, several states had enacted laws authorizing the use of cannabis for medical purposes. The Cole Memo noted that jurisdictions that have enacted laws legalizing cannabis in some form have also implemented strong and effective regulatory and enforcement systems to control the cultivation, processing, distribution, sale, and possession of cannabis. As such, conduct in compliance with those laws and regulations is less likely to implicate the Cole Memo's enforcement priorities. The DOJ did not provide (and has not provided since) specific guidelines for what regulatory and enforcement systems would be deemed sufficient under the Cole Memo. In light of limited investigative and prosecutorial resources, the Cole Memo concluded that the DOJ should be focused on addressing only the most significant threats related to cannabis, such as distribution of cannabis from states where cannabis is legal to those where cannabis is illegal, the diversion of cannabis revenues to illicit drug cartels and sales of cannabis to minors.

On January 4, 2018, former U.S. Attorney General Jeff Sessions issued a memorandum (the "Sessions Memo") which rescinded the Cole Memo. The Sessions Memo stated, in part, that current law reflects "Congress' determination that cannabis is a dangerous drug and cannabis activity is a serious crime," and Mr. Sessions directed all U.S. Attorneys to enforce the laws enacted by Congress by following well-established principles when pursuing prosecutions related to cannabis activities. We are not aware of any prosecutions of investment companies doing routine business with licensed marijuana related businesses in light of the DOJ position following issuance of the Sessions Memo. However, there can be no assurance that the federal government will not enforce federal laws relating to cannabis in the future. As a result of the Sessions Memo, federal prosecutors are now free to utilize their prosecutorial discretion to decide whether to prosecute cannabis activities, despite the existence of state-level laws that may be inconsistent with federal prohibitions. No direction was given to federal prosecutors in the Sessions Memo as to the priority they should ascribe to such cannabis activities, and thus it is uncertain how active U.S. federal prosecutors will be in relation to such activities.

Federal prosecutors appear to continue to use the Cole Memo's priorities as an enforcement guide. Former U.S. Attorney General Merrick Garland indicated that he was deprioritizing enforcement of low-level cannabis crimes such as possession, and shared his view that the government should focus on large-scale criminal enterprises that circumvent state legalization laws instead of going after people who abide by local cannabis policies. There were no new federal cannabis memoranda issued by the Biden Administration or any published change in federal enforcement policy. We are unaware of any new enforcement guidelines being released by the Trump administration. The U.S. federal government has always reserved the right to enforce federal law regarding the sale and disbursement of medical or recreational marijuana, even if state law sanctioned such sale and disbursement. Although the rescission of the Cole Memo does not necessarily indicate that marijuana industry prosecutions are now affirmatively a priority for the DOJ, there can be no assurance that the U.S. federal government will not enforce such laws in the future. The sheer size of the cannabis industry, in addition to participation by state and local governments and investors, however, suggests that a large-scale federal enforcement operation would more than likely create unwanted political backlash for the DOJ and the current administration. Regardless, at this time, cannabis remains a Schedule I controlled substance at the federal level. It is unclear whether the risk of enforcement has been altered.

One legislative safeguard for the medical cannabis industry, appended to the federal budget bill, remains in place following the rescission of the Cole Memo. For several years, Congress has adopted a so-called "rider" provision to the Consolidated Appropriations Act (formerly referred to as the Rohrabacher-Farr Amendment and currently referred to as the Rohrabacher-Blumenauer Amendment) to prevent the federal government from using congressionally appropriated funds to enforce federal cannabis laws against regulated medical cannabis actors operating in compliance with state and local law. Despite the rescission of the Cole Memo, the DOJ appears to continue to adhere to the enforcement priorities set forth in the Cole Memo.

The Cole Memo and the Rohrabacher-Blumenauer Amendment gave licensed cannabis operators (particularly medical cannabis operators) and investors in states with legal regimes greater certainty regarding the DOJ's enforcement priorities and the risk of operating cannabis businesses. While the Sessions Memo has introduced some uncertainty regarding federal enforcement, the cannabis industry continues to experience growth in legal medical and adult use markets across the United States. Currently, there is no guarantee that state laws legalizing and regulating the sale and use of cannabis will remain in place or that local governmental authorities will not limit the applicability of state laws within their respective jurisdictions. Unless and until the U.S. Congress amends the CSA with respect to cannabis (and as to the timing or scope of any such potential amendments there can be no assurance), there is a risk that federal authorities may enforce current U.S. federal law criminalizing cannabis.

3

Although the U.S. Supreme Court has ruled that it is the federal government that has the right to regulate and criminalize cannabis, and federal law criminalizing the use of marijuana preempts state laws that legalize its use, cannabis is largely regulated at the state level.

State laws that permit and regulate the production, distribution and use of cannabis for adult use or medical purposes are in direct conflict with the CSA, which makes cannabis use and possession federally illegal. Although certain states and territories of the U.S. authorize medical and/or adult use cannabis production and distribution by licensed or registered entities, under U.S. federal law, the possession, use, cultivation and transfer of cannabis and any related drug paraphernalia is illegal, and any such acts are criminal acts under federal law under any and all circumstances under the CSA. Although our activities are believed to be compliant with applicable state and local laws, strict compliance with state and local laws with respect to cannabis may neither absolve us of liability under U.S. federal law, nor may it provide a defense to any federal proceeding which may be brought against us.

Many states and U.S. territories have legalized the medical and/or adult use of cannabis.

Although we are not engaged in the purchase, sale, growth, cultivation, harvesting, or processing of marijuana products, strict enforcement of federal prohibitions regarding marijuana could irreparably harm our business, subject us to criminal prosecution and/or adversely affect the trading price of our securities. We cannot provide any assurances that federal regulations will not inhibit the growth, expansion, or legality of the cannabis movement which is highly interdependent in the growth of sales of our vaporizers.

As part of the "Consolidated Appropriations Act, 2021," in a COVID-19 relief bill signed into law on December 27, 2020, the U.S. Congress amended the Prevent All Cigarette Trafficking ("PACT") Act to apply to e-cigarettes and all vaping products. Originally passed in 2009, the PACT Act amended the existing Jenkins Act of 1949, which required interstate shippers to report cigarette sales to state tobacco tax administrators in order to combat illicit sales and tax avoidance. The PACT Act, among other things, prohibited the use of the U.S. Postal Service ("USPS") to deliver cigarettes and smokeless tobacco products directly to consumers.

In addition to the non-mailing provisions, the PACT Act requires anyone who sells cigarettes or smokeless tobacco to register with the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") and the tobacco tax administrators of the states into which a shipment is made or in which an advertisement or offer is disseminated. Delivery sellers who ship cigarettes or smokeless tobacco to consumers are further required to label packages as containing tobacco, verify the age and identity of the customer at purchase, use a delivery method (other than USPS) that checks identification and obtains adult customer signature at delivery, and maintain records of delivery sales for a period of four years after the date of sale, among other things.

The PACT Act also requires sellers to file a monthly report with the state tobacco tax administrator and any other local or tribal entity that taxes the sale of cigarettes. Such reports must include the name and address of the persons delivering and receiving the shipment and the brand and quantity of the "cigarettes" that were shipped. These requirements apply to all sales of cigarettes and smokeless tobacco, including sales to consumers and sales between businesses.

**PACT Act and shipping restrictions.** The PACT Act, as amended in 2020 to cover Electronic Nicotine Delivery Systems ("ENDS"), imposes registration, reporting, tax, labeling and age-verification requirements on covered sellers, and the ATF maintains a non-compliant list that can effectively bar listed entities from using common carriers and other service providers. The U.S. Postal Service generally prohibits mailing ENDS products directly to consumers and permits only limited business-to-business exceptions subject to strict procedures, and major private carriers have also restricted or discontinued vapor shipments. Compliance burdens, carrier limitations, and increased enforcement and related litigation risk could increase costs, constrain distribution, disrupt sales, and materially adversely affect our business, results of operations and financial condition.

**PACT Act enforcement and litigation risk.** Enforcement of the PACT Act and related shipping, reporting, registration, and tax-compliance requirements has increased, including actions targeting distributors and sellers of ENDS products and scrutiny of the limited exceptions that may permit certain business-to-business shipments. Government enforcement, civil litigation by regulators, or actions by carriers or the U.S. Postal Service could further restrict lawful shipping options, increase compliance costs, result in penalties, and disrupt distribution channels. Any such developments could materially adversely affect our business, results of operations, and financial condition.

**Legislative developments affecting hemp-derived products.** Recent federal appropriations and related legislation have included provisions intended to materially restrict "intoxicating hemp" products and to narrow the scope of products that may be lawfully sold under the hemp framework. If enacted and implemented as currently proposed, these measures could materially limit the manufacture, distribution, and sale of certain hemp-derived cannabinoid products (including products marketed for intoxicating effects), and could require reformulation, relabeling, changes to distribution channels, or discontinuation of certain product lines. These developments, as well as evolving state laws, could adversely affect demand for hemp-related products and components, our customers' and distributors' compliance obligations, and our results of operations.

**Global Market**

We participate in the vapor and related consumer products markets, which are subject to rapid changes in regulation, product standards, consumer preferences, and competitive dynamics. Market size and growth rates cited from third parties may vary significantly based on methodology, geography, and regulatory assumptions.

---

4

**Distribution and Sales**

The distribution and sales strategy for our products is tailored to the characteristics of each market, whether it be geographical, demographic, or genre (cannabis or e-liquid).

Our sales and distribution channels are:

- Direct sales and distribution, where we have set up our own distribution directly to retailers.

- Single independent distributors who are responsible for distribution within a single market.

- Exclusive territory and exclusive channel distribution, where distributors have an exclusive territory within a country or an exclusive right to sell within a distribution channel (e.g. gas stations).

- Distribution through wholesalers, where we supply either national or regional wholesalers who then service retailers.

- Internet/e-commerce sales, where we sell directly to end users through one of our internet websites and/or landing pages.

- Distribution through online distributors that sell to an extensive network of resellers.

- Distribution through dispensaries who are responsible for dispensing medical or recreational cannabis.

- Distribution through master distributors, where we sell to distributors who service other distributors.

**Business Strategy**

VPR Brands is a holding company, whose assets include an issued U.S. patent for atomization related products, including technology for medical marijuana vaporizers and electronic cigarette products and components, as well as pocket lighters. We also have several trademarks HONEYSTICK, PHANTOM, RIPPER, VPOD, HRB, GRANDFADDA,) for licensing activities. We are also engaged in product development for the vapor or vaping market, including e-liquids. Electronic cigarettes are electronic devices which deliver nicotine through atomization, or vaping of e-liquids and without smoke and other chemicals constituents typically found in traditional tobacco burning cigarette products.

Our portfolio of electronic cigarette personal vaporizer and pocket lighter patents are the basis for our efforts to:

- Design, market and distribute a line of pocket lighters under the "DISSIM" brand;

- Design, market and distribute a line of vaporizers for essential oils, concentrates, and dry herbs under the "HONEYSTICK" brand;

- Design, market, license and distribute a line of vaporizers under the brand;

- Design, market and distribute a line of HEMP CBD products under the "GOLD LINE" brand;

- Design, market and distribute electronic cigarettes and popular vaporizers under the "GRANDFADDA" brand;

- Prosecute and enforce our patent and trademark rights;

- License our intellectual property; and

- Develop private label manufacturing programs.

Our electronic cigarette e-liquids are marketed as an alternative to tobacco burning cigarettes.

We design, develop, market and distribute a line of products oriented toward the cannabis markets, which is the HoneyStick brand of vaporizers and the Goldline HEMP products. We design, develop, market and distribute a cigar-style vapor product under the Grandfadda® brand. The Grandfadda® product is intended for adult consumers and is designed to emulate certain attributes of a premium cigar experience, including form factor, draw characteristics, and tobacco-profile flavor. At this time, the Grandfadda® line is offered only in tobacco-variant flavor formulations.

5

**Patent and Trademark Rights**

We are evaluating our options and conducting investigations to determine if our intellectual property is being infringed upon in the U.S. and globally. and if so, by whom. We are prosecuting infringers and pursuing available remedies. We have hired a law firm on contingency basis to file suit against infringers.

**License of our Technology and Trademarks**

In light of recent lawsuits filed against several electronic cigarette companies, we believe that an opportunity exists to license our patented technology and trademarks to companies named in those lawsuits and others who may be seeking an alternative to the electronic cigarette technologies which are or may be subject to patent litigation. We are actively enforcing our intellectual property rights via lawsuits against infringers.

**Private Label**

As an extension of our plan to license our technology to other electronic cigarette companies, we plan to offer private label manufacturing programs for electronic cigarette as well as cannabis vape companies that would rather purchase a finished manufactured product, rather than simply purchasing a license to manufacture their products using our technology. We believe that we have a greater understanding of the manufacturing process than a licensee would and that we can better oversee the manufacturing process of our patented technologies and offer a more reliable and higher quality product through our supply chain than can otherwise be achieved by third parties.

**Competition**

Competition in the electronic cigarette and vaporizer industry is intense. We compete with other sellers of electronic cigarettes, the nature of our competitors is varied as the market is highly fragmented and the barriers to entry into the business are low. Our direct competitors sell products that are substantially similar to ours and through the same channels through which we sell our electronic cigarette products. We compete with these direct competitors for sales through distributors, wholesalers and retailers, including but not limited to national chain stores, tobacco shops, dispensaries gas stations, travel stores, shopping mall kiosks, in addition to direct to public sales through the internet, mail order and telesales. As a general matter, we have access to and market and sell the similar electronic cigarettes as our competitors and since we sell our products at substantially similar prices as our competitors.

Part of our business strategy focuses on the establishment of contractual relationships with distributors and prominent branding focused on performance and quality. We are aware that e-cigarette competitors in the industry are also seeking to enter into such contractual relationships and try to create brand loyalty. In many cases, competitors for such contracts may have greater management, human, and financial resources than we do for entering into such contracts and for attracting distributor relationships. Furthermore, certain of our electronic cigarette competitors may have better control of their supply and distribution, be, better established, larger and better financed than us.

We also compete against "big tobacco", U.S. cigarette manufacturers of both conventional tobacco cigarettes and electronic cigarettes like Altria Group, Inc., Lorillard, Inc. and Reynolds American, Inc. We compete against big tobacco who offers not only conventional tobacco cigarettes and electronic cigarettes but also smokeless tobacco products such as "snus" (a form of moist ground smokeless tobacco that is usually sold in sachet form that resembles small tea bags), chewing tobacco and snuff. Big tobacco has nearly limitless resources, global distribution networks in place and a customer base that is fiercely loyal to their brands. Furthermore, we believe that big tobacco will devote more attention and resources to developing and offering electronic cigarettes as the market for electronic cigarettes grows. Because of their well-established sales and distribution channels, marketing expertise and significant resources, big tobacco is better positioned than small competitors like us to capture a larger share of the electronic cigarette market.

We also face competition from manufacturers in China as they try to increase their U.S. presence by marketing directly to members within our supply and value chain similar products.

We may also face competition from other patent holders, including but not limited to, Imperial Tobacco Group Plc, Europe's second-biggest tobacco company, who in September 2013 acquired a portfolio of electronic cigarette patents from Dragonite International Ltd. (formerly Ruyan Group Holdings Limited) for $75 million, as we attempt to negotiate and contract with other electronic cigarette companies to license our intellectual property.

6

**Manufacturing**

We depend on third party manufacturers for our electronic cigarettes, vaporizers and accessories. Our customers associate certain characteristics of our products including the weight, feel, draw, unique flavor, packaging and other attributes of our products to the brands we market, distribute and sell. Any interruption in supply and/or consistency of our products may adversely impact our ability to deliver our products to our wholesalers, distributors and customers and otherwise harm our relationships and reputation with customers, and have a materially adverse effect on our business, results of operations and financial condition.

Although we believe that several alternative sources for our products are available, several of our models have proprietary molds and any failure to obtain the components, chemical constituents and manufacturing services necessary for the production of our products would have a material adverse effect on our business, results of operations and financial condition.

**Source and Availability of Raw Materials**

We believe that an adequate supply of product and raw materials will be available to us as needed and from multiple sources and suppliers.

**Intellectual Property**

We own the following U.S. patent:

- Electronic Cigarette, Patent 8,205,622 as issued by the United States Patent and Trademark Office on May 14, 2012.

We own the following U.S. Trademarks:

- HoneyStick, Dissim, VPOD, HRB, Phantom, GRANDFADDA, Ripper, Crumble,

We have the following U.S. Trademarks Pending:

- TRBM

The following are the website domains acquired:

- www.vapehoneystick.com

**Additional Trademarks**

- www.Dissim.com

- www.vaporcigar.com

- www.flashlighter.com

- www.cbdgoldline.com

- www.goldlinecbd.com

- www.cartdub.com

- www.vprbrands.com

**Government Regulations**

*Tobacco Deemed Products*

Pursuant to a December 2010 decision by the U.S. Court of Appeals for the District of Columbia Circuit, in Sottera, Inc. v. Food & Drug Administration, 627 F.3d 891 (D.C. Cir. 2010), the FDA is permitted to regulate electronic cigarettes as "tobacco products" under the Family Smoking Prevention and Tobacco Control Act of 2009 (the "*Tobacco Control Act*"). Under this Court decision, the FDA is not permitted to regulate electronic cigarettes as "drugs" or "devices" or a "combination product" under the Federal Food, Drug and Cosmetic Act unless they are marketed for therapeutic purposes.

The Tobacco Control Act also requires establishment, within the FDA's new Center for Tobacco Products, of a Tobacco Products Scientific Advisory Committee to provide advice, information and recommendations with respect to the safety, dependence or health issues related to tobacco products.

The FDA had previously indicated that it intended to regulate e-cigarettes under the Tobacco Control Act through the issuance of "Deeming Regulations" that would include e-liquid, e-cigarettes, and other vaping products (collectively, "*Deemed Tobacco Products*") under the Tobacco Control Act and subject to the FDA's jurisdiction.

7

On May 10, 2016, the FDA issued the "Deeming Regulations" which came into effect August 8, 2016. The Deeming Regulations amended the definition of "tobacco products" to include e-liquid, e-cigarettes and other vaping products. Deemed Tobacco Products include, but are not limited to, e-liquids, atomizers, batteries, cartomizers, clearomisers, tank systems, flavors, bottles that contain e-liquids and programmable software. Beginning August 8, 2016, Deemed Tobacco Products became subject to all FDA regulations applicable to cigarettes, cigarette tobacco, and other tobacco products which require:

- a prohibition on sales to those younger than 18 years of age and requirements for verification by means of photographic identification (in December 2019, the federal minimum age for sale of tobacco products was raised from 18 to 21 years);

- health and addictiveness warnings on product packages and in advertisements;

- a ban on vending machine sales unless the vending machines are located in a facility where the retailer ensures that individuals under 18 years of age are prohibited from entering at any time;

- registration with, and reporting of product and ingredient listings to, the FDA;

- no marketing of new tobacco products prior to FDA review;

- no direct and implied claims of reduced risk such as "light", "low" and "mild" descriptions unless FDA confirms (a) that scientific evidence supports the claim and (b) that marketing the product will benefit public health;

- payment of user fees;

- ban on free samples; and

- childproof packaging.

In addition, the Deeming Regulations requires any Deemed Tobacco Product that was not commercially marketed as of the "grandfathering" date of February 15, 2007, to obtain premarket approval before it can be marketed in the United States. Premarket approval could take any of the following three pathways: (1) submission of a premarket tobacco product application ("PMTA") and receipt of a marketing authorization order; (2) submission of a substantial equivalence report and receipt of a substantial equivalence order; or (3) submission of a request for an exemption from substantial equivalence requirements and receipt of a substantial equivalence exemption determination. We cannot predict if any of the products in our product line, all of which would be considered "non-grandfathered", will receive the required premarket approval from the FDA if we were to undertake obtaining premarket approval through any of the available pathways.

Since there were virtually no e-liquid, e-cigarettes or other vaping products on the market as of February 15, 2007, there is limited ability to rely on the substantial equivalence or exemption pathways for many vapor products. As a result, many products would require a PMTA, which can be costly and time-consuming. Products marketed without required premarket authorization may be subject to regulatory enforcement actions, including warning letters, import detention, seizure, injunction, or removal from the U.S. market, any of which could materially adversely affect our business, results of operations and financial condition.

In a press release dated July 28, 2017, the FDA also stated that "the FDA plans to issue foundational rules to make the product review process more efficient, predictable, and transparent for manufacturers, while upholding the agency's public health mission. Among other things, the FDA intends to issue regulations outlining what information the agency expects to be included in PMTAs, Modified Risk Tobacco Product ("MRTP") applications and reports to demonstrate Substantial Equivalence ("SE"). The FDA also plans to finalize guidance on how it intends to review PMTAs for vapor products. The agency also will continue efforts to assist industry in complying with federal tobacco regulations through online information, meetings, webinars and guidance documents".

We have not filed any PMTAs. We have shifted our product strategy away from nicotine-containing vapor products and toward cannabis vape hardware products and lighters. In March 2022, Congress enacted legislation (effective April 14, 2022) that clarified FDA authority to regulate tobacco products containing nicotine from any source, including synthetic nicotine. Nicotine products, including products containing nicotine from non-tobacco sources, may be regulated by the FDA as tobacco products and may require premarket authorization to be lawfully marketed. If we were to market, distribute, or support nicotine products without required authorizations, we could be subject to regulatory enforcement, which could materially adversely affect our business, results of operations and financial condition.

In addition to federal regulation, state and local governments currently legislate and regulate tobacco products, including what is considered a tobacco product, how tobacco taxes are calculated and collected, to whom tobacco products can be sold and by whom, in addition to where tobacco products, specifically cigarettes may be smoked and where they may not. Certain municipalities have enacted local ordinances which preclude the use of e-liquid, e-cigarettes and other vaping products where traditional tobacco burning cigarettes cannot be used and certain states have proposed legislation that would categorize vaping products as tobacco products, equivalent to their tobacco burning counterparts. If these bills become laws, vaping products may lose their appeal as an alternative to traditional cigarettes, which may have the effect of reducing the demand for the products.

8

We may be required to discontinue, prohibit or suspend sales of our e-liquid products in states that require us to obtain a retail tobacco license. If we are unable to obtain certain licenses, approvals or permits and if we are not able to obtain the necessary licenses, approvals or permits for financial reasons or otherwise and/or any such license, approval or permit is determined to be overly burdensome to us, then we may be required to cease sales and distribution of our e-liquid products to those states, which would have a material adverse effect on our business, results of operations and financial condition.

As a result of FDA import alert 66-41 (which allows the detention of unapproved drugs promoted in the U.S.), U.S. Customs has from time to time temporarily and in some instances indefinitely detained certain products. If the FDA modifies the import alert from its current form which allows U.S. Customs discretion to release the products, to a mandatory and definitive hold, we may no longer be able to ensure a supply of raw materials or saleable product, which will have material adverse effect on our business, results of operations and financial condition.

The PACT Act was amended to apply to electronic nicotine delivery systems and related vapor products (as broadly defined under applicable law), and imposes registration, reporting, tax compliance, labeling, age verification, and delivery requirements on certain sellers, among other obligations. In addition, the U.S. Postal Service generally prohibits mailing covered vapor products directly to consumers, subject to limited exceptions (including certain business-to-business shipments) and compliance requirements. Compliance with these requirements and carrier policies may increase our costs, constrain distribution channels, and could materially adversely affect our business, results of operations and financial condition.

As noted above, the PACT Act now applies to e-cigarettes and other vapor products.

The tobacco industry expects significant regulatory developments to take place over the next few years, driven principally by the World Health Organization's Framework Convention on Tobacco Control ("FCTC"). The FCTC is the first international public health treaty on tobacco, and its objective is to establish a global agenda for tobacco regulation with the purpose of reducing initiation of tobacco use and encouraging cessation. Regulatory initiatives that have been proposed, introduced or enacted include:

- the levying of substantial and increasing tax and duty charges;

- restrictions or bans on advertising, marketing and sponsorship;

- the display of larger health warnings, graphic health warnings and other labeling requirements;

- restrictions on packaging design, including the use of colors and generic packaging;

- restrictions or bans on the display of tobacco product packaging at the point of sale, and restrictions or bans on cigarette vending machines;

- requirements regarding testing, disclosure and performance standards for tar, nicotine, carbon monoxide and other smoke constituents levels;

- requirements regarding testing, disclosure and use of tobacco product ingredients;

- increased restrictions on smoking in public and work places and, in some instances, in private places and outdoors;

- elimination of duty free allowances for travelers; and

- encouraging litigation against tobacco companies.

If e-liquid, e-cigarettes or other vaping products are subject to one or more significant regulatory initiatives enacted under the FCTC, our business, results of operations and financial condition could be materially and adversely affected.

9

*Canada*

E-cigarettes with or without nicotine are legal in Canada. In May 2018, Bill S-5: An Act to amend the Tobacco Act and Non-smokers' Health Act received Royal Assent established a new legislative framework to regulate the manufacturing, sale, labelling and promotions of vaping products in Canada. Sales of vaping products containing nicotine are permitted to adults 18 years of age and older. Vaping products containing cannabis are regulated under the Cannabis Act and its regulations. The Cannabis Act became law on October 17, 2018, and establishes the framework for controlling the production, sale and possession of cannabis across Canada. On October 17, 2019, cannabis extracts, including vaping products, became legal for sale in Canada. As with vaping products containing nicotine, the safety of cannabis vaping devices (such as the batteries) is regulated under the CCPSA.

*Company's Efforts to Mitigate Risks Associated with New and Evolving Regulation*

We are constantly seeking to stay in compliance with all existing and reasonably expected future regulations. Through our internal compliance team, market consultants and technicians and testing labs hopes to stay in accordance with all standards whether set forth in the New Tobacco Products Directive or the Deeming Regulations. Making sure that all e-liquid products meet and exceed the standards set forth by each market's regulatory body is our highest concern. Staying in compliance with all marketing and packaging directives is imperative to maintaining access to the markets. Although these processes are costly and time consuming, it is imperative for our success that these steps are taken and constantly kept up to date. Failure to comply in a timely fashion to any particular directive or regulation could have material adverse effects on the results of business operations.

**CBD Products**

Our CBD products are subject to various state and federal laws regarding the production and sales of hemp-based products. Section 12619 of the Agriculture Improvement Act of 2018 ("2018 Farm Bill") removed "hemp," as defined in the Agricultural Marketing Act of 1946 (the "1946 Agricultural Act"), from the classification of "marijuana," which is generally prohibited as a Schedule I drug under the CSA. Under the 1946 Agricultural Act (as amended by the 2018 Farm Bill), the term "hemp" means "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." As a result of the passage of the 2018 Farm Bill, and since we believe our CBD products contain parts of the cannabis plant with a THC concentration of not more than 0.3 percent on a dry weight basis, we believe that our CBD products are not governed by the CSA and, ergo, would not be subject to prosecution thereunder because we believe our CBD products contain "hemp" within the meaning of the 1946 Agricultural Act (as amended by the 2018 Farm Bill) and do not contain any "marijuana" as prohibited under the CSA (as amended by the 2018 Farm Bill); provided, however, there is a lack of legal protection for hemp-based products that contain more than 0.3 percent THC and there is a risk that we would be subject to prosecution under the CSA in the event that its CBD products are found to contain more than 0.3 percent THC.

Furthermore, the 1946 Agricultural Act (as amended by the 2018 Farm Bill) provides additional regulations regarding the production of hemp-based products and there is the risk that its CBD products may be found to be in violation of these regulations. Specifically, the 1946 Agricultural Act (as amended by the 2018 Farm Bill) contains provisions relating to the shared state-federal jurisdiction over hemp cultivation and production, whereby states and Indian tribes have been delegated the broad authority to regulate and limit the production and sale of hemp and hemp products within their borders. Under the 1946 Agricultural Act (as amended by the 2018 Farm Bill), a plan under which a State or Indian tribe monitors and regulates the production of hemp shall only be required to include "(i) a practice to maintain relevant information regarding land on which hemp is produced in the State or territory of the Indian tribe, including a legal description of the land, for a period of not less than three calendar years; (ii) a procedure for testing, using post-decarboxylation or other similarly reliable methods, delta-9 tetrahydrocannabinol concentration levels of hemp produced in the State or territory of the Indian tribe; (iii) a procedure for the effective disposal of—(I) plants, whether growing or not, that are produced in violation of this subtitle; and (II) products derived from those plants; (iv) a procedure to comply with enforcement procedures; (v) a procedure for conducting annual inspections of, at a minimum, a random sample of hemp producers to verify that hemp is not produced in violation of applicable law; (vi) a procedure for submitting the information, as applicable, to the Secretary of Agriculture (the "*Secretary*") not more than 30 days after the date on which the information is received; and (vii) a certification that the State or Indian tribe has the resources and personnel to carry out the practices and procedures described in clauses (i) through (vi)." Further, a hemp producer in a State or the territory of an Indian tribe for which a State or Tribal plan is approved shall be determined to have negligently violated the State or Tribal plan, including by negligently— "(i) failing to provide a legal description of land on which the producer produces hemp; (ii) failing to obtain a license or other required authorization from the State department of agriculture or Tribal government, as applicable; or (iii) producing Cannabis sativa L. with a delta-9 THC concentration of more than 0.3 percent on a dry weight basis." A hemp producer that negligently violates a State or Tribal plan three times in a five-year period shall be ineligible to produce hemp for a period of five years beginning on the date of the third violation. If the State department of agriculture or Tribal government in a State or the territory of an Indian tribe for which a State or Tribal plan, as applicable, determines that a hemp producer in the State or territory has violated the State or Tribal plan with a culpable mental state greater than negligence— "(i) the State department of agriculture or Tribal government, as applicable, shall immediately report the hemp producer to —(I) the Attorney General; and (II) the chief law enforcement officer of the State or Indian tribe, as applicable." In the case of a State or Indian tribe for which a State or Tribal plan is not approved, the production of hemp in that State or the territory of that Indian tribe shall be subject to a plan established by the Secretary to monitor and regulate that production. A plan established by the Secretary under shall include— "(A) a practice to maintain relevant information regarding land on which hemp is produced in the State or territory of the Indian tribe, including a legal description of the land, for a period of not less than three calendar years; (B) a procedure for testing, using post-decarboxylation or other similarly reliable methods, delta-9 tetrahydrocannabinol concentration levels of hemp produced in the State or territory of the Indian tribe; (C) a procedure for the effective disposal of—(i) plants, whether growing or not, that are produced in violation of applicable law; and (ii) products derived from those plants; (D) a procedure to comply with the enforcement procedures; (E) a procedure for conducting annual inspections of, at a minimum, a random sample of hemp producers to verify that hemp is not produced in violation of this subtitle; and (F) such other practices or procedures as the Secretary considers to be appropriate. The Secretary shall also establish a procedure to issue licenses to hemp producers. In the case of a State or Indian tribe for which a State or Tribal plan is not approved under applicable law, it shall be unlawful to produce hemp in that State or the territory of that Indian tribe without a license issued by the Secretary. A violation of a plan established by the Secretary shall be subject to enforcement and the Secretary shall report the production of hemp without a license issued by the Secretary to the Attorney General. In the event that our CBD products are found to be in violation of these regulations, we may become subject to enforcement action as provided for in the 1946 Agricultural Act (as amended by the 2018 Farm Bill) and may become subject to prosecution thereunder.

10

**Corporate History**

We were incorporated in New York on July 19, 2004, as Jobsinsite.com, Inc. On August 5, 2004, we changed our name to Jobsinsite, Inc. On June 18, 2009, we merged with a Delaware corporation and became Jobsinsite, Inc. On July 1, 2009, we filed Articles of Conversion with the Secretary of State of Delaware and became Soleil Capital L.P., a Delaware limited partnership. On September 2, 2015, we changed our name to VPR Brands, LP. We are managed by Soleil Capital Management LLC, a Delaware limited liability company (our "General Partner").

Under our Limited Partnership Agreement, as amended (the "partnership agreement"), we are authorized to issue an unlimited number of partnership interests for the consideration and on the terms and conditions determined by our General Partner, without the approval of the unitholders. We may also issue additional partnership interests that, as determined by our General Partner, may have rights to distributions or special voting rights to which the common units are not entitled. The common unitholders do not have preemptive rights under the partnership agreement to acquire additional common units or other partnership interests. As of the date hereof, 91,746,806 common units, no par value per unit, are issued and outstanding and no Class A preferred units, no par value per unit, are issued and outstanding.

Since our inception, we have generated nominal revenues through the sale of software items related to the job search industry and in 2009, management actively explored opportunities to manage private capital. Specifically, we had plans to sponsor and manage limited partnerships organized for the purpose of exploring opportunities to acquire securities in secondary transactions of venture backed businesses and dispensing capital to seed stage venture capital opportunities. As a result of our new business direction and in an effort to establish operations in the venture capital and private equity industry, we have reorganized the business and restructured as a public limited partnership. In 2013, management identified an opportunity to acquire a portfolio of electronic cigarette and personal vaporizers patents. In connection with this transaction our business objectives pivoted and we are now focusing our efforts on the electronic cigarette and personal vaporizer industry and is pursuing plans to commercialize and monetize its portfolio of electronic cigarette and personal vaporizer patents. Prior to our decision to design, develop and market electronic cigarette e-liquids sold under the Helium brand in March 2016, we had designed, developed and marketed electronic cigarettes sold under the RED brand.

On December 27, 2013, we entered into a patent acquisition agreement (the "Purchase Agreement") Guocheng "Greg" Pan, pursuant to which we agreed to purchase certain electronic cigarette and personal vaporizer patents owned and invented by Mr. Pan (the "Purchased Assets"). Under the terms of the Purchase Agreement and in consideration for the acquisition of the Purchased Assets, we issued to Mr. Pan (and certain of his designees) 10,501,700 common units representing limited partnership units and a warrant to purchase 2,000,000 common units representing limited partnership units. The warrants entitle Mr. Pan (or his designees) to purchase common units at $0.15 per common unit with an expiration date 10 years from the effective date of the Purchase Agreement.

The patents were originally valued based on number of units issued, warrants issued, valuation of the traded stock at the time of issuance and similar patents sold during the year. Based on these assumptions, we valued the assets purchased at approximately $5.5 million at the time of purchase. During the year ended December 31, 2014, we determined due to lack of sales and projected sales and completion in the industry the value of the patent should be significantly reduced. As a result, we wrote off the entire patent.

On May 29, 2015, we entered into a Share Purchase Agreement with Kevin Frija ("Frija Share Purchase Agreement") for a private placement ("Private Placement") of up to 50,000,000 common units representing limited partnership interests. The Private Placement was expected to occur in multiple tranches. For the first tranche, on June 4, 2015, we issued 10,000,000 common units to Mr. Frija at a purchase price of $0.01 per unit, resulting in gross proceeds of $100,000. In subsequent tranches, Mr. Frija had the right to buy an additional 40,000,000 common units at a purchase price of $0.01 per unit. We expected to receive gross proceeds of $400,000 in the aggregate upon the closing of the subsequent tranches of the Private Placement. No placement agent has participated in the Private Placement.

In connection with the Share Purchase Agreement, we named Mr. Frija Chief Executive Officer and Chairman of the Board of Directors and as a manager of our General Partner. Contemporaneous with Mr. Frija's appointments, the then current chief executive officer and chairman of the board of directors, Messrs. Jon Pan and Greg Pan, respectively, resigned from their respective positions. Notwithstanding, Mr. Greg Pan continued to be a member of the General Partner, which is member-managed. In consideration and as severance, for Jon Pan's resignation as chief executive officer, we and the General Partner have entered into that certain Share Purchase Agreement with Jon Pan wherein we agreed to grant Jon Pan the right to purchase 10,000,000 common units at a price of $0.01 per unit.

On September 2, 2015, in accordance with authority granted to the General Partner under the partnership agreement, the General Partner changed our name ("Name Change") from Soleil Capital L.P. to VPR Brands, LP by filing an amendment to our Certificate of Limited Partnership with the Delaware Secretary of State. Accordingly, on September 10, 2015, the General Partner also amended the partnership agreement to reflect the Name Change from Soleil Capital L.P. to VPR Brands, LP. On September 17, 2015, the Financial Industry Regulatory Authority (FINRA) approved the Name Change and our new trading symbol VPRB.

We, Soleil Capital Management LLC and Greg Pan entered into a Termination of Share Purchase Agreement on August 18, 2015, which terminated the Share Purchase Agreement, dated June 1, 2015, among the Company, Soleil Capital Management LLC and Greg Pan.

11

On December 9, 2015, Mr. Frija sold an aggregate of 9,000,000 of his common units at a sale price of $0.01 per unit (for an aggregate of $90,000) to Jacob Levy (1,000,000 units), Nissim Levy (1,000,000 units), Sara Morad (1,000,000 units), Yaron Edery (1,000,000 units), Barry Rub (2,000,000 units), Hannah Frija (2,000,000 units), and Ralph Frija (1,000,000 units).

On March 28, 2016, Mr. Frija exercised a right to buy 15,000,000 common units at a purchase price of $0.01 per unit, resulting in 15,000,000 common units issued to Mr. Frija in exchange for gross proceeds of $150,000, pursuant to the terms of the Frija Share Purchase Agreement, leaving a balance of 25,000,000 common units to purchase at $0.01 per unit under the right to buy under the Frija Share Purchase Agreement.

On May 23, 2016 ($20,000) and May 31, 2016 ($20,000) and June 16, 2016 ($10,000), pursuant to the terms of the Frija Share Purchase Agreement, Mr. Frija exercised a right to buy 5,000,000 common units at a purchase price of $0.01 per unit, resulting in 5,000,000 common units issued to Mr. Frija in exchange for total gross proceeds of $50,000, leaving a balance of 20,000,000 common units to purchase at $0.01 per unit (an aggregate purchase price of $200,000) under the right to buy under the Frija Share Purchase Agreement.

Effective March 2026, Mr. Greg Pan ceased to be a member of the General Partner. Accordingly, Mr. Frija, our Chief Executive Officer, is now the sole member of the General Partner.

***Asset Purchase Agreement with Vapor Corp.***

On July 29, 2016, we entered into an Asset Purchase Agreement (the "Purchase Agreement") between Vapor and Mr. Frija (the former Chief Executive Officer of Vapor), pursuant to which Vapor sold Vapor's wholesale operations and inventory related thereto (collectively, "Assets") to us. The Vapor acquisition and the line of business was accounted for using the purchase method.

***February 2019 Notes***

In February 2019, we issued five similar senior convertible promissory notes, each having a principal amount of $200,000 to each of (i) Brikor LLC (the "Brikor Note"); (ii) Mike Daiagi and Mathew Daiagi jointly (the "Daiagi and Daiagi Note"); (iii) Amber Investments LLC (the "Amber Investments Note"); (iv) K & S Pride Inc. (the "K & S Pride Note"); and (v) Surplus Depot Inc. (the "Surplus Depot Note" and collectively with the Brikor Note, Daiagi and Daiagi Note, Amber Investments Note, K & S Pride Note and Surplus Depot Note, the "February 2019 Notes"). The principal amount due under the February 2019 Notes bear interest at the rate of 18% per annum. The principal amount and accrued but unpaid interest (to the extent not converted in accordance with the terms of each of the February 2019 Notes) are due and payable on the third anniversary of the issue date. The February 2019 Notes and the amounts payable thereunder are unsecured obligations and are senior in right of payment and otherwise to all indebtedness, as provided in the February 2019 Notes, and each of them.

At any time after the first anniversary of the issue date, the holders may require us, upon at least 30 business days' written notice, to redeem all or any portion of the February 2019 Notes, and each of them. The portion of the February 2019 Notes subject to redemption will be redeemed in cash.

The February 2019 Notes are convertible into common units. Pursuant to the terms of the February 2019 Notes, the holders have the right, at their option, to convert any portion of the outstanding and unpaid Conversion Amount (as hereinafter defined) into common units in accordance with the provisions of the February 2019 Notes at the Conversion Rate (as hereinafter defined). The number of common units issuable upon conversion of any Conversion Amount will be determined by dividing (x) such Conversion Amount by (y) $0.10 (subject to adjustment as set forth in the February 2019 Notes) (such result, the "Conversion Rate"). "Conversion Amount" means the sum of (A) the portion of the principal balance of the February 2019 Notes to be converted with respect to which the determination is being made, (B) accrued and unpaid interest with respect to such principal balance, if any, and (C) the Default Balance (other than any amount thereof within the purview of foregoing clauses (A) or (B)), if any.

12

*Frija Notes*

From time to time we have received funds from Mr. Frija, our Chief Executive Officer, President, principal financial officer, principal accounting officer, member of our General Partner, and significant unitholder, in exchange for promissory notes (the "Frija Notes"). All of the Frija Notes were unsecured, bore an interest rate of 24% per annum, were due on the one year anniversary of the date of the respective Frija Note, and permitted Mr. Frija to deduct one ACH payment from our bank account in the amount of $500 per business day until the principal amount due and accrued interest was repaid on each of the Frija Notes. Information regarding certain of the Frija Notes is included below.

In April 2022, the Company received $100,001 pursuant to a promissory note in the principal amount of $100,001 (the "April 2022 Frija Note") to Mr. Frija. The balance of the April 2022 Frija Note ($50,809) was repaid during the year ended December 31, 2024.

In May 2022, the Company received $52,000 and in September 2022 received $48,001 of advances pursuant to a promissory note in the principal amount of $100,001 (the "May 2022 Frija Note") to Mr. Frija. The balance of the May 2022 Frija Note ($100,001) was repaid during the year ended December 31, 2024.

In September 2022, the Company received $1,000 and in October 2022 received $14,000 of advances pursuant to a promissory note in the principal amount of $100,001 (the "September 2022 Note") to Mr. Frija. The balance of the September 2022 Note ($15,000) was repaid during the year ended December 31, 2024.

For the twelve months ended December 31, 2025, and 2024, the Company incurred interest expense of $0 and $2,504, respectively.

During the year ended December 31, 2024, the Company repaid all outstanding notes totaling $165,810, resulting in a $0 balance as of December 31, 2025 and December 31, 2024, respectively.

**Employees**

As of December 31, 2025, we had 10 employees. None of our employees is represented by a union. We consider our relations with our employees to be good.

**Legal Proceedings**

From time to time, we are involved in various claims and legal actions arising in the ordinary course of business. Other than the matters described below under "Recent Developments," there are no legal proceedings currently pending against us which we believe would have a material effect on our business, financial position or results of operations and, to the best of our knowledge, there are no such material legal proceedings contemplated or threatened.

**Recent Developments**

On November 2025, the Company entered into a Settlement Agreement and Mutual Release with Flumgio Technology Inc ("Flumgio") regarding Patent infringement of Company branded products. Pursuant to the terms of the Flumgio Agreement, Flumgio agreed to pay the Company $50,000, to be recognized as settlement income. Subject to full receipt of the Settlement Sum, VPR will grant Licensee, for past use and a non-exclusive and non-assignable license to the '622 Patent to allow Licensee to continue make, use, sell, offer for sale, import, export, supply, lease, distribute, purchase, perform, provide, display, transmit, or otherwise practice the '622 patent, with respect to manufacturing, marketing, and selling its devices. The Company received $50,000 pursuant to the Flumgio Agreement.

Ferrara Candy Company

On November 2025, the Company entered into a Settlement Agreement and Release with Ferrara Candy Company ("Ferrara") related to a trademark matter involving the Company's trademark application (Serial No. 98/575,935). Pursuant to the settlement, VPR agreed to file a request for express abandonment of the application, and Ferrara agreed to pay the Company $1,000 following receipt of confirmation of the abandonment and any related surrenders described in the agreement. The Company received $1,000 pursuant to the Ferrara Agreement.

13

*All Rise Settlement*

On May 29, 2025, the Company entered into a Settlement Agreement and Release (the "All Rise Agreement") with All Rise Records Inc. ("All Rise") regarding Patent infringements of Company branded products. Pursuant to the terms of the All Rise Agreement, All Rise agreed to pay the Company $30,000, to be recognized as settlement income when received. All Rise agreed to pay the $30,000 settlement amount in monthly installments of $5,000 beginning on June 1, 2025. In addition to the $30,000 settlement payment, All Rise agreed to pay the Company a royalty of $0.05 per unit of the All Rise e-cigarette devices sold by All Rise from June 1, 2025 through the life of the Patent (expires on July 16, 2030). All Rise also agreed to pay the Company a royalty of $0.12 per unit of the All Rise inverter torch lighters sold by All Rise from June 1, 2025 through the life of U.S. patent 11.913.644 (expires on February 27, 2044). As of December 31, 2025, the Company had received $30,000 pursuant to the All Rise Agreement.

*Ashh Settlement*

On May 5, 2025, the Company entered into a Settlement Agreement and Release (the "Ashh Agreement") with Ashh, Inc. ("Ashh") regarding trademark and patent infringements of Company branded products. Pursuant to the terms of the Ashh Agreement, Ashh agreed to pay the Company $50,000. The Company received the $50,000 cash payment, which was recognized as settlement income, in May 2025. In addition to the settlement payment, once all of the product covered by the current inventory licensed has been sold, Ashh agreed to pay the Company a royalty of $0.03 per unit of the licensed devices sold by Ashh until the earlier of the life of the Patent (expires on July 16, 2030) or the invalidity or unenforceability of the Patent.

*Zaydan Settlement*

On March 27, 2025, the Company entered into a Settlement Agreement and Release (the "Zaydan Agreement") with Zaydan Innovations, Inc. ("Zaydan") regarding Patent infringements of Company branded products. Pursuant to the terms of the Zaydan Agreement, Zaydan agreed to pay the Company $7,500. The Company received the $7,500 cash payment, which was recognized as settlement income, in April 2025.

*Pop Vapor Settlement*

On February 17, 2025, the Company entered into a Settlement Agreement and Release (the "Pop Vapor Agreement") with Pop Vapor Co, LLC ("Pop Vapor") regarding Patent (United States Patent No. 8,205,622) infringements of Company branded products. Pursuant to the terms of the Pop Vapor Agreement, Pop Vapor agreed to pay the Company $30,000. The Company received the $30,000 cash payment, which was recognized as settlement income, in April 2025. In addition to the settlement payment, Pop Vapor agreed to pay the Company a royalty of $0.05 per unit of the POP Hit brand devices sold by Pop Vapor from April 1, 2024 until the earlier of the life of the Patent (expires on July 16, 2030) or the invalidity or unenforceability of the Patent. As of December 31, 2025, the Company has received a total of $39,640 pursuant to the Pop Vapor Agreement.

14

*Daze Settlement*

In December 2024, we entered into a Settlement Agreement & Release (the "Daze Agreement") with 7 Daze LLC ("Daze"). The Daze Agreement was entered into in the ordinary course of business, following our assertion of patent infringement of the Patent by Daze's autodraw electronic cigarettes, including those marketed under the Ohmlet and Egge brand names, and any other auto-draw electronic cigarette marketed and/or sold by Daze (the "Daze Dispute").

Pursuant to the terms of the Daze Agreement, the parties agreed to settle the Daze Dispute, and we granted to Daze and its parents, subsidiaries and related companies a fully paid-up, royalty free, non-exclusive license to practice the invention in the Patent and all related patents and applications in the United States and worldwide, for the full term of the Patent and all related patents and applications including, without limitation, without limitation, the rights to make, have made, use, import, license, offer to sell, and sell the invention in the Patent and all related patents and applications. The License also serves as a covenant not to sue Daze in connection with Daze and its parents', subsidiaries' and related companies' manufacturing, use, distribution, or sale of any products for infringement of the invention in the Patent and all related patents and applications.

Pursuant to the terms of the Daze Agreement, Daze agreed to pay us the sum of $100,000 according to the following payment schedule:

i.  $25,000 on or before December 20, 2024; and

ii.  Six monthly payments of $12,500, due on the first day of each consecutive month beginning on February 1, 2025 and ending with the sixth and final payment due July 1, 2025.

As of December 31, 2025, the Company has received all of the amounts due under the Daze Agreement.

During the twelve months ended December 31, 2025 and 2024, the Company received cash payments pursuant to the above settlements totaling $41,625 and $1,675,492, respectively, net of settlement legal fees. These amounts are included in net settlement income in the accompanying unaudited condensed statements of operations.

Effective in March 2026, Mr. Greg Pan ceased to be a member of the General Partner. Accordingly, Mr. Frija, our Chief Executive Officer, is now the sole member of the General Partner.

**Item 1A. Risk Factors**

*Various portions of this Annual Report on Form 10-K contain forward-looking statements that involve risks and uncertainties. Actual results, performance or achievements could differ materially from those anticipated in these forward-looking statements as a result of certain risk factors, including those set forth below and elsewhere in this report. These risk factors are not presented in the order of importance or probability of occurrence. For purposes of these risk factors, the term "electronic cigarettes" is deemed to include "vaporizers."*

Below is a summary of material risks, uncertainties and other factors that could have a material effect on our business and our operations:

●  We have a history of operating losses and our auditors have indicated that there is a substantial doubt about our ability to continue as a going concern.

●  We are affected by extensive laws, governmental regulations, administrative determinations, court decisions and similar other constraints, which can make compliance costly and subject us to enforcement actions by governmental agencies.

●  We face intense competition and our failure to compete effectively could have a material adverse effect on our business, results of operations and financial condition.

●  We may be unable to promote and maintain our brands.

●  We expect that new products and/or brands we develop will expose us to risks that may be difficult to identify until such products and/or brands are commercially available.

●  If we are unable to manage our anticipated future growth, our business and results of operations could suffer materially.

15

- We are subject to significant product liability litigation.

- Sales of conventional tobacco cigarettes have been declining, which could have a material adverse effect on our business.

- Our patents and our ability to enforce them.

- We may not be able to adequately protect our intellectual property rights in China or elsewhere, which could harm our business and competitive position.

- Third parties may claim that we infringe their intellectual property and trademark rights.

- Adverse publicity associated with our products or ingredients, or those of similar companies, could adversely affect our sales and revenue.

- We rely on our CEO and may experience difficulty in attracting and hiring qualified new personnel in some areas of our business.

- We may not be successful in maintaining the consumer brand recognition and loyalty of our products.

- We are subject to significant product liability litigation.

- If we are the subject of future product defect or liability suits, our business will likely fail.

- If we experience product recalls, we may incur significant and unexpected costs and our business reputation could be adversely affected.

- Product exchanges, returns and warranty claims may adversely affect our business.

- Adverse economic conditions may adversely affect the demand for our products.

- We rely, significantly, on the efforts of third party agents to generate sales of our products.

- We may not be able to establish sustainable relationships with large retailers or national chains.

- We may not be able to adapt to trends in our industry.

- We depend on third party manufacturers for our products.

- We rely on Chinese manufacturers to produce our products.

- Changes in U.S. and foreign government administrative policy, including the imposition of or increases in tariffs and changes to existing trade agreements, could have a material adverse effect on us.

- We may face competition from foreign importers who do not comply with government regulation.

- Our results of operations could be adversely affected by currency exchange rates and currency devaluations.

- We depend on our General Partner.

- Rights of limited partners are significantly different than rights of shareholders of a corporation.

16

- Our General Partner is solely responsible for our operations.

- Our ability to retain our management is critical to our success and our ability to grow depends on our ability to attract additional key personnel.

- The control of our General Partner may be transferred to a third party without common unitholder consent.

- We have hired and will need to hire additional qualified accounting and administrative personnel in order to remediate material weaknesses in our internal control over financial accounting, and we will need to expend additional resources and efforts to establish and maintain the effectiveness of our internal control over financial reporting and our disclosure controls and procedures.

- We are required to comply with certain provisions of Section 404 of the Sarbanes-Oxley Act of 2002, as amended, and if we fail to continue to comply, our business could be harmed, and the price of our securities could decline.

- We are subject to cyber-security risks, including those related to customer, employee, vendor or other company data and including in connection with integration of acquired businesses and operations.

- The business that we conduct outside the U.S. may be adversely affected by international risk and uncertainties.

- Our CBD and hemp-derived product lines face an existential risk due to evolving federal regulation.

- Many of our products contain nicotine, which is considered to be a highly addictive substance.

- There is significant regulatory burden and enforcement risk related to federal oversight of our electronic nicotine and vapor products.

- Bans and heightened regulatory standards for flavored e-cigarettes directly limit our market access and may have a material adverse impact on our business.

- The market for electronic cigarettes and vapor products is a niche market, subject to a great deal of uncertainty and is still evolving.

- The long-term health effects of electronic cigarettes and vaping products are not yet fully known, and any conclusive evidence of harm could materially harm our business.

- Changes in federal and state law, particularly the November 2026 "Total THC" standard, could cause our hemp-derived products to be classified as illegal controlled substances.

- Our supply of hemp-derived cannabinoids and the market for our hardware depend on complex state and federal laws, which face an existential shift in late 2026.

- Our business, results of operations and financial condition could be adversely affected by increasing excise taxes and the complex requirements to collect and remit sales and excise taxes.

- We may have a difficult time obtaining the various insurances that are desired to operate our business in the CBD industry, which may expose us to additional risk and financial liability.

- Trading on the OTC Markets is volatile and sporadic, which could depress the market price of our common units.

- Our stock price is likely to be highly volatile because of several factors, including a limited public float.

- Our common units are a "penny stock" under SEC rules. It may be more difficult to resell securities classified as "penny stock."

- Our management controls a substantial number of our common units, decreasing your influence on unitholder decisions.

- Units eligible for future sale may adversely affect the market.

- Provisions of our partnership agreement may delay or prevent a takeover which may not be in the best interests of our unitholders.

- We do not expect to pay dividends in the foreseeable future.

17

### RISKS RELATED TO OUR BUSINESS

*We are affected by extensive laws, governmental regulations, administrative determinations, court decisions and similar other constraints, which can make compliance costly and subject us to enforcement actions by governmental agencies.*

The formulation, manufacturing, packaging, labeling, holding, storage, distribution, advertising and sale of our products are affected by extensive laws, governmental regulations and policies, administrative determinations, court decisions and similar constraints at the federal, state and local levels, both within the United States and in any country where we conduct business. There can be no assurance that we, or our independent distributors, will be in compliance with all of these regulations. A failure by us or our distributors to comply with these laws and regulations could lead to governmental investigations, civil and criminal prosecutions, administrative hearings and court proceedings, civil and criminal penalties, injunctions against product sales or advertising, civil and criminal liability for us and/or our principals, bad publicity, and tort claims arising out of governmental or judicial findings of fact or conclusions of law adverse to us or our principals. In addition, the adoption of new regulations and policies or changes in the interpretations of existing regulations and policies may result in significant new compliance costs or discontinuation of product sales, and may adversely affect the marketing of our products, resulting in decreases in revenue.

*We face intense competition and our failure to compete effectively could have a material adverse effect on our business, results of operations and financial condition.*

Competition in the electronic cigarette and related e-liquids industry is intense. We compete with other sellers of electronic cigarettes, most notably Lorillard, Inc., Altria Group, Inc. and Reynolds American Inc., big tobacco companies, through their electronic cigarettes business segments; the nature of our competitors is varied as the market is highly fragmented and the barriers to entry into the business are low.

We compete primarily on the basis of product quality, brand recognition, brand loyalty, service, marketing, advertising and price. We are subject to highly competitive conditions in all aspects of our business. The competitive environment and our competitive position can be significantly influenced by weak economic conditions, erosion of consumer confidence, competitors' introduction of low-priced products or innovative products, cigarette excise taxes, higher absolute prices and larger gaps between price categories, and product regulation that diminishes the ability to differentiate tobacco products.

Our principal competitors are "big tobacco", U.S. cigarette manufacturers of both conventional tobacco cigarettes and electronic cigarettes like Altria Group, Inc., Lorillard, Inc. and Reynolds American Inc. We compete against "big tobacco" who offers not only conventional tobacco cigarettes and electronic cigarettes but also smokeless tobacco products such as "snus" (a form of moist ground smokeless tobacco that is usually sold in sachet form that resembles small tea bags), chewing tobacco and snuff. Furthermore, we believe that "big tobacco" will devote more attention and resources to developing and offering electronic cigarettes as the market for electronic cigarettes grows. Because of their well-established sales and distribution channels, marketing expertise and significant resources, "big tobacco" is better positioned than small competitors like us to capture a larger share of the electronic cigarette market. We also compete against numerous other smaller manufacturers or importers of cigarettes. There can be no assurance that we will be able to compete successfully against any of our competitors, some of whom have far greater resources, capital, experience, market penetration, sales and distribution channels than us. If our major competitors were, for example, to significantly increase the level of price discounts offered to consumers, we could respond by offering price discounts, which could have a materially adverse effect on our business, results of operations and financial condition.

*We may be unable to promote and maintain our brands.*

We believe that establishing and maintaining our brand is a critical aspect of attracting and expanding a large customer base. Promotion and enhancement of our brands will depend largely on our success in continuing to provide high quality products. If our customers and end users do not perceive our products to be of high quality, or if we introduce new products or enter into new business ventures that are not favorably received by our customers and end users, we will risk diluting our brand identities and decreasing their attractiveness to existing and potential customers.

18

Moreover, in order to attract and retain customers and to promote and maintain our brand equity in response to competitive pressures, we may have to increase substantially our financial commitment to creating and maintaining a distinct brand loyalty among our customers. If we incur significant expenses in an attempt to promote and maintain our brands, our business, results of operations and financial condition could be adversely affected.

*We expect that new products and/or brands we develop will expose us to risks that may be difficult to identify until such products and/or brands are commercially available.*

We are currently developing, and in the future will continue to develop, new products and brands, the risks of which will be difficult to ascertain until these products and/or brands are commercially available. For example, we are developing new formulations, packaging and distribution channels. Any negative events or results that may arise as we develop new products or brands may adversely affect our business, financial condition and results of operations.

*If we are unable to manage our anticipated future growth, our business and results of operations could suffer materially.*

Our operating results depend to a large extent on our ability to successfully manage our anticipated growth. To manage our anticipated growth, we believe we must effectively, among other things:

- hire, train and manage additional employees;
- expand our marketing and distribution capabilities;
- increase our product development activities
- add additional qualified finance and accounting personnel; and
- implement and improve our administrative, financial and operational systems, procedures and controls.

If we are unable to manage our growth effectively, we may not be able to take advantage of market opportunities or develop new products, and we may fail to satisfy product requirements, maintain product quality, execute our business plan or respond to competitive pressures, any of which could have a material adverse effect on our business, results of operations and financial condition.

*We are subject to significant product liability litigation.*

The tobacco industry has experienced, and continues to experience, significant product liability litigation. Most tobacco liability lawsuits have been brought against manufacturers and sellers of cigarettes by individual plaintiffs, often participating on a class-action basis, for injuries allegedly caused by cigarette smoking or by exposure to cigarette smoke. However, several lawsuits have also been brought against manufacturers and sellers of smokeless products for injuries to health allegedly caused by use of smokeless products. In addition to the risks to our business, results of operations and financial condition resulting from adverse results in any such action, ongoing litigation may divert management's attention and resources, which could have an impact on our business and operations. We cannot predict with certainty the outcome of these claims and there can be no assurance that we will not sustain losses in connection with such lawsuits and that such losses will not have a material adverse effect on our business, results of operations and financial condition.

As a result of their relative novelty, electronic cigarette and vaporizer product manufacturers and sellers have only recently become subject to litigation. We may see increasing litigation over e-products or the regulation of our products, as the regulatory regimes surrounding these products develop.

As a result, we may face substantial costs due to increased product liability litigation relating to new regulations or other potential defects associated with e-products we sell, which could have a material adverse effect on our business, results of operations and financial condition.

19

*Sales of conventional tobacco cigarettes have been declining, which could have a material adverse effect on our business.*

The overall U.S. market for conventional tobacco cigarettes has generally been declining in terms of volume of sales, as a result of restrictions on advertising and promotions, funding of smoking prevention campaigns, increases in regulation and excise taxes, a decline in the social acceptability of smoking, and other factors, and such sales are expected to continue to decline. While the sales of electronic cigarettes have been increasing over the last several years, the electronic cigarette market is only developing and is a fraction of the size of the conventional tobacco cigarette market. A continual decline in cigarette sales may adversely affect the growth of the electronic cigarette market, which could have a material adverse effect on our business, results of operations and financial condition.

*Our patents and our ability to enforce them.*

We have a portfolio of issued U.S., Chinese and international patents, however we cannot provide any assurances that our patents will not be challenged and if challenged, will be upheld and deemed valid. Furthermore our efforts to enforce our patent may be costly and there can be no assurances that should we seek to prosecute and enforce our patents, that we will be victorious and even if we are victorious, we cannot provide assurances that our efforts would result in damages, licensing fees or removing the infringing products from the market. Moreover, if we are not able to retain counsel on a contingency basis, we may be unable to pursue prosecution of the infringers of our patents.

*We may not be able to adequately protect our intellectual property rights in China or elsewhere, which could harm our business and competitive position.*

We believe that patents, trademarks, trade secrets and other intellectual property we use and are developing are important to sustaining and growing our business. We utilize third party manufacturers to manufacture our products in China, where the validity, enforceability and scope of protection available under intellectual property laws are uncertain and still evolving. Implementation and enforcement of Chinese intellectual property-related laws have historically been deficient, ineffective and hampered by corruption and local protectionism. Accordingly, we may not be able to adequately protect our intellectual property in China, which could have a material adverse effect on our business, results of operations and financial condition. Furthermore, policing unauthorized use of our intellectual property in China and elsewhere is difficult and expensive, and we may need to resort to litigation to enforce or defend our intellectual property or to determine the enforceability, scope and validity of our proprietary rights or those of others. Such litigation and an adverse determination in any such litigation, if any, could result in substantial costs and diversion of resources and management attention, which could harm our business and competitive position.

*Third parties may claim that we infringe their intellectual property and trademark rights.*

Competitors in our markets may claim that we infringe their proprietary rights. Such claims, whether or not meritorious, may result in the expenditure of significant financial and managerial resources, injunctions against us or the payment of damages.

*Adverse publicity associated with our products or ingredients, or those of similar companies, could adversely affect our sales and revenue.*

Adverse publicity concerning any actual or purported failure by us to comply with applicable laws and regulations regarding any aspect of our business could have an adverse effect on our public perception. This, in turn, could negatively affect our ability to obtain financing, endorsers and attract distributors or retailers for our products, which would have a material adverse effect on our ability to generate sales and revenue.

Our distributors' and customers' perception of the safety and quality of our products or even similar products distributed by others can be significantly influenced by national media attention, publicized scientific research or findings, product liability claims and other publicity concerning our products or similar products distributed by others. Adverse publicity, whether or not accurate, that associates consumption of our products or any similar products with illness or other adverse effects, will likely diminish the public's perception of our products. Claims that any products are ineffective, inappropriately labeled or have inaccurate instructions as to their use, could have a material adverse effect on the market demand for our products, including reducing our sales and revenue.

20

4/7/26, 7:56 AM
Case 1:26-cv-00459-GBW    Document 1-6    Filed 04/21/26    Page 25 of 84 PageID #: 60
sec.gov/Archives/edgar/data/1376231/000121390026037425/ea0283694-10k_vprbrands.htm

*We rely on our CEO and may experience difficulty in attracting and hiring qualified new personnel in some areas of our business.*

The loss of our CEO or any of our key employees could adversely affect our business. As a member of the tobacco industry, we may experience difficulty in identifying and hiring qualified executives and other personnel in some areas of our business. This difficulty is primarily attributable to the health and social issues associated with the tobacco industry. The loss of services of any key employees or our inability to attract, hire and retain personnel with requisite skills could restrict our ability to develop new products, enhance existing products in a timely manner, sell products or manage our business effectively. We do not carry any "key man" insurance that would provide us with proceeds in the event of the death or disability of Mr. Frija, our President, Chief Executive Officer, principal financial officer and principal accounting officer, and the sole member of our General Partner. These factors could have a material adverse effect on our business, results of operations and financial condition.

*We may not be successful in maintaining the consumer brand recognition and loyalty of our products.*

We compete in a market that relies on innovation and the ability to react to evolving consumer preferences. The smoke accessories industry in particular is subject to changing consumer trends, demands and preferences. Therefore, products once favored may over time become disfavored by consumers or no longer perceived as the best option. Consumers in the market have demonstrated a high degree of brand loyalty, but producers must continue to adapt their products in order to maintain their status among these customers as the market evolves. Trends within the industry change often and our failure to anticipate, identify or react to changes in these trends could, among other things, lead to reduced demand for our products. Factors that may affect consumer perception of our products include health trends and attention to health concerns associated with vaping, price-sensitivity in the presence of competitors' products or substitute products and trends in favor of new products that are currently being researched and produced by participants in our industry.

*We are subject to significant product liability litigation.*

The tobacco industry has experienced, and continues to experience, significant product liability litigation. Most tobacco liability lawsuits have been brought against manufacturers and sellers of cigarettes by individual plaintiffs, often participating on a class-action basis, for injuries allegedly caused by cigarette smoking or by exposure to cigarette smoke. However, several lawsuits have also been brought against manufacturers and sellers of smokeless products for injuries to health allegedly caused by use of smokeless products. In addition to the risks to our business, results of operations and financial condition resulting from adverse results in any such action, ongoing litigation may divert management's attention and resources, which could have an impact on our business and operations. We cannot predict with certainty the outcome of these claims and there can be no assurance that we will not sustain losses in connection with such lawsuits and that such losses will not have a material adverse effect on our business, results of operations and financial condition.

As a result of their relative novelty, electronic cigarette and vaporizer product manufacturers and sellers have only recently become subject to litigation. We may see increasing litigation over e-products or the regulation of our products, as the regulatory regimes surrounding these products develop.

As a result, we may face substantial costs due to increased product liability litigation relating to new regulations or other potential defects associated with e-products we sell, which could have a material adverse effect on our business, results of operations and financial condition.

*If we are the subject of future product defect or liability suits, our business will likely fail.*

In the course of our planned operations, we may become subject to legal actions based on a claim that our products are defective in workmanship or have caused personal or other injuries. We currently maintain liability insurance, but such coverage may not be adequate to cover all potential claims. Moreover, even if we are able to maintain sufficient insurance coverage in the future, any successful claim could significantly harm our business, financial condition and results of operations.

*If we experience product recalls, we may incur significant and unexpected costs and our business reputation could be adversely affected.*

We may be exposed to product recalls and adverse public relations if our products are alleged to cause illness or injury, or if we are alleged to have violated governmental regulations. A product recall could result in substantial and unexpected expenditures that could exceed our product recall insurance coverage limits and harm to our reputation, which could have a material adverse effect on our business, results of operations and financial condition. In addition, a product recall may require significant management time and attention and may adversely impact on the value of our brands. Product recalls may lead to greater scrutiny by federal or state regulatory agencies and increased litigation, which could have a material adverse effect on our business, results of operations and financial condition.

*Product exchanges, returns and warranty claims may adversely affect our business.*

If we are unable to maintain an acceptable degree of quality control of our products we will incur costs associated with the exchange and return of our products as well as servicing our customers for warranty claims. Any of the foregoing on a significant scale may have a material adverse effect on our business, results of operations and financial condition.

21

*Adverse economic conditions may adversely affect the demand for our products.*

Electronic cigarettes and vapor products are new to the market and may be regarded by users as a novelty item and expendable as such demand for our products may be extra sensitive to economic conditions. When economic conditions are prosperous, discretionary spending typically increases; conversely, when economic conditions are unfavorable, discretionary spending often declines. Any significant decline in economic conditions that affects consumer spending could have a material adverse effect on our business, results of operations and financial condition.

*We rely significantly on the efforts of third party agents to generate sales of our products.*

We rely significantly on the efforts of independent distributors to purchase and distribute our products to wholesalers and retailers. No single distributor currently accounts for a material percentage of our sales and we believe that should any of these relationships terminate we would be able to find suitable replacements and do so on a timely basis. However, any loss of distributors or our ability to timely replace any given distributor could have a material adverse effect on our business, financial condition and results of operations.

We rely, in part, on the efforts of independent salespersons who sell our products to distributors and major retailers and Internet sales affiliates to generate sales of products. No single independent salesperson or Internet affiliate currently accounts for a material percentage of our sales and we believe that should any of these relationships terminate we would be able to find suitable replacements and do so on a timely basis. However, any loss of independent sales persons or Internet sales affiliates or our ability to timely replace any one of them could have a material adverse effect on our business, financial condition and results of operations.

*We may not be able to establish sustainable relationships with large retailers or national chains.*

We believe the best way to develop brand and product recognition and increase sales volume is to establish relationships with large retailers and national chains. We currently do not have any established relationships with large retailers and or national chains and we cannot provide any assurances that we will be successful in our efforts to establish such relationships and or if we would be able to pay the costs associated with establishing such national accounts. Our inability to develop and sustain relationships with large retailers and national chains will impede our ability to develop brand and product recognition and increase sales volume and, ultimately, require us to pursue and rely on local and more fragmented sales channels, which will have a material adverse effect on our business, results of operations and financial condition.

*We may not be able to adapt to trends in our industry.*

We may not be able to adapt as the electronic cigarette industry and customer demand evolves, whether attributable to regulatory constraints or requirements, a lack of financial resources or our failure to respond in a timely and/or effective manner to new technologies, customer preferences, changing market conditions or new developments in our industry. Any of the failures to adapt for the reasons cited herein or otherwise could make our products obsolete and would have a material adverse effect on our business, financial condition and results of operations.

*We depend on third party manufacturers for our products.*

We depend on third party manufacturers for our electronic cigarettes, vaporizers and accessories. Our customers associate certain characteristics of our products including the weight, feel, draw, unique flavor, packaging and other attributes of our products to the brands we market, distribute and sell. Any interruption in supply and/or consistency of our products may adversely impact our ability to deliver our products to our wholesalers, distributors and customers and otherwise harm our relationships and reputation with customers, and have a materially adverse effect on our business, results of operations and financial condition.

Although we believe that several alternative sources for the components, chemical constituents and manufacturing services necessary for the production of our products are available, any failure to obtain any of the foregoing would have a material adverse effect on our business, results of operations and financial condition.

22

*We rely on Chinese manufacturers to produce our products.*

Our manufacturers are based in China. Certain Chinese factories and the products they export have been the source of safety concerns and recalls, which is generally attributed to lax regulatory, quality control and safety standards. Should Chinese factories continue to draw public criticism for exporting unsafe products, whether those products relate to our products or not we may be adversely affected by the stigma associated with Chinese production, which could have a material adverse effect on our business, results of operations and financial condition.

*Changes in U.S. and foreign government administrative policy, including the imposition of or increases in tariffs and changes to existing trade agreements, could have a material adverse effect on us.*

As a result of changes to U.S. and foreign government administrative policy, there may be changes to existing trade agreements, greater restrictions on free trade generally, the imposition of or significant increases in tariffs on goods imported into the U.S., including tariffs on products manufactured in China, Canada, or Mexico, and adverse responses by foreign governments to U.S. trade policies, among other possible changes. The U.S. administration has implemented or increased tariffs, and it remains unclear what the U.S. administration or foreign governments will or will not do with respect to tariffs or trade agreements and policies. A trade war, other governmental action related to tariffs or trade agreements, changes in U.S. social, political, regulatory and economic conditions or in laws and policies governing foreign trade, manufacturing, development and investment in the territories and countries where we currently develop and sell products, and any resulting negative sentiments toward the U.S. as a result of such changes, could have a material adverse effect on our business, financial condition, results of operations and financial condition.

*We may face competition from foreign importers who do not comply with government regulation.*

We may face competition from foreign sellers of electronic cigarettes that may illegally ship their products into the United States for direct delivery to customers. These market participants will not have the added cost and expense of complying with U.S. regulations and taxes and as a result will be able to offer their product at a more competitive price than us and potentially capture market share. Moreover, should we be unable to sell certain of our products during any regulatory approval process we have no assurances that we will be able to recapture those customers that we lost to our foreign domiciled competitors during any "blackout" periods, during which we are not permitted to sell our products. This competitive disadvantage may have a material adverse effect on our business, results of operations and our financial condition.

*Our results of operations could be adversely affected by currency exchange rates and currency devaluations.*

Our functional currency is the U.S. dollar; substantially all of our purchases and sales are currently generated in U.S. dollars. However, our manufacturers and suppliers are located in China. Fluctuations in exchange rates between our respective currencies could result in higher production and supply costs to us which would have a material adverse effect on our results of operations if we are not willing or able to pass those costs on to our customers.

*We depend on our General Partner.*

Our performance is directly correlated to the performance of our General Partner, which is managed by its sole member, Mr. Frija.

*Rights of limited partners are significantly different than rights of shareholders of a corporation.*

We are organized as a limited partnership. Members of limited partnerships, also known as limited partners, have different rights than shareholders of a corporation. Due to our structure as a limited partnership, your rights as a stakeholder are governed by our partnership agreement. For example, unlike a corporation for which stockholders are able to elect members of its board of directors, we do not have a board of directors. We are managed by our General Partner and our General Partner is managed by its sole member, Mr. Frija. Our General Partner has limited call rights to our securities; please read carefully our partnership agreement, which governs the relationship between us and our unitholders.

*Our General Partner, Soleil Capital Management LLC, is solely responsible for our operations.*

We are managed by our General Partner. Our General Partner does not have an operating agreement. Pursuant to Delaware law, in the absence of an operating agreement, our General Partner is managed by its members. Kevin Frija, who is our Chief Executive Officer, President, principal financial officer, principal accounting officer and a significant unitholder, is the sole member of our General Partner. Through the General Partner, Mr. Frija and Pan manages all of our operations and activities. Our common unitholders do not elect our General Partner or its members and, unlike the holders of common stock in a corporation, will have only limited voting rights on matters affecting our business and therefore limited ability to influence decisions regarding our business. Furthermore, if our common unitholders are dissatisfied with the performance of our General Partner, they will have little ability to remove our General Partner.

23

*Our ability to retain our management is critical to our success and our ability to grow depends on our ability to attract additional key personnel.*

Our success depends on our ability to attract and retain managers, executive officers and qualified personnel. We anticipate that it will be necessary for us to attract and retain key personnel in order to develop our business and pursue our growth strategy. The market for qualified managers is extremely competitive and as such our inability to attract and retain key personnel would adversely affect in the short term, our continuity of operations and in the long term our profitability.

*The control of our General Partner may be transferred to a third party without common unitholder consent.*

Our General Partner may transfer its General Partner interest to a third party in a merger or consolidation without the consent of our common unitholders. Furthermore, at any time, the members of our General Partner may sell or transfer all or part of their limited liability company interests in our General Partner without the approval of the common unitholders, subject to certain restrictions as described elsewhere in this annual report. A new general partner and/or owner could have different business objectives and/or philosophies then our current business objectives and/or philosophies, employ individuals who are less experienced in our current business, be unsuccessful in identifying new opportunities in our current area of business or have a track record that is not as successful as VPR Brand's track record. If any of the foregoing were to occur, we could experience difficulty in operating our business, and the value of our business, our results of operations and our financial condition could materially suffer.

*We have hired and will need to hire additional qualified accounting and administrative personnel in order to remediate material weaknesses in our internal control over financial accounting, and we will need to expend additional resources and efforts to establish and maintain the effectiveness of our internal control over financial reporting and our disclosure controls and procedures.*

As a public company, we are subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the Sarbanes-Oxley Act of 2002, as amended (the "Sarbanes-Oxley Act"). Our management is required to evaluate and disclose its assessment of the effectiveness of our internal control over financial reporting as of each year-end, including disclosing any "material weakness" in our internal control over financial reporting. A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. As a result of its assessment, management has determined that there were material weaknesses due to the lack of segregation of duties and sufficient internal controls (including technology-based general controls) that encompass our Company as a whole with respect to entity and transactions level controls in order to ensure complete documentation of complex and non-routine transactions and adequate financial reporting. If we continue to experience material weaknesses in our internal controls or fail to maintain or implement required new or improved controls, such circumstances could cause us to fail to meet our periodic reporting obligations or result in material misstatements in our financial statements, or adversely affect the results of periodic management evaluations and, if required, annual auditor attestation reports. Due to these material weaknesses, management concluded that, as of December 31, 2025, our internal control over financial reporting was not effective. Management also concluded that our disclosure controls and procedures were not effective as of December 31, 2025. Although the number of employees has grown as a result of the hiring of additional accounting and information technology staff, we cannot assure you that we will have sufficient resources to resolve these material weaknesses. These weaknesses have the potential to adversely impact our financial reporting process and our financial reports. We will need to hire additional qualified accounting and administrative personnel in order to resolve these material weaknesses.

24

*We are required to comply with certain provisions of Section 404 of the Sarbanes-Oxley and if we fail to continue to comply, our business could be harmed, and the price of our securities could decline.*

Rules adopted by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act require an annual assessment of internal control over financial reporting, and for certain issuers an attestation of this assessment by the issuer's independent registered public accounting firm. The standards that must be met for management to assess the internal control over financial reporting as effective are evolving and complex, and require significant documentation, testing, and possible remediation to meet the detailed standards. We expect to incur significant expenses and to devote resources to Section 404 compliance on an ongoing basis. It is difficult for us to predict how long it will take or costly it will be to complete the assessment of the effectiveness of our internal control over financial reporting for each year and to remediate any deficiencies in our internal control over financial reporting. As a result, we may not be able to complete the assessment and remediation process on a timely basis. In the event that our Chief Executive Officer or principal financial officer determines that our internal control over financial reporting is not effective as defined under Section 404, we cannot predict how regulators will react or how the market prices of our securities will be affected; however, we believe that there is a risk that investor confidence and the market value of our securities may be negatively affected.

*We are subject to cyber-security risks, including those related to customer, employee, vendor or other company data and including in connection with integration of acquired businesses and operations.*

We use information technologies to securely manage operations and various business functions. We rely on various technologies, some of which are managed by third parties, to process, transmit and store electronic information, and to manage or support a variety of business processes and activities, including reporting on our business and interacting with customers, vendors and employees. In addition, we collect and store certain data, including proprietary business information, and may have access to confidential or personal information that is subject to privacy and security laws, regulations and customer-imposed controls. Our systems are subject to repeated attempts by third parties to access information or to disrupt our systems. Despite our security design and controls, and those of our third-party providers, we may become subject to system damage, disruptions or shutdowns due to any number of causes, including cyber-attacks, breaches, employee error or malfeasance, power outages, computer viruses, telecommunication or utility failures, systems failures, service providers, natural disasters or other catastrophic events. It is possible for such vulnerabilities to remain undetected for an extended period. We may face other challenges and risks as we upgrade and standardize our information technology systems as part of our integration of acquired businesses and operations. We have contingency plans in place to prevent or mitigate the impact of these events, however, these events could result in operational disruptions or the misappropriation of sensitive data, and depending on their nature and scope, could lead to the compromise of confidential information, improper use of our systems and networks, manipulation and destruction of data, defective products, production downtimes and operational disruptions and exposure to liability. Such disruptions or misappropriations and the resulting repercussions, including reputational damage and legal claims or proceedings, may adversely affect our results of operations, cash flows and financial condition, and the trading price of our common stock.

This risk is enhanced in certain jurisdictions with stringent data privacy laws. For example, the California Consumer Privacy Act of 2018 ("CCPA") provides certain data privacy rights for consumers and certain operational requirements for businesses. The CCPA includes a statutory damages framework and private rights of action against businesses that fail to comply with certain CCPA terms or implement reasonable security procedures and practices to prevent data breaches. The CCPA went into effect in January 2020.

*The business that we conduct outside the U.S. may be adversely affected by international risk and uncertainties.*

Although our operations are based in the United States, we conduct business outside of the United States and expect to continue to do so in the future. Any business that we conduct outside of the United States is subject to additional risks that may have a material adverse effect on our ability to continue conducting business in certain international markets, including, without limitation:

- Potentially reduced protection for intellectual property rights;

- Unexpected changes in tariffs, trade barriers and regulatory requirements;

- Economic weakness, including inflation or political instability, in particular foreign economies and markets;

- Business interruptions resulting from geo-political actions, including war and terrorism or natural disasters, including earthquakes, hurricanes, typhoons, floods and fires; and

- Failure to comply with Office of Foreign Asset Control rules and regulations and the Foreign Corrupt Practices Act ("FCPA").

These factors or any combination of these factors may adversely affect our revenue or our overall financial performance.

25

*RISKS RELATED TO REGULATION AND MARKET*

*Our business is primarily involved in the sale of products that contain nicotine and/or hemp-derived cannabinoids, which are subject to rapidly evolving, regulation and federal enforcement that may have a material adverse effect on our business.*

Our operations depend on the sale of ENDS and products containing hemp-derived cannabinoids (such as CBD). This industry faces extreme regulatory scrutiny from the FDA, the DOJ and various state and local agencies.

The FDA has established a stringent premarket authorization framework. While we have submitted PMTAs for our products, the FDA has historically issued Marketing Denial Orders (MDOs) for the vast majority of flavored ENDS products. On March 9, 2026, the FDA issued new draft guidance, "Flavored ENDS Premarket Applications – Considerations Related to Youth Risk," which reinforces a "heightened evidentiary burden" for non-tobacco flavors. To obtain authorization for flavored products, we must now demonstrate not only adult benefit but also the efficacy of advanced Device Access Restrictions ("DARs"), such as biometric age-gating or geofencing. We cannot guarantee that our technology will meet these new standards or that the FDA will grant Marketing Granted Orders ("MGOs") for our portfolio.

Furthermore, following the establishment of the Federal Multi-Agency Task Force in 2025, enforcement against unauthorized products—particularly flavored disposables—has accelerated. The task force has the authority to seek permanent injunctions, seizures, and civil money penalties. If our products are deemed unauthorized, we may be forced to remove them from the market immediately, leading to a total loss of revenue for those product lines.

*Our CBD and hemp-derived product lines face an existential risk due to evolving federal regulation.*

The Continuing Appropriations and Extensions Act, 2026, signed into law in late 2025, fundamentally redefines "hemp" by moving to a "Total THC" standard (including Delta-8, Delta-10, and THCA) and imposing a strict cap of 0.4 milligrams of total THC per container for finished consumer products.

This law is set to take full effect on November 12, 2026. We anticipate that many of our current hemp-derived offerings will exceed these limits and become classified as Schedule I controlled substances under the CSA. The transition to this new standard may require us to discontinue up to 10% of our hemp-related product portfolio by late 2026, which would have a significant material adverse impact on our results of operations and financial condition.

*Many of our products contain nicotine, which is considered to be a highly addictive substance.*

Many of our products contain nicotine, a chemical found in cigarettes, e-cigarettes, certain other vapor products and other tobacco products, which is considered to be highly addictive. The Family Smoking Prevention and Tobacco Control Act empowers the FDA to regulate the amount of nicotine found in vapor products, but may not require the reduction of nicotine yields of a vapor product to zero. Any FDA regulation may require us to reformulate, recall and or discontinue certain of the products we may sell from time to time, which may have a material adverse effect on our ability to market our products and have a material adverse effect on our business, financial condition, results of operations, cash flows and or future prospects.

26

*Significant increases in state and local regulation of our products have been proposed or enacted and are likely to continue to be proposed or enacted in numerous jurisdictions.*

There has been increasing activity on the state and local levels with respect to scrutiny of e-products. State and local governmental bodies across the U.S. have indicated e-products may become subject to new laws and regulations at the state and local levels. Further, some states and cities, have enacted regulations that require obtaining a tobacco retail license in order to sell electronic cigarettes and vaporizer products. Many states and some cities have passed laws restricting the sale of electronic cigarettes and vaporizer products to minors. If one or more states from which we generate or anticipate generating significant sales of e-products bring actions to prevent us from selling our e-products unless we obtain certain licenses, approvals or permits, and if we are not able to obtain the necessary licenses, approvals or permits for financial reasons or otherwise and/or any such license, approval or permit is determined to be overly burdensome to us, then we may be required to cease sales and distribution of our products to those states, which could have a material adverse effect on our business, results of operations and financial condition.

Certain states and cities have already restricted the use of electronic cigarettes and vaporizer products in smoke-free venues. Additional city, state or federal regulators, municipalities, local governments and private industry may enact rules and regulations restricting the use of electronic cigarettes and vaporizer products in those same places where cigarettes cannot be smoked. Because of these restrictions, our customers may reduce or otherwise cease using our e-products, which could have a material adverse effect on our business, results of operations and financial condition.

*There is significant regulatory burden and enforcement risk related to federal oversight of our electronic nicotine and vapor products.*

Our products, including e-cigarettes, e-liquids, and vaporizers, are subject to the Tobacco Control Act. While the 2010 *Sottera* decision initially permitted the FDA to regulate tobacco-derived nicotine, March 2022 legislation expanded this authority to include nicotine from any source, including synthetic nicotine. Consequently, all our nicotine-containing products are "Deemed Tobacco Products" subject to FDA registration, ingredient reporting, and premarket authorization requirements.

Furthermore, we are now subject to the PACT Act, which was amended to apply to electronic nicotine delivery systems. The PACT Act requires us to comply with complex registration, labeling, and tax collection rules. Because the U.S. Postal Service generally prohibits the mailing of these products to consumers, our distribution channels are constrained and our shipping costs have increased.

Failure to comply with these evolving requirements—including the federal minimum age of 21 for all tobacco sales—could result in significant financial penalties, criminal convictions, or the forced removal of our products from the market. The anticipated costs of maintaining compliance with these and future FDA regulations, such as potential good manufacturing practice standards, could significantly increase our operating expenses and harm our competitive position.

*Bans and heightened regulatory standards for flavored e-cigarettes directly limit our market access and may have a material adverse impact on our business.*

The market for flavored ENDS is subject to aggressive federal, state, and local restrictions. While the FDA initiated an enforcement policy against flavored cartridges in 2020, regulatory pressure has since intensified. On March 9, 2026, the FDA issued new draft guidance, "Flavored ENDS Premarket Applications – Considerations Related to Youth Risk," which reinforces a "heightened evidentiary burden" for any non-tobacco flavored products. To maintain or obtain marketing authorization, we must now demonstrate the efficacy of advanced DARs, such as biometric age-gating, to prevent youth access. We cannot guarantee that our products will meet these new technical standards or receive MGOs.

Furthermore, following the 2025 establishment of the Federal Multi-Agency Task Force, enforcement against unauthorized flavored products—particularly disposables—has accelerated. This task force has the authority to seek permanent injunctions and product seizures, which could lead to an immediate loss of revenue for those product lines.

State-level restrictions also continue to expand. For example, the State of California's ban on flavored tobacco products, which became effective in 2025, has already restricted our access to one of the largest U.S. markets. As more states and municipalities adopt similar or more restrictive measures, our ability to sell our flavored product portfolio will be materially harmed.

27

*The market for electronic cigarettes and vapor products is a niche market, subject to a great deal of uncertainty and is still evolving.*

Electronic cigarettes and vapor products, having recently been introduced to market, are still at an early stage of development, represent a niche market and are evolving rapidly and are characterized by an increasing number of market entrants. Our future sales and any future profits are substantially dependent upon the widespread acceptance and use of electronic cigarettes. Rapid growth in the use of, and interest in, electronic cigarettes is relatively recent, and may not continue on a lasting basis. The demand and market acceptance for these products is subject to a high level of uncertainty. Therefore, we are subject to all of the business risks associated with a new enterprise in a niche market, including risks of unforeseen capital requirements, failure of widespread market acceptance of electronic cigarettes and vapor products, in general or, specifically our products, failure to establish business relationships and competitive disadvantages as against larger and more established competitors.

*The long-term health effects of electronic cigarettes and vaping products are not yet fully known, and any conclusive evidence of harm could materially harm our business.*

Because electronic cigarettes and vapor products have been developed and commercialized only recently, the medical profession has not yet had a sufficient period of time to fully realize the long-term health effects attributable to electronic cigarette and vapor product use.

While the 2019 outbreak of lung injuries was largely linked by the CDC to vitamin E acetate in THC-containing products, there is a growing body of medical research regarding the potential for other long-term respiratory and cardiovascular risks associated with the chronic inhalation of vaporized substances.

We also face risks related to the materials used in our devices. Potential health concerns regarding the leaching of heavy metals or other toxins from heating elements and device components could lead to product liability claims, regulatory recalls, or a general decline in consumer acceptance of vaporizing hardware. If the medical profession were to determine conclusively that electronic cigarette or vapor product usage poses long-term health risks, demand for our products, could decline, which could have a material adverse effect on our business, results of operations and financial condition.

*Changes in federal and state law, particularly the November 2026 "Total THC" standard, could cause our hemp-derived products to be classified as illegal controlled substances.*

We distribute products containing hemp-derived cannabinoids and provide hardware for use with such products. While the 2018 Farm Act previously legalized hemp with less than 0.3% Delta-9 THC, the Continuing Appropriations and Extensions Act, 2026, has fundamentally altered this framework. Effective November 12, 2026, federal law will apply a "Total THC" standard (including Delta-8, Delta-10, and THCA) and impose a strict cap of 0.4 milligrams of total THC per container.

We anticipate that a significant portion of our current hemp-derived portfolio, which may comprise up to 10% of our hemp-related offerings, will exceed these new limits. Unless this legislation is amended, these products will be reclassified as Schedule I controlled substances under the CSA. Such a reclassification would require us to discontinue these product lines, potentially leading to criminal prosecution or a forced cessation of certain operations, which would have a material adverse impact on our results of operations and financial condition.

Furthermore, we are affected by laws related to cannabis and marijuana. Because marijuana remains a Schedule I controlled substance under federal law, any perception that we are involved in the marijuana industry—or the use of our hardware with such substances—could result in negative press, the loss of business partners, or federal enforcement actions.

*Our supply of hemp-derived cannabinoids and the market for our hardware depend on complex state and federal laws, which face an existential shift in late 2026.*

Hemp-derived CBD can only be legally produced and transported in states that comply with federal standards. While we currently purchase all of our hemp-derived CBD from licensed growers and processors, the legal landscape is shifting due to the Continuing Appropriations and Extensions Act, 2026. Effective November 12, 2026, federal law will transition to a "Total THC" standard with a strict limit of 0.4 milligrams per container.

This federal change may render many of our and our suppliers' products illegal as Schedule I controlled substances, regardless of their status under previous state laws or the 2018 Farm Act. If our current suppliers are unable to re-formulate their processes to meet these new "Total THC" caps, or if raw ingredients become legally unavailable, our business operations—including the sale of our cannabis vape hardware intended for use with these substances—would be materially and adversely impacted. Furthermore, any reduction in the number of states maintaining qualifying laws under this new federal standard could restrict our ability to distribute products across state lines.

28

*Our business, results of operations and financial condition could be adversely affected by increasing excise taxes and the complex requirements to collect and remit sales and excise taxes.*

The sale of ENDS, components, and related hardware is increasingly subject to federal, state, and local excise taxes similar to those levied against conventional cigarettes. As of March 2026, more than 32 states and the District of Columbia had implemented such taxes, and we expect this number to continue to increase. These taxes significantly increase the cost of our products to the consumer, which may reduce demand and have a material adverse effect on our results of operations.

Furthermore, the PACT Act now applies to ENDS and related vapor products, imposing strict registration, reporting, and tax compliance obligations. We are required to establish and maintain sophisticated systems to track, collect, and remit these taxes for both internet and traditional sales. The requirement to comply with these diverse and often conflicting state and local tax laws— including the obligation to remit sales taxes in jurisdictions like New York, Hawaii, and North Carolina—increases our administrative costs and may require us to increase our prices. Any failure to accurately track or remit these taxes could result in significant financial penalties, litigation, or the loss of our ability to sell products in certain jurisdictions.

Additionally, many jurisdictions are contemplating or have implemented legislation that categorizes cannabis vape hardware and lighters as subject to tobacco or nicotine-related excise taxes. Continued increases in tax rates or the expansion of tax categories to include our hardware products will likely harm our net profit margins and overall financial condition.

*We may have a difficult time obtaining the various insurances that are desired to operate our business in the CBD industry, which may expose us to additional risk and financial liability.*

Insurance that is otherwise readily available, such as general liability, and directors and officer's insurance, may become more difficult for us to find, and more expensive, due to our recent launch of certain products containing hemp-derived CBD. Additionally, the Continuing Appropriations and Extensions Act, 2026, which imposes a strict 0.4 mg "Total THC" cap per container effective November 12, 2026, has caused many insurance carriers to re-evaluate their exposure to the hemp industry. If our hemp-derived products are deemed to exceed these new federal limits, they may be classified as Schedule I controlled substances, which could lead to the immediate cancellation of our insurance policies or the denial of claims. There are no guarantees that we will be able to maintain affordable insurance in the future, or that the cost will be affordable to us. If we are forced to go without such insurances, it may prevent us from entering into certain retail agreements or certain business sectors, it may inhibit our growth, and may expose us to additional risk and financial liabilities.

### RISKS RELATING TO OUR COMMON UNITS

*Trading on the OTC Markets is volatile and sporadic, which could depress the market price of our common units.*

Our common units are quoted on the OTCQB tier of the OTC Markets. Trading in securities quoted on the OTC Markets is often thin and characterized by wide fluctuations in trading prices, due to many factors, some of which may have little to do with our operations or business prospects. This volatility could depress the market price of our common units for reasons unrelated to operating performance. Moreover, the OTC Markets is not a stock exchange, and trading of securities on the OTC Markets is often more sporadic than the trading of securities listed on a quotation system like Nasdaq Capital Market or a stock exchange like the NYSE American.

*Our stock price is likely to be highly volatile because of several factors, including a limited public float.*

The market price of our common units has been volatile in the past and the market price of our common units is likely to be highly volatile in the future. You may not be able to resell our common units following periods of volatility because of the market's adverse reaction to volatility.

Other factors that could cause such volatility may include, among other things:

- actual or anticipated fluctuations in our operating results;

- the absence of securities analysts covering us and distributing research and recommendations about us;

- we may have a low trading volume for a number of reasons, including that a large portion of our stock is closely held;

- overall stock market fluctuations;

- announcements concerning our business or those of our competitors;

- actual or perceived limitations on our ability to raise capital when we require it, and to raise such capital on favorable terms;

29

- conditions or trends in the industry;

- litigation;

- changes in market valuations of other similar companies;

- future sales of common units;

- departure of key personnel or failure to hire key personnel; and

- general market conditions.

Any of these factors could have a significant and adverse impact on the market price of our common units and/or warrants. In addition, the stock market in general has at times experienced extreme volatility and rapid decline that has often been unrelated or disproportionate to the operating performance of particular companies. These broad market fluctuations may adversely affect the trading price of our common units and/or warrants, regardless of our actual operating performance.

*Our common units are a "penny stock" under SEC rules. It may be more difficult to resell securities classified as "penny stock."*

Our common units is a "penny stock" under applicable SEC rules (generally defined as non-exchange traded stock with a per-share price below $5.00). Unless we successfully list our common units on a national securities exchange, or attain and maintain a per-unit price above $5.00, these rules impose additional sales practice requirements on broker-dealers that recommend the purchase or sale of penny stocks to persons other than those who qualify as "established customers" or "accredited investors." For example, broker-dealers must determine the appropriateness for non-qualifying persons of investments in penny stocks. Broker-dealers must also provide, prior to a transaction in a penny stock not otherwise exempt from the rules, a standardized risk disclosure document that provides information about penny stocks and the risks in the penny stock market. The broker-dealer also must provide the customer with current bid and offer quotations for the penny stock, disclose the compensation of the broker-dealer and its salesperson in the transaction, furnish monthly account statements showing the market value of each penny stock held in the customer's account, provide a special written determination that the penny stock is a suitable investment for the purchaser, and receive the purchaser's written agreement to the transaction.

Legal remedies available to an investor in "penny stocks" may include the following:

- If a "penny stock" is sold to the investor in violation of the requirements listed above, or other federal or states securities laws, the investor may be able to cancel the purchase and receive a refund of the investment.

- If a "penny stock" is sold to the investor in a fraudulent manner, the investor may be able to sue the persons and firms that committed the fraud for damages.

These requirements may have the effect of reducing the level of trading activity, if any, in the secondary market for a security that becomes subject to the penny stock rules. The additional burdens imposed upon broker-dealers by such requirements may discourage broker-dealers from effecting transactions in our securities, which could severely limit the market price and liquidity of our securities. These requirements may restrict the ability of broker-dealers to sell our common units and may affect your ability to resell our common units.

Many brokerage firms will discourage or refrain from recommending investments in penny stocks. Most institutional investors will not invest in penny stocks. In addition, many individual investors will not invest in penny stocks due, among other reasons, to the increased financial risk generally associated with these investments.

For these reasons, penny stocks may have a limited market and, consequently, limited liquidity. We can give no assurance at what time, if ever, our common units will no longer be classified as a "penny stock" in the future.

*Our management controls a substantial number of our common units, decreasing your influence on unitholder decisions.*

Our management, including Mr. Frija, own 27,361,271 units, or approximately 29.8% of our outstanding common units. Mr. Frija serves as our Chief Executive Officer, President, principal financial and accounting officer and is the sole member of our General Partner. As a result, our management as a group could have a significant influence in delaying, deferring or preventing any potential change in control of our company; they will be able to strongly influence the actions of our General Partner even if they were to cease being directors or officers of our company and can effectively control the outcome of actions brought to our unitholders for approval. Such a high level of ownership may adversely affect the exercise of your voting and other unitholder rights.

30

*Units eligible for future sale may adversely affect the market.*

From time to time, certain of our unitholders may be eligible to sell all or some of their common units by means of ordinary brokerage transactions in the open market pursuant to Rule 144 promulgated under the Securities Act, subject to certain limitations. In general, pursuant to Rule 144, non-affiliate unitholders may sell freely after six months, subject only to the current public information requirement. Affiliates may sell after six months, subject to the Rule 144 volume, manner of sale (for equity securities), current public information, and notice requirements. Of the 91,746,806 common units outstanding as of March 31, 2026, approximately 46,288,573 units are tradable without restriction. Given the limited trading of our common units, resale of even a small number of our common units pursuant to Rule 144 or an effective registration statement may adversely affect the market price of our common units.

*Provisions of our partnership agreement, as amended, may delay or prevent a takeover which may not be in the best interests of our unitholders.*

Provisions of our partnership agreement may be deemed to have anti-takeover effects. Pursuant to Section 5.6 of the partnership agreement, the General Partner of the Company may, without the approval of our limited partners, issue additional securities for any partnership purpose at any time and from time to time for such consideration and on such terms and conditions as the General Partner shall determine in its sole discretion, all without the approval of any limited partners, and that each additional interest authorized to be issued by the Company may be issued in one or more classes, or one of more series of any such classes, with such designations, preferences, rights, powers and duties as shall be fixed by the General Partner in its sole discretion. Pursuant to Section 13.1 of the partnership agreement, the General Partner may, without the approval of any partner, any unitholder or any other person, amend any provision of the partnership agreement to reflect any amendment expressly permitted in the partnership agreement to be made by the General Partner acting along, therefore including the creation of a new class of Company securities with dividends, liquidation, conversion, voting or other rights that could adversely affect the voting power or other rights of the holders of our common units.

*We do not expect to pay dividends in the foreseeable future.*

We do not intend to declare dividends for the foreseeable future, as we anticipate that we will reinvest any future earnings in the development and growth of our business. Therefore, investors will not receive any funds unless they sell their common units, and unitholders may be unable to sell their units on favorable terms. We cannot assure you of a positive return on investment or that you will not lose the entire amount of your investment in our common units.

**Item 1B. Unresolved Staff Comments**

Not applicable.

**Item 1C. Cybersecurity**

*Risk Management and Strategy*

Our comprehensive risk management strategy for the assessment, identification and management of material risks stemming from cybersecurity threats involves a systematic evaluation of potential threats, vulnerabilities, and their potential impacts on our organization's operations, data, and systems.

31

Our cybersecurity risk management program is integrated into our overall enterprise risk management program and shares common methodologies, reporting channels, and governance processes that apply across the enterprise risk management program, including legal, compliance, strategic, operational, and financial risk areas. The cybersecurity risk management program includes:

- Risk assessments designed to help identify material cybersecurity risks to our critical systems, information, and broader enterprise IT environment;

- A team principally responsible for managing (i) cybersecurity risk assessment processes, (ii) security controls, and (iii) response to cybersecurity incidents;

- The use of external service providers, where appropriate, to assess, test or otherwise assist with aspects of security controls;

- Cybersecurity awareness training for users and senior management, including through the use of third-party providers for regular mandatory training;

- A cybersecurity incident response plan that includes procedures for responding to cybersecurity incidents; and,

- A risk management process for third-party service providers, suppliers and vendors, including a rigorous vetting process and ongoing monitoring mechanisms designed to ensure compliance with cybersecurity standards.

As of the date of this Annual Report on Form 10-K, we are not aware of any cybersecurity incidents that have had a materially adverse effect on our operations, business, results of operations, or financial condition.

*Governance*

Our General Partner considers cybersecurity risk as part of its risk oversight function. The General Partner oversees the implementation of the cybersecurity risk management program.

The General Partner receives periodic reports from management on potential cybersecurity risks and threats and receives presentations on cybersecurity topics from our information systems manager. The General Partner also receives briefings from management on the cybersecurity risk management program as needed.

Management is responsible for assessing and managing our material risks from cybersecurity threats. Management has primary responsibility for our overall cybersecurity risk management program and supervises both the internal cybersecurity personnel and external cybersecurity consultants. Our information systems manager has many years of experience leading cybersecurity oversight and has extensive experience with information technology, including security, auditing, compliance, systems, and programming.

The management team supervises efforts to prevent, detect, mitigate, and remediate cybersecurity risks and incidents through various means, which may include briefings from internal security personnel, threat intelligence and other information obtained from governmental, public or private sources, including external consultants; and alerts and reports produced by security tools deployed in the IT environment. Our cybersecurity incident response plan governs our assessment and response upon the occurrence of a material cybersecurity incident, including the process for informing senior management and our General Partner.

## Item 2. Properties

On May 19, 2022, we entered into a 5-year lease of approximately 3,100 square feet of warehouse and office space. The lease requires base monthly rent of $3,358 for the first year and provides for 5% increase in base rent on each anniversary date. There is additional common area maintenance charges which are approximately $2,500 per month. We believe that this facility is adequate for our current and future needs.

## Item 3. Legal Proceedings

None

## Item 4. Mine Safety Disclosures

Not applicable.

32

**PART II**

**Item 5. Market Price for Registrant's Common Equity, Related Unitholder Matters and Issuer Purchases of Equity Securities**

*Trading Price History*

Our common units are currently quoted on the OTCQB tier of the OTC Markets Group, Inc. under the ticker symbol "VPRB." The OTC Market is a computer network that provides information on current "bids" and "asks", as well as volume information.

For the fiscal years ended December 31, 2025 and 2024, the following table sets forth the high and low closing bid quotations for our common units as reported by OTC Markets Group. These quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission and may not necessarily represent actual transactions.

|  | High | | Low | |
|---|---|---|---|---|
| **Fiscal Year Ended December 31, 2024** | | | | |
| First Quarter (January 1, 2024 through March 31, 2024) | $ | 0.2000 | $ | 0.1355 |
| Second Quarter (April 1, 2024 through June 30, 2024) | $ | 0.1949 | $ | 0.0831 |
| Third Quarter (July 1, 2024 through September 30, 2024) | $ | 0.1270 | $ | 0.0550 |
| Fourth Quarter (October 1, 2024 through December 31, 2024) | $ | 0.0700 | $ | 0.0302 |
| | | | | |
| **Fiscal Year Ended December 31, 2025** | | | | |
| | | | | |
| First Quarter (January 1, 2025 through March 31, 2025) | $ | 0.0430 | $ | 0.0238 |
| Second Quarter (April 1, 2025 through June 30, 2025) | $ | 0.0500 | $ | 0.0200 |
| Third Quarter (July 1, 2025 through September 30, 2025) | $ | 0.0499 | $ | 0.0241 |
| Fourth Quarter (October 1, 2025 through December 31, 2025) | $ | 0.0477 | $ | 0.0150 |
| | | | | |
| **Fiscal Year Ending December 31, 2026** | | | | |
| | | | | |
| First Quarter (January 1, 2026 through March 31, 2026) | $ | 0.0430 | $ | 0.0200 |

On March 30, 2026, the closing price of our common units on the OTCQB was $0.02 per unit.

*Unitholders of Record*

As of March 31, 2026, we had 91,746,806 outstanding common units and there were approximately 36 holders of record of our common units, not including holders who hold their units in street name.

*Dividends*

We have never declared or paid a cash dividend. At this time, we do not anticipate paying dividends in the future. We are under no legal or contractual obligation to declare or to pay dividends, and the timing and amount of any future cash dividends and distributions is at the discretion of the General Partner of the Manager and will depend, among other things, on our future after-tax earnings, operations, capital requirements, borrowing capacity, financial condition and general business conditions. We plan to retain any earnings for use in the operation of our business and to fund future growth. You should not purchase our Common Units on the expectation of future dividends.

**Item 6. [Reserved]**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

The following discussion and analysis of the financial condition and results of operations of VPR Brands, LP ("VPRB" or the "Company") should be read in conjunction with our financial statements and the accompanying notes thereto included elsewhere in this Annual Report on Form 10-K. References in this Management's Discussion and Analysis of Financial Condition and Results of Operations to "us," "we," "our," and similar terms refer to the Company. This Annual Report on Form 10-K includes forward-looking statements, as that term is defined in the federal securities laws, based upon current expectations that involve risks and uncertainties, such as plans, objectives, expectations and intentions. Actual results and the timing of events could differ materially from those anticipated in these forward-looking statements as a result of a number of factors. Words such as "anticipate," "estimate," "plan," "continuing," "ongoing," "expect," "believe," "intend," "may," "will," "should," "could," and similar expressions are used to identify forward-looking statements. We caution you that these statements are not guarantees of future performance or events and are subject to a number of uncertainties, risks and other influences, many of which are beyond our control, which may influence the accuracy of the statements and the projections upon which the statements are based. Reference is made to "Risk Factors", which are included elsewhere in this Annual Report on Form 10-K.

33

*OVERVIEW*

We are a company engaged in the electronic cigarette, electronic cigar, personal vaporizer and pocket lighter industry. We own a portfolio of electronic cigarette, personal vaporizer patents, several trademarks and pocket lighter patents which are the basis for our efforts to:

- Design, market, license, and distribute a line of vaporizers under the brand;

- Design, market and distribute a line of e liquids under the "HELIUM" brand;

- Design, market and distribute a line vaporizers for essential oils, concentrates, and dry herbs under the "HONEYSTICK" brand;

- Design, market and distribute a line of cannabidiol ("CBD") products under the "GOLD LINE" brand;

- Design, market and distribute electronic cigarettes and popular vaporizers under the KRAVE brand;

- Prosecute and enforce our patent and trademark rights;

- License our intellectual property; and

- Develop private label manufacturing programs.

For the fiscal years ended December 31, 2025 and 2024, we generated revenues of $3,615,987 and $5,676,359, respectively; reported net loss before taxes of $1,602,592 and net loss before taxes of $66,353, respectively, and negative cash flow from operating activities of $1,121,225 for December 31, 2025, as compared to a positive cash flow from operation of $274,094 for December 31, 2024. As noted in our financial statements, we reported an accumulated deficit as of December 31, 2025, and 2024, of $8,790,579 and $7,594,395, respectively.

*Results of Operations*

*Results of Operations for the Year Ended December 31, 2025 Compared to the Year Ended December 31, 2024*

Revenues

Our revenues for the twelve months ended December 31, 2025 and 2024 was $3,615,987 and $5,676,359, respectively. The decrease was a result of a decrease in customer sales and royalty revenue in the year ended December 31, 2025.

Cost of Sales

Cost of sales for the year ended December 31, 2025 and 2024 was $2,577,706 and $4,143,529, respectively. The decrease is the result of a decrease in sales during 2025. Gross margin remained consistent at 31% for both 2025 and 2024. The stability in gross margin was primarily attributable to relatively consistent pricing and cost structures across our product sales during the period.

Operating Expenses

Operating expenses for the year ended December 31, 2025 were $2,498,053, as compared to $2,902,920 for the year ended December 31, 2024. The decrease was primarily due to the absence of unit-based compensation and decreases in selling, general and administrative expenses in the year ended December 31, 2025.

Other Income/Expense

The Company reported other expense of $142,820 for the year ended December 31, 2025, as compared to other income of $1,303,737 for the year ended December 31, 2024. The decrease was primarily due to decrease in settlement income, which totaled $41,625 in 2025, compared to $1,675,492 in 2024. Interest expense declined to $185,733 in 2025 from $377,148 in 2024, due to the repayment of all convertible loans in January 2025. Other items of other income (expense) had a minimal impact on the change in net other income during the period.

Net Loss

Net loss for the year ended December 31, 2025 was $1,196,184, compared to net loss of $143,224 for the year ended December 31, 2024.

34

<u>Liquidity and Capital Resources</u>

The following table sets forth a summary of our net cash flows for the periods indicated:

|  | For the Years Ended December 31, | |
|  | 2025 | 2024 |
|---|---|---|
| Net cash provided by (used in) operating activities | $ (1,121,225) | $ 274,094 |
| Net cash used in investing activities | $ (16,000) | - |
| Net cash flows used in financing activities | $ (157,364) | $ (621,420) |

We used cash from operating activities of $1,121,225 for the year ended December 31, 2025, as compared to generating cash of $274,094 for the year ended December 31, 2024. The decrease was primarily attributable to changes in operating assets and liabilities, including increases in inventory and vendor deposits, decreases in customer deposits, refund liabilities, and tax liabilities, and the recognition of a deferred tax asset, partially offset by an increase in accounts payable and accrued expenses and reductions in accounts receivable and royalty receivables.

Net cash used in financing activities was $157,364 for the year ended December 31, 2025, compared to $621,420 in 2024. During 2025, cash used in financing activities primarily consisted of payments of notes payable of $42,879, payments of convertible notes of $69,129, and lease liability payments of $45,356. In 2024, cash used in financing activities primarily related to repayments of convertible notes of $412,060 and related party notes of $165,810, as well as lease payments of $43,550.

<u>Assets</u>

At December 31, 2025 and 2024, we had total assets of $1,593,684 and $2,753,410, respectively. Assets primarily consist of inventory, vendor deposits, accounts receivable, intellectual property, and a right-to-use asset. In 2025, our inventory decreased by $32,822 as a result of reduction in sales, inventory adjustment and cash position; accounts receivable and royalty receivable collectively decreased by $118,460 from sales, vendor deposits decreased by $99,339, and right of use asset decreased by $33,200.

<u>Liabilities</u>

At December 31, 2025 and 2024, we had total liabilities of $2,071,589 and $2,035,131, respectively. The decrease was primarily due to a reduction in related party notes payable and convertible notes payable, partially offset by an increase in customer deposits and accounts payable.

*Availability of Additional Funds*

Our capital requirements going forward will consist of financing our operations until we are able to reach a level of revenues and gross margins adequate to equal or exceed our ongoing operating expenses. We do not have any credit agreement or source of liquidity immediately available to us.

Since inception, our operations have primarily been funded through proceeds from equity and debt financing. At December 31, 2025, we had $125,345 of cash on hand. Although we believe that we have access to capital resources, there are no commitments in place for new financing as of the filing date of this Annual Report on Form 10-K and there can be no assurance that we will be able to obtain funds on commercially acceptable terms, if at all. We expect to have ongoing needs for working capital in order to (a) fund operations; plus (b) fund strategic acquisitions. To that end, we may be required to raise additional funds through equity or debt financing. However, there can be no assurance that we will be successful in securing additional capital. If we are unsuccessful, we may need to (a) initiate cost reductions; (b) forego business development opportunities; (c) seek extensions of time to fund its liabilities; or (d) seek protection from creditors.

In addition, if we are unable to generate adequate cash from operations, and if we are unable to find sources of funding, it may be necessary for us to sell all or a portion of our assets, enter into a business combination, or reduce or eliminate operations. These possibilities, to the extent available, may be on terms that result in significant dilution to our unitholders or that result in our unitholders losing all of their investment in our Company.

If we are able to raise additional capital, we do not know what the terms of any such capital raising would be. In addition, any future sale of our equity securities would dilute the ownership and control of your units and could be at prices substantially below prices at which our units currently trade. Our inability to raise capital could require us to significantly curtail or terminate our operations. We may seek to increase our cash reserves through the sale of additional equity or debt securities. The sale of convertible debt securities or additional equity securities could result in additional and potentially substantial dilution to our unitholders. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict our operations and liquidity. In addition, our ability to obtain additional capital on acceptable terms is subject to a variety of uncertainties.

Our audited financial statements included elsewhere in this Annual Report on Form 10-K have been prepared in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP"), which contemplate our continuation as a going concern and the realization of assets and the satisfaction of liabilities in the normal course of business. The carrying amounts of assets and liabilities presented in the financial statements do not necessarily purport to represent realizable or settlement values. The financial statements do not include any adjustment that might result from the outcome of this uncertainty.

*Off-Balance Sheet Arrangements*

We have no off-balance sheet arrangements that have, or are reasonably likely to have, a current or future effect on our financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that is material to investors.

35

*Critical Accounting Policies and Estimates*

Our discussion and analysis of our financial condition and results of operations are based upon our financial statements, which have been prepared in accordance with U.S. GAAP. Our significant accounting policies are described in notes accompanying the financial statements. The preparation of the financial statements requires our management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, expenses, and related disclosure of contingent assets and liabilities. Estimates are based on information available as of the date of the financial statements, and accordingly, actual results in future periods could differ from these estimates. Significant judgments and estimates used in the preparation of the financial statements apply critical accounting policies described in the notes to our financial statements.

We consider the recognition and related assumptions used in determining the collectability of accounts receivable and the realizability of the deferred tax assets and liabilities to be most critical in understanding the judgments that are involved in the preparation of our financial statements.

Together with our critical accounting policies set out below, our significant accounting policies are summarized in Note 2 of our audited financial statements as of and for the year ended December 31, 2025.

*Accounts Receivable*

We recognize an allowance for expected credit losses in accordance with Accounting Standards Update ("ASU") 2016-13, Financial Instruments – Credit Losses, issued by the Financial Accounting Standards Board ("FASB"). This ASU establishes a current expected credit loss ("CECL") model, which requires us to measure all expected credit losses for financial assets held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts.

To estimate expected credit losses, we segregated our receivables into three risk-based categories, each reflecting distinct credit risk characteristics. A loss rate was then applied to each category based on historical experience and anticipated losses given the associated risk factors.

An allowance for credit losses is recorded through a provision for bad debts charged to earnings. The evaluation of expected credit losses is inherently subjective and requires management to make estimates that may be subject to significant revision as additional information becomes available.

As of December 31, 2025, and 2024, we had an allowance for expected credit losses of $105,792 and $131,716, respectively.

*Income Taxes*

We have recorded income taxes in accordance with ASC 740, "Income Taxes," which requires the recognition of deferred tax liabilities and assets for the expected future tax consequences of differences between the carrying amounts of assets and liabilities for financial reporting purposes and their respective tax bases. Additionally, the Company follows the provisions of FASB ASC 740-10, "Uncertainty in Income Taxes," which establishes recognition thresholds for tax positions. Under this standard, an entity may only recognize tax positions that meet a "more-likely-than-not" threshold. As of December 31, 2025, and 2024, we do not believe we have any uncertain tax positions that would require recognition or disclosure in the accompanying audited financial statements.

*Recent Accounting Pronouncements*

From time to time, new accounting pronouncements are issued by the FASB or other standard setting bodies that may have an impact on our accounting and reporting. We believe that such recently issued accounting pronouncements and other authoritative guidance for which the effective date is in the future either will not have an impact on its accounting or reporting or that such impact will not be material to its financial position, results of operations, and cash flow when implemented.

In November 2024, the FASB issued ASU 2024-03, Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of Income Statement Expenses. This update aims to enhance transparency for users of financial statements by requiring public business entities to disaggregate specific expense categories. The update mandates disclosures in the notes to financial statements, detailing the composition and trends of key expense categories within major income statement captions. These enhanced disclosures are expected to help investors more effectively assess the entity's performance, understand its cost structure, and make more accurate forecasts of future cash flow. ASU 2024-03 is effective for annual periods beginning after December 15, 2026, and interim periods beginning after December 15, 2027, with early adoption permitted. We are currently evaluating the potential impact of ASU 2024-03 on our financial reporting and disclosures.

In January 2025, the FASB issued ASU 2025-01, *Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40)*, which revises the effective date of ASU 2024-03 (on disclosures about disaggregation of income statement expenses) "to clarify that all public business entities are required to adopt the guidance in annual reporting periods beginning after December 15, 2026, and interim periods within annual reporting periods beginning after December 15, 2027." Entities within the ASU's scope are permitted to early adopt the ASU. The Company is currently evaluating the potential impact of ASU 2024-03 on its financial reporting and disclosures.

In July 2025, the FASB issued ASU 2025-05, Financial Instrument-Credit Losses (Topic 326): Measurement of Credit Losses for Accounts Receivable and Contract Assets. This ASU affects entities that apply the practical expedient and accounting policy election (if applicable) when estimating expected credit losses on current accounts receivable and/or current contract assets arising from transactions under Topic 606, including those assets acquired in a transaction accounted for under Topic 805, Business Combinations. The amendments will be effective for annual reporting periods beginning after December 15, 2025, and interim reporting periods within those annual reporting periods. Early adoption is permitted in both interim and annual reporting periods in which financial statements have not yet been issued or made available for issuance. The Company is currently evaluating the potential impact of ASU 2025-05 on its financial reporting and disclosures.

36

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

As a "smaller reporting company" as defined by Item 10 of Regulation S-K, we are not required to provide this information.

**Item 8. Financial Statements and Supplementary Data**

The financial information required by Item 8 begins on page F-1 through F-22.

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures.**

*Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a-15 under the Exchange Act, as of December 31, 2025, the fiscal year end covered by this report, our management concluded its evaluation of the effectiveness of the design and operation of our disclosure controls and procedures.

Disclosure controls and procedures refer to controls and other procedures designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and that such information is accumulated and communicated to our management, including our Chief Executive Officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating and implementing possible controls and procedures.

Our management does not expect that our disclosure controls and procedures will prevent all error and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions.

As of December 31, 2025, under the supervision and with the participation of our management, including our Chief Executive Officer and principal financial officer, we conducted an evaluation of the effectiveness of the design and operations of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act. Based upon our evaluation, our Chief Executive Officer and principal financial officer concluded that our disclosure controls and procedures were not effective as of December 31, 2025 due to insufficient personnel to properly prepare, implement and monitor adequate controls and procedures.

37

*Management's Annual Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management is also required to assess and report on the effectiveness of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2025. In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control - Integrated Framework (2013)*. During our assessment of the effectiveness of internal control over financial reporting as of December 31, 2025, we identified the following material weakness:

We did not maintain an effective financial reporting process to prepare financial statements in accordance with U.S. GAAP. Specifically, our process lacked timely and complete financial statement reviews and procedures to ensure all required disclosures were made in our financial statements. Also, we lacked documented procedures including documentation related to testing of internal controls and entity-level controls, disclosure review, and other analytics. Furthermore, we lacked sufficient personnel to properly segregate duties.

Therefore, our internal control over financial reporting was not effective as of December 31, 2025.

A material weakness (within the meaning of PCAOB Auditing Standard No. 5) is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness; yet important enough to merit attention by those responsible for oversight of our financial reporting.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

This annual report does not include an attestation report of our registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by our registered public accounting firm pursuant to the rules of the SEC that permit us to provide only management's report in this annual report.

*Changes in Internal Control over Financial Reporting*

No changes were made to our internal control over financial reporting during the quarter ended December 31, 2025 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

(a) None.

(b) During the quarter December 31, 2025, no director or officer of the Company adopted or terminated (i) any contract, instruction or written plan for the purchase or sale of the Company's securities intended to satisfy the affirmative defense conditions of Rule 10b5-1(c) promulgated under the Securities Exchange Act of 1934, as amended; and/or (ii) any "non-Rule 10b5-1 trading arrangement" as defined in Item 408(c) of Regulation S-K. During the quarter ended December 31, 2025, the Company did not adopt or terminate any Rule 10b5-1 trading arrangement.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

38

## PART III

### Item 10. Directors, Executive Officers and Corporate Governance

The following table sets forth the names, ages and positions of our executive officers and the sole member of our General Partner, Soleil Capital Management LLC. We are managed by our General Partner. Our General Partner does not have an operating agreement. Pursuant to Delaware law, in the absence of an operating agreement, our General Partner is managed by its members. Through the General Partner, Mr. Frija manages all of our operations and activities, as sole member of the General Partner.

| Name | Age | Position with the Company | Since |
| --- | --- | --- | --- |
| Kevin Frija | 54 | Sole Member, Soleil Capital Management LLC; Chief Executive Officer, President, principal financial officer, and principal accounting officer, VPR Brands, LP | June 5, 2015 |
| Daniel Hoff | 40 | Chief Operating Officer, VPR Brands, LP | January 3, 2017 |

**Mr. Kevin Frija.** Mr. Frija has served as the chief executive officer and president of the Company and as a member of the General Partner since June 2015. Prior to joining the Company, from June 2009 through March 2014, Mr. Frija served as chief executive officer and chairman of the board of directors, of Vapor Corp., a company Mr. Frija grew from $1 million in sales to $25 million and oversaw the up listing from the pink sheets to the NASDAQ, and, from June 2009 through February 2013, Mr. Frija also served as president of Vapor Corp. He has over 25 years of experience, particularly in the areas of sourcing, manufacturing, supply chain management, marketing, advertising, and licensing. Prior to Mr. Frija's involvement in Vapor Corp., he operated In Gear Fashions, Inc. ("Ingear"), a swim and resort wear company based in Miami, Florida. Mr. Frija currently and on a limited basis assists Ingear in a managerial capacity. We believe Mr. Frija's past experience as chief executive officer and chairman of the board of directors of Vapor Corp. and his experience in the areas of sourcing, manufacturing, supply chain management, marketing and advertising will be valuable to our development and growth.

**Daniel Hoff.** Mr. Hoff has served as Chief Operating Officer ("COO") since January 3, 2017. Mr. Hoff previously served as a consultant to us since 2016, serving as head of wholesale operations and Director of Alternative Products. He will retain these positions as COO. From 2007 until 2011, Mr. Hoff served as Finance & Accounting Manager at Vapor Corp., a company that designs, markets and distributes e-cigarettes, vaporizers, e-liquids and accessories. In this position, Mr. Hoff supervised corporate finance and accounting functions. From 2011 until 2014, Mr. Hoff served as Production & New Products Manager at Vapor Corp. and focused on supply chain management, product development and design and key vendor relations. From 2014 until July 2016, he served as Key Accounts Executive & Head of Alternative Products, building Vapor Corp.'s alternative products division and leading wholesale operations and key account management. We acquired Vapor Corp.'s wholesale operations and inventory in 2016, at which time Mr. Hoff joined us as a consultant until his appointment as COO.

### *Family Relationships*

None.

### *Partnership Management and Governance*

Our General Partner manages all of our operations and activities. Our General Partner is authorized in general to perform all acts that it determines to be necessary or appropriate to carry out our purposes and to conduct our business. Our partnership agreement provides that our General Partner in managing our operations and activities is entitled to consider only such interests and factors as it desires, including its own interests, and will have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting us or any limited partners, and will not be subject to any different standards imposed by the partnership agreement, the Delaware Limited Partnership Act or under any other law, rule or regulation or in equity.

Our General Partner does not have an operating agreement. Pursuant to Delaware law, in the absence of an operating agreement, our General Partner is managed by its members. Until March 2026, Messrs. Kevin Frija and Greg Pan were members of our General Partner. Mr. Pan ceased to be a member of the General Partner in March 2026 and accordingly, Mr. Frija, our President, Chief Executive Officer, principal financial officer and principal accounting officer, is currently the sole member of the General Partner. Through the General Partner, Mr. Frija manages all of our operations and activities.

39

Our common unitholders have only limited voting rights on matters affecting our business and therefore have limited ability to influence management's decisions regarding our business. The voting rights of our common unitholders are limited as set forth in our partnership agreement and in the Delaware Limited Partnership Act.

Our General Partner does not receive any compensation from us for services rendered to us as our General Partner. Our General Partner is reimbursed by us for all expenses it incurs in carrying out its activities as General Partner of the Company, including compensation paid by the General Partner to its directors and the cost of directors' and officers' liability insurance obtained by the General Partner.

### Involvement in Certain Legal Proceedings

No director, executive officer, significant employee, or control person of the Company , and no member of the General Partner, has been involved in any legal or regulatory proceeding listed in Item 401(f) of Regulation S-K in the past 10 years.

### Leadership Structure and General Partner's Role in Risk Oversight

Our General Partner manages all of our operations and activities. Our General Partner does not have an operating agreement. Pursuant to Delaware law, in the absence of an operating agreement, our General Partner is managed by its members. Until March 2026, Messrs. Kevin Frija and Greg Pan were members of our General Partner. Mr. Pan ceased to be a member of the General Partner in March 2026 and accordingly, Mr. Frija, our President, Chief Executive Officer, principal financial officer and principal accounting officer, is currently the sole member of the General Partner. Through the General Partner, Mr. Frija manages all of our operations and activities.

Our General Partner is generally responsible for the oversight of corporate risk in its review and deliberations relating to our activities. Our principal source of risk falls into two categories, financial and product commercialization. Our General Partner oversees management of financial risks, and regularly reviews information regarding our cash position, liquidity and operations, as well as the risks associated with each. The General Partner regularly reviews plans, results and potential risks related to our product development and commercialization efforts. Our General Partner also oversees risk management as it relates to our compensation plans, policies and practices for all employees including executives and directors, particularly whether our compensation programs may create incentives for our employees to take excessive or inappropriate risks which could have a material adverse effect on us.

### Committees

We do not currently maintain an audit committee, compensation committee, corporate governance and nominating committee, conflicts committee or an executive committee.

### Compensation of Members of our General Partner

Our General Partner manages all of our operations and activities. Our General Partner does not have an operating agreement. Pursuant to Delaware law, in the absence of an operating agreement, our General Partner is managed by its members. The current sole member of our General Partner is Kevin Frija, who is our Chief Executive Officer, President, principal financial officer and principal accounting officer. Through the General Partner, Mr. Frija manages all of our operations and activities. Mr. Frija does not receive any additional compensation for his services as sole member of our General Partner. During 2025, our General Partner had two members: Messrs. Frija and Pan. Neither member received any additional compensation for his services as a member of our General Partner.

40

*Procedures for Contacting the General Partner*

The General Partner has established a process for unitholders and other interested parties to send written communications to the General Partner or to individual members of General Partner, as applicable. Such communications should be sent by U.S. mail addressed to:

> Soleil Capital Management LLC
> c/o VPR Brands, LP
> Attention: Corporate Secretary
> 1141 Sawgrass Corporate Parkway
> Sunrise, FL 33323

The General Partner has instructed the Corporate Secretary to promptly forward all communications so received to the full General Partner, the independent directors or the individual Board member(s) specifically addressed in the communication. Comments or questions regarding our accounting, internal controls or auditing matters, our compensation and benefit programs, or the nomination of directors and other corporate governance matters will be delivered to all members of the General Partner.

Depending on the subject matter, the Company's Corporate Secretary will:

- Forward the communication to the members to whom it is addressed;

- Attempt to handle the inquiry directly, for example, where it is a request for information about our Company or if it is a securities-related matter; or

- Not forward the communication if it is primarily commercial in nature or if it relates to a topic that is not relevant to the General Partner or is otherwise improper.

*Procedures for Recommending, Nominating and Evaluating Director Candidates*

We are organized as a limited partnership. Members of limited partnerships, also known as limited partners, have different rights than shareholders of a corporation. Unlike a corporation for which stockholders are able to elect members of its board of directors, we do not have a board of directors, and our unitholders do not have the right or ability to nominate directors. Our General Partner manages all of our operations and activities. Our General Partner does not have an operating agreement. Pursuant to Delaware law, in the absence of an operating agreement, our General Partner is managed by its members. The current sole member of our General Partner is Kevin Frija, who is our Chief Executive Officer, President, principal financial officer and principal accounting officer. Through the General Partner, Mr. Frija manages all of our operations and activities, as sole member of the General Partner.

*Code of Ethics*

The Company has adopted a code of ethics that applies to all of our employees, including its principal executive officer, principal financial officer and principal accounting officer, and the General Partner. We will provide, free of charge, a copy of our code of ethics to any person, upon request. A copy of the code of ethics can be requested by writing to us at 1141 Sawgrass Corporate Parkway, Sunrise, FL 33323.

41

**Item 11. Executive Compensation**

Our compensation philosophy for our future manager and certain other employees is that compensation should be composed primarily of (1) annual cash payments tied to the performance of the applicable business unit(s) in which such employee works; (2) long-term carried interest tied to the performance of the investments made by the funds in the business unit in which such employee works or for which he or she has responsibility; (3) deferred equity awards reflecting the value of our common units; and (4) additional cash payments tied to extraordinary performance of such employee or other circumstances (for example, if there has been a change of role or responsibility).

We believe base salary should represent a significantly lesser component of total compensation. We believe the appropriate combination of annual cash payments and long-term carried interest or deferred equity awards encourage employees to focus on the underlying performance of our investment funds and objectives of our advisory clients, as well as the overall performance of the firm and interests of our common unit holders.

**2025 SUMMARY COMPENSATION TABLE**

| Name & Principal Position | Year | Salary $ | Bonus $ | Unit Awards $ | Option Awards $ | Nonequity Incentive plan compensation $ | Nonqualified deferred compensation earnings $ | All Other Compensation $ | Total $ |
|---|---|---|---|---|---|---|---|---|---|
| Kevin Frija, | 2025 | $ 209,118 | — | — | — | — | — | — $ | 209,118 |
| Chief Executive Officer and President | 2024 | $ 198,014 | — | 102,596 | — | — | — | — $ | 300,610 |
| | | | | | | | | | |
| Dan Hoff | 2025 | $ 210,977 | — | — | — | — | — | — $ | 210,977 |
| Chief Operating Officer | 2024 | $ 104,000 | — | 102,596 | — | 123,101 | — | — $ | 329,697 |

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The following table provides the names and addresses of each of our executive officers, each of the members of our General Partner, all of such members and executive officers as a group and each person known to own directly or beneficially more than 5% of our outstanding common units (as determined in accordance with Rule 13d-3 under the Exchange Act) as of March 31, 2026. On March 31, 2026, there were 91,746,806 common units outstanding. Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities. Except as indicated by footnote, and subject to the community property laws where applicable, to our knowledge the persons named in the table above have sole voting and investment power with respect to all common units shown as beneficially owned by them. Unless otherwise noted below, the address for each beneficial owner listed on the table is in care of VPR Brands, LP, 1141 Sawgrass Corporate Parkway, Sunrise, FL 33323.

| Name and address of beneficial owner | Common Units Beneficially Owned | Percentage of Beneficial Ownership(1) |
|---|---|---|
| *Named Executive Officers and Members of our General Partner:* | | |
| Kevin Frija | 24,230,824 | 26.4% |
| Dan Hoff | 3,130,447 | 3.4% |
| All current executive officers and members of our General Partner as a group (two persons) | 27,361,271 | 29.8% |
| | | |
| *Other 5% Unitholders:* | | |
| Guocheng "Greg" Pan (2) | 10,381,360 | 11.3% |

(1) In determining the percent of voting units owned by a person (a) the numerator is the number of common units beneficially owned by the person, including units the beneficial ownership of which may be acquired within 60 days upon the exercise of rights to acquire (such as options or warrants) or conversion of convertible securities, and (b) the denominator is the total of (i) the 91,746,806 common units outstanding, plus (ii) any common units which the person has the right to acquire within 60 days upon the exercise of rights to acquire (such as options or warrants) or conversion of convertible securities.

(2) Mr. Pan's address is 787 Adeline Ave., San Jose, CA 95136.

42

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

*Our Policy Concerning Transactions with Related Persons*

Under Item 404 of SEC Regulation S-K, a related person transaction is any actual or proposed transaction, arrangement or relationship or series of similar transactions, arrangements or relationships, including those involving indebtedness not in the ordinary course of business, to which we or our subsidiaries were or are a party, or in which we or our subsidiaries were or are a participant, in which the amount involved exceeded or exceeds the lesser of $120,000 or 1% of the average of our total assets at year-end for the last two completed fiscal years and in which any member of our General Partner, executive officers, beneficial owners of more than 5% of any class of our voting securities (a "significant unitholder"), or any member of the immediate family of any of the foregoing persons, had or will have a direct or indirect material interest.

We recognize that transactions between us and any of our affiliates or with a third party in which one of our affiliates, directors or significant unitholders has an interest can present potential or actual conflicts of interest and create the appearance that our decisions are based on considerations other than the best interests of our Company and unitholders.

Our General Partner is charged with responsibility for reviewing, approving and overseeing any transaction between the Company and any related person (as defined in Item 404 of Regulation S-K), including the propriety and ethical implications of any such transactions, as reported or disclosed to the General Partner by the independent auditors, employees, officers, members of the Board of Directors or otherwise, and to determine whether the terms of the transaction are not less favorable to us than could be obtained from an unaffiliated party.

*Transactions*

The following includes a summary of transactions since January 1, 2025, or any currently proposed transaction, in which we were or are to be a participant and the amount involved exceeded or exceeds the lesser of $120,000 or 1% of the average of our total assets at year-end for the last two completed fiscal years, and in which any related person had or will have a direct or indirect material interest.

From time to time we have received funds from Mr. Frija, our Chief Executive Officer, President, principal financial officer, principal accounting officer, and sole member of our General Partner, significant unitholder, in exchange for promissory notes (the "Frija Notes"). All of the Frija Notes were unsecured, bore an interest rate of 24% per annum, were 0-due on the one year anniversary of the date of the respective Frija Note, and permitted Mr. Frija to deduct one ACH payment from our bank account in the amount of $500 per business day until the principal amount due and accrued interest was repaid on each of the Frija Notes. Information regarding certain of the Frija Notes is included below.

In April 2022, we received $100,001 pursuant to a promissory note in the principal amount of $100,001 (the "April 2022 Frija Note") to Mr. Frija. The balance of the April 2022 Frija Note $50,809, which was repaid during the year ended December 31, 2024. Accordingly, the balance of the April 2022 Frija Note as of December 31, 2025, was $0.

In May 2022, we received $52,000 and in September 2022 received $48,001 of advances pursuant to a promissory note in the principal amount of $100,001 (the "May 2022 Frija Note") to Mr. Frija. The balance of the May 2022 Frija Note as of December 31, 2023, was $100,001, which was repaid during the year ended December 31, 2024. Accordingly, the balance of the May 2022 Frija Note as of December 31, 2025, was $0.

In September 2022, we received $1,000 and in October 2022 received $14,000 of advances pursuant to a promissory note in the principal amount of $100,001 (the "September 2022 Note") to Mr. Frija. The balance of the September 2022 Note as of December 31, 2023, was $15,000, which was repaid during the year ended December 31, 2024. Accordingly, the balance of September 2022 Note as of December 31, 2025, was $0.

The Company did not record any transactions outside the ordinary business with these parameters during the year ended December 31, 2025.

43

*Indemnification of Management*

Under our partnership agreement, in most circumstances we will indemnify the following persons, to the fullest extent permitted by law, from and against all losses, claims, damages, liabilities, joint or several, expenses (including legal fees and expenses), judgments, fines, penalties, interest, settlements or other amounts: our general partner; any departing general partner; any person who is or was an affiliate of a general partner or any departing general partner; any person who is or was a member, partner, tax matters partner, officer, director, employee, agent, fiduciary or trustee of us or our subsidiaries, the general partner or any departing general partner or any affiliate of ours or our subsidiaries, the general partner or any departing general partner; any person who is or was serving at the request of a general partner or any departing general partner or any affiliate of a general partner or any departing general partner as an officer, director, employee, member, partner, agent, fiduciary or trustee of another person; or any person designated by our general partner. We have agreed to provide this indemnification to the extent such person acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the partnership, and with respect to any alleged conduct resulting in a criminal proceeding against such person, to deny indemnification if such person had reasonable cause to believe that his or her conduct was unlawful. We have also agreed to provide this indemnification for criminal proceedings. Any indemnification under these provisions will only be out of our assets. Unless it otherwise agrees, the general partner will not be personally liable for, or have any obligation to contribute or loan funds or assets to us to enable it to effectuate indemnification. We may purchase insurance against liabilities asserted against and expenses incurred by persons for our activities, regardless of whether we would have the power to indemnify the person against liabilities under our partnership agreement.

*Independence*

Our common units are currently quoted on the OTCQB market tier of the OTC Markets Group, Inc. The OTCQB does not have any director independence requirements.

We are organized as a limited partnership. Unlike a corporation for which stockholders are able to elect members of its board of directors, we do not have a board of directors. We are managed by our General Partner. Our General Partner does not have an operating agreement. Pursuant to Delaware law, in the absence of an operating agreement, our General Partner is managed by its members. The sole member of our General Partner is Mr. Frija, who also serves our Chief Executive Officer, President, principal financial officer, and principal accounting officer, and is a significant unitholder. Accordingly, Mr. Frija, the sole member of our General Partner, is not independent.

*Material Provisions of the VPR Brands, LP Partnership Agreement*

The following is a summary of the material provisions of the Agreement of Limited Partnership, as amended, of the Company, which is referred to herein as our "partnership agreement."

*General Partner*

Our General Partner, Soleil Capital Management L.L.C., manages all of our operations and activities. Our General Partner is authorized in general to perform all acts that it determines to be necessary or appropriate to carry out our purposes and to conduct our business. Our partnership agreement provides that our general partner in managing our operations and activities will be entitled to consider only such interests and factors as it desires, including its own interests, and will have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting us or any limited partners, and will not be subject to any different standards imposed by the partnership agreement, the Delaware Limited Partnership Act or under any other law, rule or regulation or in equity. Our common unitholders have only limited voting rights on matters affecting our business and therefore have limited ability to influence management's decisions regarding our business. The voting rights of our common unitholders are limited as set forth in our partnership agreement and in the Delaware Limited Partnership Act. For example, our General Partner may generally make amendments to our partnership agreement or certificate of limited partnership without the approval of any common unitholder as set forth under "– Amendment of the Partnership Agreement – No Limited Partner Approval."

*Organization*

We were formed on June 19, 2004 and have a perpetual existence.

*Purpose*

Under our partnership agreement, we are permitted to engage, directly or indirectly, in any business activity that is approved by our general partner and that lawfully may be conducted by a limited partnership organized under Delaware law.

44

*Power of Attorney*

Each limited partner, and each person who acquires a limited partner interest in accordance with our partnership agreement, grants to our general partner and, if appointed, a liquidator, a power of attorney to, among other things, execute and file documents required for our qualification, continuance, dissolution or termination. The power of attorney also grants our general partner the authority to amend, and to make consents and waivers under, our partnership agreement and certificate of limited partnership, in each case in accordance with our partnership agreement.

*Capital Contributions*

Our common unitholders are not obligated to make additional capital contributions, except as described below under "Limited Liability."

*Limited Liability*

Assuming that a limited partner does not participate in the control of our business within the meaning of the Delaware Limited Partnership Act and that he otherwise acts in conformity with the provisions of our partnership agreement, his liability under the Delaware Limited Partnership Act will be limited, subject to possible exceptions, to the amount of capital he is obligated to contribute to us for his common units plus his share of any undistributed profits and assets. If it were determined however that the right, or exercise of the right, by the limited partners as a group:

- to remove or replace our general partner,

- to approve some amendments to our partnership agreement, or

- to take other action under our partnership agreement,

- constituted "participation in the control" of our business for the purposes of the Delaware Limited Partnership Act, then our limited partners could be held personally liable for our obligations under the laws of Delaware to the same extent as our general partner. This liability would extend to persons who transact business with us who reasonably believe that the limited partner is a general partner.

Neither our partnership agreement nor the Delaware Limited Partnership Act specifically provides for legal recourse against our general partner if a limited partner were to lose limited liability through any fault of our general partner. While this does not mean that a limited partner could not seek legal recourse, we know of no precedent for this type of a claim in Delaware case law.

Under the Delaware Limited Partnership Act, a limited partnership may not make a distribution to a partner if after the distribution all liabilities of the limited partnership, other than liabilities to partners on account of their partnership interests and liabilities for which the recourse of creditors is limited to specific property of the partnership, would exceed the fair value of the assets of the limited partnership. For the purpose of determining the fair value of the assets of a limited partnership, the Delaware Limited Partnership Act provides that the fair value of property subject to liability for which recourse of creditors is limited will be included in the assets of the limited partnership only to the extent that the fair value of that property exceeds the non-recourse liability. The Delaware Limited Partnership Act provides that a limited partner who receives a distribution and knew at the time of the distribution that the distribution was in violation of the Delaware Limited Partnership Act will be liable to the limited partnership for the amount of the distribution for three years. Under the Delaware Limited Partnership Act, a substituted limited partner of a limited partnership is liable for the obligations of his assignor to make contributions to the partnership, except that such person is not obligated for liabilities unknown to him at the time he became a limited partner and that could not be ascertained from the partnership agreement.

Moreover, if it were determined that we were conducting business in any state without compliance with the applicable limited partnership statute, or that the right or exercise of the right by the limited partners as a group to remove or replace our general partner, to approve some amendments to our partnership agreement or to take other action under our partnership agreement constituted "participation in the control" of our business for purposes of the statutes of any relevant jurisdiction, then the limited partners could be held personally liable for our obligations under the law of that jurisdiction to the same extent as our general partner under the circumstances. We intend to operate in a manner that our general partner considers reasonable and necessary or appropriate to preserve the limited liability of the limited partners.

45

*Issuance of Additional Securities*

Our partnership agreement authorizes us to issue an unlimited number of additional partnership securities and options, rights, warrants and appreciation rights relating to partnership securities for the consideration and on the terms and conditions established by our general partner in its sole discretion without the approval of any limited partners.

In accordance with the Delaware Limited Partnership Act and the provisions of our partnership agreement, we may also issue additional partnership interests that have designations, preferences, rights, powers and duties that are different from, and may be senior to, those applicable to the common units.

*Distributions*

Distributions will be made to the partners pro rata according to the percentages of their respective partnership interests.

*Amendment of the Partnership Agreement*

General

Amendments to our partnership agreement may be proposed only by or with the consent of our general partner. To adopt a proposed amendment, other than the amendments that require limited partner approval discussed below, our general partner must seek approval of a majority of our outstanding units required to approve the amendment or call a meeting of the limited partners to consider and vote upon the proposed amendment.

Prohibited Amendments

No amendment may be made that would:

1. enlarge the obligations of any limited partner without its consent, except that any amendment that would have a material adverse effect on the rights or preferences of any class of partnership interests in relation to other classes of partnership interests may be approved by at least a majority of the type or class of partnership interests so affected, or

2. enlarge the obligations of, restrict in any way any action by or rights of, or reduce in any way the amounts distributable, reimbursable or otherwise payable by us to our general partner or any of its affiliates without the consent of our general partner, which may be given or withheld in its sole discretion.

The provision of our partnership agreement preventing the amendments having the effects described in clauses (1) or (2) above can be amended upon the approval of the holders of at least 90% of the outstanding voting units.

No Limited Partner Approval

Our General Partner may generally make amendments to our partnership agreement or certificate of limited partnership without the approval of any limited partner to reflect:

1. a change in the name of the partnership, the location of the partnership's principal place of business, the partnership's registered agent or its registered office;

2. the admission, substitution, withdrawal or removal of partners in accordance with the partnership agreement;

3. a change that our general partner determines is necessary or appropriate for the partnership to qualify or to continue our qualification as a limited partnership or a partnership in which the limited partners have limited liability under the laws of any state or other jurisdiction or to ensure that the partnership will not be treated as an association taxable as a corporation or otherwise taxed as an entity for U.S. federal income tax purposes;

46

4. amendment that our general partner determines to be necessary or appropriate to address certain changes in U.S. federal income tax regulations, legislation or interpretation;

5. an amendment that is necessary, in the opinion of our counsel, to prevent the partnership or our general partner or its directors, officers, agents or trustees, from having a material risk of being in any manner being subjected to the provisions of the 1940 Act, the Advisers Act or "plan asset" regulations adopted under the U.S. Employee Retirement Income Security Act of 1974, whether or not substantially similar to plan asset regulations currently applied or proposed by the U.S. Department of Labor;

6. an amendment that our general partner determines in its sole discretion to be necessary or appropriate for the creation, authorization or issuance of any class or series of partnership securities or options, rights, warrants or appreciation rights relating to partnership securities;

7. any amendment expressly permitted in our partnership agreement to be made by our general partner acting alone;

8. an amendment effected, necessitated or contemplated by an agreement of merger, consolidation or other business combination agreement that has been approved under the terms of our partnership agreement;

9. any amendment that in the sole discretion of our general partner is necessary or appropriate to reflect and account for the formation by the partnership of, or its investment in, any corporation, partnership, joint venture, limited liability company or other entity, as otherwise permitted by our partnership agreement;

10. a change in our fiscal year or taxable year and related changes;

11. a merger with or conversion or conveyance to another limited liability entity that is newly formed and has no assets, liabilities or operations at the time of the merger, conversion or conveyance other than those it receives by way of the merger, conversion or conveyance; and/or

12. any other amendments substantially similar to any of the matters described in (1) through (11) above.

In addition, our General Partner may make amendments to our partnership agreement without the approval of any limited partner if those amendments, in the discretion of our General Partner:

1. do not adversely affect our limited partners considered as a whole (including any particular class of partnership interests as compared to other classes of partnership interests) in any material respect;

2. are necessary or appropriate to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state or non-U.S. agency or judicial authority or contained in any federal or state or non-U.S. statute (including the Delaware Limited Partnership Act);

3. are necessary or appropriate to facilitate the trading of limited partner interests or to comply with any rule, regulation, guideline or requirement of any securities exchange on which the limited partner interests are or will be listed for trading;

4. are necessary or appropriate for any action taken by our general partner relating to splits or combinations of units under the provisions of our partnership agreement; or

5. are required to effect the intent of the provisions of our partnership agreement or are otherwise contemplated by our partnership agreement.

47

Opinion of Counsel and Limited Partner Approval

Our General Partner will not be required to obtain an opinion of counsel that an amendment will not result in a loss of limited liability to the limited partners if one of the amendments described above under "–No Limited Partner Approval" should occur. No other amendments to our partnership agreement (other than an amendment pursuant to a merger, sale or other disposition of assets effected in accordance with the provisions described under "–Merger, Sale or Other Disposition of Assets") will become effective without the approval of holders of at least 90% of the outstanding common units, unless we obtain an opinion of counsel to the effect that the amendment will not affect the limited liability under the Delaware Limited Partnership Act of any of our limited partners.

In addition to the above restrictions, any amendment that would have a material adverse effect on the rights or preferences of any type or class of partnership interests in relation to other classes of partnership interests will also require the approval of the holders of at least a majority of the outstanding partnership interests of the class so affected.

In addition, any amendment that reduces the voting percentage required to take any action must be approved by the affirmative vote of limited partners whose aggregate outstanding voting units constitute not less than the voting requirement sought to be reduced.

*Merger, Sale or Other Disposition of Assets*

Our partnership agreement generally prohibits our general partner, without the prior approval of the holders of a majority of the voting power of our outstanding voting units, from causing us to, among other things, sell, exchange or otherwise dispose of all or substantially all of our assets in a single transaction or a series of related transactions, including by way of merger, consolidation or other combination, or approving on our behalf the sale, exchange or other disposition of all or substantially all of the assets of our subsidiaries. However, our general partner in its sole discretion may mortgage, pledge, hypothecate or grant a security interest in all or substantially all of our assets (including for the benefit of persons other than us or our subsidiaries) without that approval. Our general partner may also sell all or substantially all of our assets under any forced sale of any or all of our assets pursuant to the foreclosure or other realization upon those encumbrances without that approval.

If conditions specified in our partnership agreement are satisfied, our general partner may convert or merge us or any of our subsidiaries into, or convey some or all of our assets to, a newly formed entity if the sole purpose of that merger or conveyance is to effect a mere change in our legal form into another limited liability entity. The common unitholders are not entitled to dissenters' rights of appraisal under our partnership agreement or the Delaware Limited Partnership Act in the event of a merger or consolidation, a sale of substantially all of our assets or any other transaction or event.

Treated as a Corporation for Tax Purposes

We are treated as a corporation for U.S. federal (and applicable state) income tax purposes.

Dissolution

We will dissolve upon:

1. the election of our general partner to dissolve us, if approved by the holders of a majority of the voting power of our outstanding voting units;

2. there being no limited partners, unless we are continued without dissolution in accordance with the Delaware Limited Partnership Act;

3. the entry of a decree of judicial dissolution of us pursuant to the Delaware Limited Partnership Act; or

4. the withdrawal or removal of our general partner or any other event that results in its ceasing to be our general partner other than by reason of a transfer of general partner interests or withdrawal or removal of our general partner following approval and admission of a successor, in each case in accordance with our partnership agreement.

48

Upon a dissolution under clause (4), the holders of a majority of the voting power of our outstanding voting units may also elect, within specific time limitations, to continue our business without dissolution on the same terms and conditions described in the partnership agreement by appointing as a successor general partner an individual or entity approved by the holders of a majority of the voting power of the outstanding voting units, subject to our receipt of an opinion of counsel to the effect that:

1. the action would not result in the loss of limited liability of any limited partner; and

2. neither we nor any successor limited partnership would be treated as an association taxable as a corporation or otherwise be taxable as an entity for U.S. federal income tax purposes upon the exercise of that right to continue.

*Liquidation and Distribution of Proceeds*

Upon our dissolution, unless we are continued as a new limited partnership, the liquidator authorized to wind up our affairs will, acting with all of the powers of our general partner that the liquidator deems necessary or appropriate in its judgment, liquidate our assets and apply the proceeds of the liquidation first, to discharge our liabilities as provided in the partnership agreement and by law and thereafter to the partners pro rata according to the percentages of their respective partnership interests as of a record date selected by the liquidator. The liquidator may defer liquidation of our assets for a reasonable period of time or distribute assets to partners in kind if it determines that an immediate sale or distribution of all or some of our assets would be impractical or would cause undue loss to the partners.

*Withdrawal or Removal of the General Partner*

On or after June 30, 2017, our General Partner may withdraw as general partner without first obtaining approval of any common unitholder by giving 90 days' advance notice, and that withdrawal will not constitute a violation of the partnership agreement. Notwithstanding the foregoing, our general partner may withdraw at any time without common unitholder approval upon 90 days' advance notice to the limited partners if at least 50% of the outstanding common units are beneficially owned or owned of record or controlled by one person and its affiliates other than our general partner and its affiliates.

Upon the withdrawal of our general partner under any circumstances, the holders of a majority of the voting power of our outstanding voting units may select a successor to that withdrawing general partner. If a successor is not elected, or is elected but an opinion of counsel regarding limited liability and tax matters cannot be obtained, we will be dissolved, wound up and liquidated, unless within 180 days after that withdrawal, the holders of a majority of the voting power of our outstanding voting units agree in writing to continue our business and to appoint a successor general partner. See "–Dissolution" above.

Our General Partner may not be removed unless that removal is approved by the vote of the holders of at least 66-2/3% of the outstanding voting units and we receive an opinion of counsel regarding limited liability and tax matters. Any removal of our General Partner is also subject to the approval of a successor general partner by the vote of the holders of a majority of the voting power of our outstanding voting units. See "–Meetings; Voting" below.

In the event of removal of a general partner under circumstances where cause exists or withdrawal of a general partner where that withdrawal violates our partnership agreement, a successor general partner will have the option to purchase the general partner interest of the departing general partner for a cash payment equal to its fair market value. Under all other circumstances where a general partner withdraws or is removed by the limited partners, the departing general partner will have the option to require the successor general partner to purchase the general partner interest of the departing general partner for a cash payment equal to its fair market value. In each case, this fair market value will be determined by agreement between the departing general partner and the successor general partner. If no agreement is reached within 30 days of the general partner's departure, an independent investment banking firm or other independent expert selected by the departing general partner and the successor general partner will determine the fair market value. If the departing general partner and the successor general partner cannot agree upon an expert within 45 days of the general partner's departure, then an expert chosen by agreement of the experts selected by each of them will determine the fair market value.

If the option described above is not exercised by either the departing general partner or the successor general partner, the departing general partner's general partner interest will automatically convert into common units pursuant to a valuation of those interests as determined by an investment banking firm or other independent expert selected in the manner described in the preceding paragraph.

In addition, we are required to reimburse the departing general partner for all amounts due the departing general partner, including without limitation all employee-related liabilities, including severance liabilities, incurred for the termination of any employees employed by the departing general partner or its affiliates for our benefit.

*Transfer of General Partner Interests*

On or after June 30, 2017, our General Partner may transfer all or any part of its general partner interest without first obtaining approval of any common unitholder. As a condition of this transfer, the transferee must assume the rights and duties of the general partner to whose interest that transferee has succeeded, agree to be bound by the provisions of our partnership agreement and furnish an opinion of counsel regarding limited liability matters. At any time, the members of our general partner may sell or transfer all or part of their limited liability company interests in our general partner without the approval of the common unitholders.

---

49

*Limited Call Right*

If at any time less than 10% of the then issued and outstanding limited partner interests of any class (other than special voting units), including our public common units, are held by persons other than our general partner and its affiliates, our general partner will have the right, which it may assign in whole or in part to any of its affiliates or to us, to acquire all, but not less than all, of the remaining limited partner interests of the class held by unaffiliated persons as of a record date to be selected by our general partner, on at least 10 but not more than 60 days' notice. The purchase price in the event of this purchase is the greater of:

1. the current market price as of the date three days before the date the notice is mailed; and

2. the highest cash price paid by our general partner or any of its affiliates for any limited partner interests of the class purchased within the 90 days preceding the date on which our general partner first mails notice of its election to purchase those limited partner interests.

As a result of our General Partner's right to purchase outstanding limited partner interests, a holder of limited partner interests may have his limited partner interests purchased at an undesirable time or price. The tax consequences to a common unitholder of the exercise of this call right are the same as a sale by that common unitholder of his common units in the market.

*Sinking Fund; Preemptive Rights*

We have not established a sinking fund and we have not granted any preemptive rights with respect to our limited partner interests.

*Meetings; Voting*

Except as described below regarding a person or group owning 20% or more of our common units then outstanding, record holders of common units on the record date will be entitled to notice of, and to vote at, meetings of our limited partners and to act upon matters as to which holders of limited partner interests have the right to vote or to act.

Except as described below regarding a person or group owning 20% or more of our common units then outstanding, each record holder of a common unit is entitled to a number of votes equal to the number of common units held.

Our General Partner does not anticipate that any meeting of common unitholders will be called in the foreseeable future. Any action that is required or permitted to be taken by the limited partners may be taken either at a meeting of the limited partners or without a meeting, without a vote and without prior notice if consents in writing describing the action so taken are signed by limited partners owning not less than the minimum percentage of the voting power of the outstanding limited partner interests that would be necessary to authorize or take that action at a meeting. Meetings of the limited partners may be called by our general partner or by limited partners owning at least 50% or more of the voting power of the outstanding limited partner interests of the class for which a meeting is proposed. Common unitholders may vote either in person or by proxy at meetings. The holders of a majority of the voting power of the outstanding limited partner interests of the class for which a meeting has been called, represented in person or by proxy, will constitute a quorum unless any action by the limited partners requires approval by holders of a greater percentage of such limited partner interests, in which case the quorum will be the greater percentage.

However, if at any time any person or group (other than our general partner and its affiliates, or a direct or subsequently approved transferee of our general partner or its affiliates) acquires, in the aggregate, beneficial ownership of 20% or more of any class of common units then outstanding, that person or group will lose voting rights on all of its common units and the common units may not be voted on any matter and will not be considered to be outstanding when sending notices of a meeting of common unitholders, calculating required votes, determining the presence of a quorum or for other similar purposes. Common units held in nominee or street name account will be voted by the broker or other nominee in accordance with the instruction of the beneficial owner unless the arrangement between the beneficial owner and his nominee provides otherwise.

*Status as Limited Partner*

By transfer of common units in accordance with our partnership agreement, each transferee of common units will be admitted as a limited partner with respect to the common units transferred when such transfer and admission is reflected in our books and records. Except pursuant to section 17-607 as described under "–Limited Liability" above, pursuant to Section 17-804 of the Delaware Limited Partnership Act (which relates to the liability of a limited partner who receives a distribution of assets upon the winding up of a limited partnership and who knew at the time of such distribution that it was in violation of this provision) or as set forth in the partnership agreement, the common units will be fully paid and non-assessable.

50

*Non-Citizen Assignees; Redemption*

If we are or become subject to federal, state or local laws or regulations that in the determination of our general partner create a substantial risk of cancellation or forfeiture of any property in which the partnership has an interest because of the nationality, citizenship or other related status of any limited partner, we may redeem the common units held by that limited partner at their current market price. To avoid any cancellation or forfeiture, our general partner may require each limited partner to furnish information about his nationality, citizenship or related status. If a limited partner fails to furnish information about his nationality, citizenship or other related status within 30 days after a request for the information or our general partner determines, with the advice of counsel, after receipt of the information that the limited partner is not an eligible citizen, the limited partner may be treated as a non-citizen assignee. A non-citizen assignee does not have the right to direct the voting of his common units and may not receive distributions in kind upon our liquidation.

*Indemnification*

Under our partnership agreement, in most circumstances we will indemnify the following persons, to the fullest extent permitted by law, from and against all losses, claims, damages, liabilities, joint or several, expenses (including legal fees and expenses), judgments, fines, penalties, interest, settlements or other amounts:

- our General Partner;

- any departing general partner;

- any person who is or was an affiliate of a general partner or any departing general partner;

- any person who is or was a member, partner, tax matters partner, officer, director, employee, agent, fiduciary or trustee of us or our subsidiaries, the general partner or any departing general partner or any affiliate of us or our subsidiaries, the general partner or any departing general partner;

- any person who is or was serving at the request of a general partner or any departing general partner or any affiliate of a general partner or any departing general partner as an officer, director, employee, member, partner, agent, fiduciary or trustee of another person; or

- any person designated by our General Partner.

We have agreed to provide this indemnification unless there has been a final and non-appealable judgment by a court of competent jurisdiction determining that these persons acted in bad faith or engaged in fraud or willful misconduct. We have also agreed to provide this indemnification for criminal proceedings. Any indemnification under these provisions will only be out of our assets. Unless it otherwise agrees, the General Partner will not be personally liable for, or have any obligation to contribute or loan funds or assets to us to enable it to effectuate, indemnification. We may purchase insurance against liabilities asserted against and expenses incurred by persons for our activities, regardless of whether we would have the power to indemnify the person against liabilities under our partnership agreement.

*Books and Reports*

Our general partner is required to keep appropriate books of the partnership's business at our principal offices or any other place designated by our general partner. The books will be maintained for both tax and financial reporting purposes on an accrual basis. For tax and financial reporting purposes, our year ends on December 31 each year.

We will make available to record holders of common units, within 120 days after the close of each fiscal year, an annual report containing audited financial statements and a report on those financial statements by our independent public accountants. Except for our fourth quarter, we will also make available summary financial information within 90 days after the close of each quarter. Under our partnership agreement, we will be deemed to have made such annual reports and quarterly financial information available to each record holder of common units if we have either (i) filed the report or information with the SEC via its Electronic Data Gathering, Analysis and Retrieval system and such report or information is publicly available on such system or (ii) made such report or information available on any publicly available website maintained by us.

As soon as reasonably practicable after the end of each fiscal year, we will furnish to each partner tax information (including Schedule K-1), which describes on a U.S. dollar basis such partner's share of our income, gain, loss and deduction for our preceding taxable year. It will most likely require longer than 90 days after the end of our fiscal year to obtain the requisite information from all lower-tier entities so that K-1s may be prepared for us. Consequently, holders of common units who are U.S. taxpayers should anticipate the need to file annually with the IRS (and certain states) a request for an extension past April 15 or the otherwise applicable due date of their income tax return for the taxable year. In addition, each partner will be required to report for all tax purposes consistently with the information provided by us.

51

Right to Inspect Our Books and Records

Our partnership agreement provides that a limited partner can, for a purpose reasonably related to his interest as a limited partner, upon reasonable written demand and at his own expense, have furnished to him:

- promptly after becoming available, a copy of our U.S. federal, state and local income tax returns; and;

- copies of our partnership agreement, the certificate of limited partnership of the partnership, related amendments and powers of attorney under which they have been executed

Our general partner may, and intends to, keep confidential from the limited partners trade secrets or other information the disclosure of which our general partner believes is not in our best interests or which we are required by law or by agreements with third parties to keep confidential.

## Item 14. Principal Accounting Fees and Services

Kreit & Chiu CPA LLP ("Kreit & Chiu") serves as our independent registered public accounting firm. The following table summarizes the aggregate fees for professional services provided by Kreit & Chiu for the years ended December 31, 2025 and 2024.

| | Kreit & Chiu | |
| --- | --- | --- |
| | 2025 | 2024 |
| Audit Fees | 114,234 | 152,793 |
| Audit-Related Fees | - | - |
| Tax Fees | - | - |
| All Other Fees | - | - |
| Total | 114,234 | 152,793 |

*Audit Fees* – This category consists of fees for (a) the audits of our financial statements in our Annual Report on Form 10-K and services attendant to, or required by, statute or regulation; (b) reviews of the interim and combined financial statements included in our quarterly reports on Form 10-Q; (c) comfort letters, consents and other services related to SEC and other regulatory filings.

*Audit-Related Fees –* This category consists of assurance and related services by the independent registered public accounting firm that are reasonably related to the performance of the audit or review of our financial statements and are not reported above under "Audit Fees." The services for the fees disclosed under this category include consultation regarding our correspondence with the SEC, other accounting consulting and other audit services.

*Tax Fees* – This category consists of fees for services rendered for tax compliance and tax planning and advisory services.

*All Other Fees –* This category consists of fees for other miscellaneous items.

### *Pre-Approval Policies and Procedures*

Our General Partner pre-approves all services provided by our independent auditors. All of the above services and fees were reviewed and approved by our General Partner before the respective services were rendered.

Our board of directors has considered the nature and amount of fees billed by our independent registered public accounting firm and believe that the provision of services for activities unrelated to the audit is compatible with maintaining their respective independence.

52

PART IV

**Item 15. Exhibits, Financial Statement Schedules**

(a)  Documents filed as part of this report:

(1)  All financial statements

**Index to Financial Statements**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB Firm ID 6651) | F-1 |
| VPR Brands, LP Balance Sheets as of December 31, 2025 and 2024 | F-2 |
| VPR Brands, LP Statements of Operations for the years ended December 31, 2025 and 2024 | F-3 |
| VPR Brands, LP Statements of Changes in Partners' Capital for the years ended December 31, 2025 and 2024 | F-4 |
| VPR Brands, LP Statements of Cash Flows for the years ended December 31, 2025 and 2024 | F-5 |
| Notes to Financial Statements | F-6 |

Financial Statements filed as part of this annual report are filed in accordance with Reg. 210.3-11 of Regulation S-X

(2)  Financial Statement Schedules

All financial statement schedules have been omitted, since the required information is not applicable or is not present in amounts sufficient to require submission of the schedule, or because the information required is included in the financial statements and notes thereto.

(b)  Exhibits required by Item 601 of Regulation S-K

| Exhibit Number | Description of Exhibit |
|---|---|
| 3.1 | State of Delaware Certificate of Limited Partnership of Soleil Capital L.P. (incorporated by reference to Exhibit 10.5 to the Company's Form 10-Q for the quarter ended September 30, 2009). |
| 3.2 | State of Delaware Amendment to Certificate of Limited Partnership of Soleil Capital L.P. (incorporated by reference to Exhibit 3.2 to the Company's Form 10-Q for the quarter ended September 30, 2015). |
| 3.3 | Agreement of Limited Partnership of Soleil Capital L.P. dated September 19, 2009 (incorporated by reference to Exhibit 3.2 to the Company's Form 10-K for the fiscal year ended December 31, 2009). |
| 3.4 | First Amendment to Limited Partnership Agreement of Soleil Capital L.P., dated September 10, 2015 (incorporated by reference to Exhibit 3.1 to the Company's Form 8-K filed on September 10, 2015). |
| 3.5 | Second Amendment, dated January 23, 2020, to Limited Partnership Agreement of VPR Brands, LP (incorporated by reference to Exhibit 3.1 to the Company's Form 8-K filed with the Commission on January 27, 2020). |
| 4.1 | Material Provisions of the VPR Brands, LP Partnership Agreement (incorporated by reference to Exhibit 4.1 to the Company's Form 10-K filed with the Commission on April 19, 2024). |
| 10.1 | Share Purchase Agreement, dated May 29, 2015, among Soleil Capital L.P., Soleil Capital Management LLC and Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed on June 9, 2015). |

53

| Exhibit Number | Description of Exhibit |
|---|---|
| 10.2 | Share Purchase Agreement, dated June 1, 2015, among Soleil Capital L.P., Soleil Capital Management LLC and Jon Pan (incorporated by reference to Exhibit 10.1 to the Company's Form 10-Q for the quarter ended June 30, 2015). |
| 10.3 | Termination of Share Purchase Agreement, dated August 18, 2015, among Soleil Capital L.P., Soleil Capital Management LLC and Greg Pan (incorporated by reference to Exhibit 10.2 to the Company's Form 10-Q for the quarter ended June 30, 2015). |
| 10.4 | Promissory Note dated February 1, 2019 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on February 6, 2019). |
| 10.5 | Promissory Note dated February 15, 2019 issued by VPR Brands, LP to Brikor LLC (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on February 21, 2019). |
| 10.6 | Promissory Note dated February 15, 2019 issued by VPR Brands, LP to Mike Daiagi and Mathew Daiagi (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the Commission on February 21, 2019). |
| 10.7 | Promissory Note dated February 15, 2019 issued by VPR Brands, LP to Amber Investments LLC. (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed with the Commission on February 21, 2019). |
| 10.8 | Promissory Note dated February 19, 2019 issued by VPR Brands, LP to K & S Pride Inc. (incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K filed with the Commission on February 21, 2019). |
| 10.9 | Promissory Note dated February 20, 2019 issued by VPR Brands, LP to Surplus Depot Inc. (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K filed with the Commission on February 21, 2019). |
| 10.10 | Promissory Note dated June 14, 2019 issued by VPR Brands, LP to Kevin Frija and Dan Hoff (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on June 17, 2019). |
| 10.11 | Promissory Note dated July 5, 2019 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on July 15, 2019). |
| 10.12 | Loan Agreement Executed on July 29, 2019 and dated July 15, 2019 between VPR Brands, LP and Lendistry, LLC (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on August 7, 2019). |
| 10.13 | Promissory Note dated October 7, 2019 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on October 8, 2019). |
| 10.14 | Promissory Note dated November 8, 2019 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2019). |

54

| Exhibit Number | Description of Exhibit |
|---|---|
| 10.15 | Promissory Note dated November 15, 2019 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on November 18, 2019). |
| 10.16 | Promissory Note dated December 9, 2019 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on December 11, 2019). |
| 10.17 | Promissory Note dated December 16, 2019 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on December 20, 2019). |
| 10.18 | Promissory Note dated January 10, 2020 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on January 10, 2020). |
| 10.19 | Promissory Note dated February 18, 2020 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on February 19, 2020). |
| 10.20 | Promissory Note dated April 6, 2020 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on April 7, 2020). |
| 10.21 | Equity Purchase Agreement by and between VPR Brands, LP and DiamondRock, LLC dated February 19, 2020 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on February 21, 2020). |
| 10.22 | Registration Rights Agreement by and between VPR Brands, LP and DiamondRock, LLC dated February 19, 2020 (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the Commission on February 21, 2020). |
| 10.26 | Promissory Note dated June 22, 2020 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on June 23, 2020). |
| 10.27 | Promissory Note dated August 19, 2020 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on August 21, 2020). |
| 10.29 | Promissory Note dated September 22, 2020 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on September 24, 2020). |
| 10.31 | Promissory Note dated November 2, 2020 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on November 6, 2020). |
| 10.32 | Promissory Note dated December 1, 2020 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on December 1, 2020). |
| 10.34 | Promissory Note dated January 14, 2021 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on January 15, 2021). |

55

| Exhibit Number | Description of Exhibit |
|---|---|
| 10.35 | Promissory Note dated February 25, 2021 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on February 25, 2021). |
| 10.36 | Promissory Note dated July 12, 2021 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on July 13, 2021). |
| 10.37 | Promissory Note dated September 17, 2021 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on September 22, 2021). |
| 10.38 | Promissory Note dated October 8, 2021 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on October 13, 2021). |
| 10.39 | Settlement Agreement, effective December 1, 2021, by and between the registrant and NEPA 2 Wholesale, LLC (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on December 6, 2021). |
| 10.40 | Promissory Note dated December 8, 2021 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on December 10, 2021). |
| 10.41 | Settlement Agreement dated December 30, 2021 by and between the registrant and PHD Marketing, Inc. (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on January 4, 2022). |
| 10.42 | Promissory Note dated January 18, 2022 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on January 19, 2022). |
| 10.43 | Promissory Note dated January 19, 2022 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed with the Commission on January 19, 2022). |
| 10.44 | Promissory Note dated January 25, 2022 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on January 31, 2022). |
| 10.45 | Settlement Agreement, dated as of March 18, 2022, by and between the registrant on the one hand, and XL Vape, LLC, VGOD LLC, and Saltnic LLC, on the other hand (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on March 23, 2022). |
| 10.46 | Promissory Note dated March 25, 2022 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.46 to the Company's Annual Report on Form 10-K filed with the Commission on April 15, 2022). |
| 10.47 | Promissory Note dated April 7, 2022 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.47 to the Company's Annual Report on Form 10-K filed with the Commission on April 15, 2022). |
| 10.48 | Promissory Note dated May 18, 2022 issued by VPR Brands, LP to Daiagi (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on May 24, 2022). |

56

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 10.49 | Settlement Agreement, dated as of August 4, 2022, by and between the registrant on the one hand, and Myle Vape, Inc and MVH I, INC., on the other hand (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on August 5, 2022). |
| 10.50 | Promissory Note dated September 20, 2022 issued by VPR Brands, LP to Kevin Frija (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on September 23, 2022). |
| 10.51 | Settlement Agreement dated as of September 30, 2022, by and between VPR Brands, LP and MONQ, LLC (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on October 3, 2022). |
| 10.52 | Purchase Agreement dated as of October 28, 2022, by and between VPR Brands, LP and BRMS, LLC (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on November 4, 2022). |
| 10.53 | Exclusive Distribution Agreement between the Registrant and Turning Point Brands Canada, dated December 13, 2023 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed with the Commission on January 5, 2024). |
| 31.1* | Rule 13a-14(a)/15d-14(a) Certification of Chief Executive Officer. |
| 31.2* | Rule 13a-14(a)/15d-14(a) Certification of Principal Financial Officer. |
| 32.1** | Section 1350 Certifications of Chief Executive Officer and Principal Financial Officer. |
| 101.INS* | Inline XBRL Instance |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition |
| 101.LAB* | Inline XBRL Taxonomy Extension Labels |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation |
| 104* | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

\*    Filed herewith.
\*\*    Furnished herewith.

**ITEM 16. FORM 10-K SUMMARY**

None.

57

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Shareholders
VPR Brands, LP

### *Opinion on the Financial Statements*

We have audited the accompanying balance sheets of VPR Brands, LP (the "Company") as of December 31, 2025 and 2024 and the related statements of operations, changes in partners' surplus (deficit), and cash flows for each of the two years in the period ended December 31, 2025, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2025 and 2024 and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2025, in conformity with accounting principles generally accepted in the United States of America.

### *Basis for Opinion*

These financial statements are the responsibility of the entity's management. Our responsibility is to express an opinion on these financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

### *Critical Audit Matters*

Critical audit matters are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involve our especially challenging, subjective, or complex judgments. We determined that there are no critical audit matters.

We have served as the Company's auditor since 2021.

/s/ Kreit & Chiu CPA LLP

Los Angeles, California

March 31, 2026

F-1

**VPR BRANDS LP**
**BALANCE SHEETS**

|  | | December 31, 2025 | | December 31, 2024 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | $ | 125,345 | $ | 1,419,934 |
| Accounts receivable, net | | 266,321 | | 346,618 |
| Royalty receivable, net | | - | | 38,163 |
| Inventory, net | | 573,097 | | 605,919 |
| Vendor deposits | | 96,363 | | 195,702 |
| Deposits | | 28,769 | | 29,692 |
| Total current assets | | 1,089,895 | | 2,636,028 |
| | | | | |
| Right of use asset | | 56,348 | | 89,549 |
| Deferred tax asset | | 406,408 | | - |
| Intangible assets | | 41,033 | | 27,833 |
| Total assets | $ | 1,593,684 | $ | 2,753,410 |
| | | | | |
| **LIABILITIES AND PARTNERS' SURPLUS** | | | | |
| | | | | |
| Current Liabilities: | | | | |
| Accounts payable and accrued expenses | $ | 776,006 | $ | 418,007 |
| Accounts payable - related party | | 10,932 | | 9,347 |
| Customer deposits | | 2,400 | | 99,789 |
| Lease liabilities, current portion | | 41,963 | | 34,391 |
| Notes payable, current portion | | 228,918 | | 271,797 |
| Refund liability | | 117,880 | | 182,534 |
| Convertible notes payable | | - | | 69,129 |
| Income tax payable | | 726,538 | | 741,222 |
| Total current liabilities | | 1,904,637 | | 1,826,216 |
| | | | | |
| Notes payable, less current portion | | 147,237 | | 147,237 |
| Lease liabilities, net of current portion | | 19,715 | | 61,678 |
| Total liabilities | | 2,071,589 | | 2,035,131 |
| | | | | |
| Partners' (Deficit) Surplus: | | | | |
| Series A preferred units – 1,000,000 units authorized; 0 units issued and outstanding | | - | | - |
| Common units - 100,000,000 units authorized; 91,746,806 units issued and outstanding as of December 31, 2025 and 2024, | | 8,312,674 | | 8,312,674 |
| Accumulated deficit | | (8,790,579) | | (7,594,395) |
| Total partners' (deficit) surplus | | (477,905) | | 718,279 |
| Total liabilities and partners' surplus | $ | 1,593,684 | $ | 2,753,410 |

The accompanying notes are an integral part of these financial statements.

F-2

**VPR BRANDS, LP**
**STATEMENTS OF OPERATIONS**

| | Year Ended December 31, | |
|---|---|---|
| | **2025** | **2024** |
| Revenues | | |
| Product revenue | $ 3,334,293 | $ 4,921,412 |
| Royalty revenue | 281,694 | 754,947 |
| Total revenue | 3,615,987 | 5,676,359 |
| | | |
| Cost of sales | 2,577,706 | 4,143,529 |
| Gross profit | 1,038,281 | 1,532,830 |
| | | |
| Operating Expenses: | | |
| Selling, general and administrative | 2,498,053 | 2,655,727 |
| Unit-based compensation | - | 247,193 |
| Total operating expenses | 2,498,053 | 2,902,920 |
| | | |
| Net Operating Loss | (1,459,772) | (1,370,090) |
| | | |
| Other Income (Expense): | | |
| Interest income | 531 | 2,254 |
| Settlement income, net | 41,625 | 1,675,491 |
| American Express points income | 757 | 5,644 |
| Interest expense | (185,733) | (377,148) |
| Interest expense- related parties | - | (2,504) |
| Total other (expense) income, net | (142,820) | 1,303,737 |
| | | |
| Loss Before Income Taxes | (1,602,592) | (66,353) |
| | | |
| Income Tax (Benefit) Expense | (406,408) | 76,871 |
| | | |
| Net Loss | $ (1,196,184) | $ (143,224) |
| | | |
| Net Loss Per Common Unit – Basic | $ (0.01) | $ (0.00) |
| | | |
| Net Loss Per Common Unit – Diluted | $ (0.01) | $ (0.00) |
| | | |
| Weighted-Average Common Units Outstanding - Basic | 91,746,806 | 89,825,160 |
| | | |
| Weighted-Average Common Units Outstanding - Diluted | 91,746,806 | 89,825,160 |

The accompanying notes are an integral part of these financial statements.

F-3

**VPR BRANDS, LP**
**STATEMENTS OF CHANGES IN PARTNERS' SURPLUS/(DEFICIT)**

| | Common Units | | Common Units to be Issued | | Accumulated | Total Partners' Surplus/ |
| --- | --- | --- | --- | --- | --- | --- |
| | Number | Amount | Number | Amount | Deficit | (Deficit) |
| Balance at December 31, 2023 | 88,804,035 | $ 8,065,481 | 578,723 | $ 34,723 | $ (7,485,894) | $ 614,310 |
| Shares issued as bonus | 2,942,771 | $ 247,193 | - | - | - | $ 247,193 |
| Reclassification of expired conversion rights | - | - | (578,723) | $ (34,723) | $ 34,723 | $ - |
| Net loss | - | - | - | - | $ (143,224) | $ (143,224) |
| Balance at December 31, 2024 | 91,746,806 | $ 8,312,674 | - | - | $ (7,594,395) | $ 718,279 |
| Net loss | - | - | - | - | $ (1,196,184) | $ (1,196,184) |
| Balance at December 31, 2025 | 91,746,806 | $ 8,312,674 | - | - | $ (8,790,579) | $ (477,905) |

The accompanying notes are an integral part of these financial statements.

F-4

**VPR BRANDS, LP**
**STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2025 | 2024 |
| Cash Flows from Operating Activities: | | |
| Adjustments to reconcile net income to cash used in operating activities: | | |
| Net Loss | $ (1,196,184) | $ (143,224) |
| Amortization of right of use asset | 33,200 | 28,890 |
| Interest on lease liability | 10,965 | 15,646 |
| Amortization of intangible assets | 2,800 | 2,000 |
| Unit-based compensation | - | 247,193 |
| Inventory obsolescence | - | 131,052 |
| Bad debt expense | 30,505 | 8,177 |
| Allowance for expected credit loss expense | 51,367 | 120,791 |
| Deferred Income Taxes | (406,408) | - |
| Changes in operating assets and liabilities: | | |
| Inventory | 32,823 | (173,468) |
| Vendor deposits | 99,339 | 74,891 |
| Accounts receivable | (1,575) | (137,812) |
| Royalty receivable | 38,163 | 50,123 |
| Customer deposits | (97,388) | 33,754 |
| Other current assets | 923 | (14,134) |
| Accounts payable and accrued expenses | 357,998 | 210,447 |
| Refund liability | (64,654) | (3,951) |
| Income tax payable | (14,684) | (138,581) |
| Accrued interest-related party | 1,585 | (37,700) |
| Net cash (used in) provided by operating activities | (1,121,225) | 274,094 |
| | | |
| Cash used in Investing Activities | | |
| Purchase of intangible assets | (16,000) | - |
| Net cash used in investing activities | (16,000) | - |
| | | |
| Cash used in Financing Activities: | | |
| Payments of notes payable | (42,879) | - |
| Payments of convertible notes payable | (69,129) | (412,060) |
| Payment on lease liability | (45,356) | (43,550) |
| Payments of notes payable, related parties | - | (165,810) |
| Net cash used in financing activities | (157,364) | (621,420) |
| | | |
| Change in Cash | (1,294,589) | (347,326) |
| Cash - Beginning of the Year | 1,419,934 | 1,767,260 |
| Cash - End of the Year | $ 125,345 | $ 1,419,934 |
| | | |
| Supplemental Cash Flow Information: | | |
| Interest paid in cash | $ 43,143 | $ 171,109 |
| Income tax paid | 14,684 | 215,452 |
| | | |
| Supplemental Disclosure of Non-Cash Investing and Financing Activities: | | |
| Reclassification of expired conversion rights from convertible preferred units to partners' (deficit) surplus | - | 34,723 |

The accompanying notes are an integral part of these financial statements.

F-5

**VPR BRANDS, LP**
**NOTES TO FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2025 AND 2024**

**NOTE 1: ORGANIZATION**

VPR Brands, LP (the "Company") was incorporated in New York on July 19, 2004, as Jobsinsite.com, Inc. On August 5, 2004, the Company changed its name to Jobsinsite, Inc. On June 18, 2009, the Company merged with a Delaware corporation and became Jobsinsite, Inc. On July 1, 2009, the Company filed articles of conversion with the Secretary of State of Delaware and became Soleil Capital L.P., a Delaware limited partnership. On September 2, 2015, the Company changed its name to VPR Brands, LP. The Company is managed by Soleil Capital Management LLC, a Delaware limited liability company (the "General Partner").

The Company is engaged in various monetization strategies of a U.S. patent that the Company owns covering electronic cigarette, electronic cigar and personal vaporizer patents, as well as a patent for an inverted pocket lighter. The Company also has several trademarks, PHANTOM, HRB, VPOD, VAPOR X, and RIPPER) for which it is also engaged in licensing and various monetization strategies. The Company also designs, develops, markets and distributes products (the HoneyStick brand of vaporizers and the Goldline CBD products) oriented toward the cannabis markets. This allows us to capitalize on the rapidly growing expansion within the cannabis markets. The Company is also identifying electronic cigarette companies that may be infringing our patents and trademarks and exploring options to license and/or enforce our patents. The Company is now also selling DISSIM brand pocket lighters for which it holds a U.S. patent and patents pending. The Company also has patents pending in the cigar accessory space and sells these proprietary accessories.

**NOTE 2: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Presentation*

The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

*Use of Estimates*

U.S. GAAP requires the Company to make judgments, estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, the reported amounts of revenues and expenses, cash flows and the related footnote disclosures during the period. On an on-going basis, the Company reviews and evaluates its estimates and assumptions. Actual results could differ from these estimates. Significant estimates impacting the financial statements for the years ending December 31, 2025, and 2024, include the assumptions used in determining the collectability of accounts receivable, deferred tax assets and liabilities, the fair value and estimated useful lives of intangible assets, and the assumptions used in calculating lease and recall liabilities.

*Cash*

Cash is carried at cost and represents cash on hand, demand deposits placed with banks or other financial institutions and all highly liquid investments with an original maturity of three months or less as of the purchase date of such investments. The Company had no cash equivalents on December 31, 2025 and 2024. The Company's cash is held at major commercial banks, which may at times exceed the Federal Deposit Insurance Corporation ("FDIC") limit. To date, the Company has not experienced any losses on its invested cash. On December 31, 2025 and 2024, the Company had approximately $0 and $587,084, respectively, of cash in excess of FDIC limits of $250,000. Any loss incurred or a lack of access to such funds above the FDIC limit could have a significant adverse impact on the Company's financial condition, results of operations and cash flows.

*Accounts Receivable*

The Company recognizes an allowance for expected credit losses in accordance with Accounting Standards Update ("ASU") 2016-13, Financial Instruments – Credit Losses, issued by the Financial Accounting Standards Board ("FASB"). This ASU establishes a current expected credit loss ("CECL") model, which requires the Company to measure all expected credit losses for financial assets held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts.

To estimate expected credit losses, the Company segregated its receivables into four risk-based categories, each reflecting distinct credit risk characteristics. A loss rate was then applied to each category based on historical experience and anticipated losses given the associated risk factors.

F-6

An allowance for credit losses is recorded through a provision for bad debts charged to earnings. The evaluation of expected credit losses is inherently subjective and requires management to make estimates that may be subject to significant revision as additional information becomes available.

As of December 31, 2025, and 2024, the Company had an allowance for expected credit losses of $105,792 and $131,716, respectively.

*Inventory*

Inventory consisting of finished products is stated at the lower of cost or net realizable value. At each balance sheet date, the Company evaluates its ending inventories for excess quantities and obsolescence. This evaluation primarily includes an analysis of forecasted demand in relation to the inventory on hand, among consideration of other factors. The physical condition (e.g., age and quality) of the inventories is also considered in establishing its valuation. Based upon the evaluation, provisions are made to reduce excess or obsolete inventories to their estimated net realizable values. Once established, write-downs are considered permanent adjustments to the cost basis of the respective inventories. These adjustments are estimates, which could vary significantly, either favorably or unfavorably, from the amounts that the Company may ultimately realize upon the disposition of inventories if future economic conditions, customer inventory levels, product discontinuances, sales return levels or competitive conditions differ from the Company's estimates and expectations.

*Leases*

The Company applied the FASB's Accounting Standards Codification ("ASC") Topic 842, Leases (Topic 842) to arrangements with lease terms of 12 months or more. Operating lease right of use assets ("ROU") represents the right to use the leased asset for the lease term and operating lease liabilities are recognized based on the present value of the future minimum lease payments over the lease term at commencement date. As most leases do not provide an implicit rate, the Company use an incremental borrowing rate based on the information available at the adoption date in determining the present value of future payments. Lease expense for minimum lease payments is amortized on a straight-line basis over the lease term and is included in general and administrative expenses in the statements of operations.

The Company has an operating lease principally for warehouse and office space. Management evaluates each lease independently to determine the purpose, necessity to its future operations in addition to other appropriate facts and circumstances.

*Revenue Recognition*

The Company recognizes revenues when its customer obtains control of promised goods or services, in an amount that reflects the consideration which it expects to receive in exchange for those goods. The Company recognizes revenues following the five-step model prescribed under ASU No. 2014-09: (i) identify contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenues when (or as) the performance obligation is satisfied.

Product Revenue

Product revenues are recognized when the customer obtains control of the Company's product, which occurs at a point in time, typically upon shipment to the customer. The Company expenses incremental costs of obtaining a contract as and when incurred if the expected amortization period of the asset that it would have recognized is one year or less or the amount is immaterial. 100% of the Company's product revenues for the years ended December 31, 2025, and 2024, were recognized when the customer obtained control of the Company's product, which occurred at a point in time, typically upon shipment to the customer.

Royalty Revenue

The Company generates royalty revenue from license and sublicense agreements that grant third parties the right to use its intellectual property, including trademarks and patents, in exchange for sales-based royalties.

*License and Sublicense Agreements*

On January 2, 2023, the Company entered into a license agreement granting a third-party licensee exclusive rights to use certain trademark and patent assets in exchange for minimum monthly royalty payments of $500,000. Under this structure, the Company received six payments totaling $3,000,000 from March through September 2023, which were recognized ratably over the exclusivity period as performance obligations were satisfied.

F-7

In March 2023, the licensee entered into a sublicense agreement with a third-party sublicensee, under which the sublicensee agreed to pay the Company sales-based royalties of 5% of gross sales of sublicensed products.

During the fourth quarter of 2023, the Company and the licensee ended the exclusivity agreement and transitioned to a sales-based royalty structure. Under the revised agreement:

- The sublicensee continues to pay the Company a 5% royalty on gross sales of sublicensed products.

- The licensee now pays a matching 5% royalty based on the sublicensee's reported sales to maintain its licensing rights.

On January 30,2026, the Company entered into a settlement with ELF Brand LLC ("EBL") to terminate its ELF® brand license; the Company paid $150,000, and granted EBL Brand a limited license under U.S. Patent No. 8,205,622 with restricted sublicensing solely to specified third parties, with third-party royalties payable to EBL Brand. Therefore, the Company has no right to the royalty revenue generated pursuant to the sublicense agreement.

The Company recognizes royalty revenue in the period in which the criteria for revenue recognition under ASC 606, Revenue from Contracts with Customers, are met, which may be based on reported sales or upon receipt of payment.

The following table provides information about accounts receivable and royalty receivable from contracts with customers:

| | Accounts Receivable | Royalty Receivable |
|---|---|---|
| December 31, 2024 | $ 346,618 | $ 38,163 |
| December 31, 2025 | $ 266,321 | $ - |

Voluntary Recall

In February 2024, the Company initiated a voluntary recall of approximately 62,200 lighters due to a missing child safety feature. Under ASC 606, these products are not eligible for revenue recognition, as revenue cannot be recognized for amounts that are not expected to be entitled. Consequently, the Company recorded this as a refund liability. The total impact of the recall, amounting to $198,068, has been recognized against revenues and receivables for potential credits associated with the recalled products.

The Company has begun processing claims and returns stemming from this recall. To date, the volume of returns has been minimal, and it is not anticipated that returns will exceed the revenue amount already written off. The Company has accounted for this adjustment as a liability and will continue to reevaluate its assumptions based on incoming data. As of December 31, 2025 and 2024 the total refund liability relating to the recall of the lighters was $117,880 and $182,534 respectively.

*Customer Concentration*

During the year ended December 31, 2024, four customers accounted for approximately 48% of the Company's net revenues. Accounts receivable and royalty receivables from the customers as of December 31, 2024 totaled $326,689. A summary of customer concentrations is presented in the table below.

| Customer | 2024 Revenue ($) | 2024 Revenue % | 2024 Receivables ($) | 2024 Receivables % |
|---|---|---|---|---|
| A | $ 1,117,735 | 20% | 272,162 | 53% |
| B | 616,697 | 11% | - | - |
| C | 532,412 | 9% | $ 13,230 | 3% |
| D | 443,987 | 8% | 41,298 | 8% |
| **Total** | $ 2,710,831 | 48% | $ 326,689 | 64% |

F-8

During the year ended December 31, 2025, four customers accounted for approximately 28% of the Company's net revenues. Accounts receivable from the customers as of December 31, 2025 totaled $210,223. A summary of customer concentrations is presented in the table below.

| Customer | 2025 Revenue ($) | 2025 Revenue % | 2025 Receivables ($) | 2025 Receivables % |
|---|---|---|---|---|
| A | $ 505,978 | 14% | $ 94,965 | 36% |
| B | 183,884 | 5% | 58,442 | 22% |
| C | 179,174 | 5% | - | - |
| D | 145,196 | 4% | 56,816 | 21% |
| Total | $ 1,014,232 | 28% | $ 210,223 | 79% |

### Unit-Based Compensation

The Company may issue restricted units to consultants for various services. Costs for these transactions will be measured at the fair value of the consideration received or the fair value of the equity instruments issued, whichever is more reliably measurable. The value of the common stock is to be measured at the earlier of: (i) the date at which a firm commitment for performance by the counterparty to earn the equity instruments is reached, or (ii) the date at which the counterparty's performance is complete. The Company may issue units as compensation in future periods for services associated with the registration of the common units.

Unit-based payments to employees, including grants of employee stock options, are recognized as compensation expense in the financial statements based on their fair value, in accordance with ASC Topic 718. This expense is recognized over the period during which an employee is required to provide services in exchange for the award, known as the requisite service period (typically the vesting period).

For the year ended December 31, 2025, the Company recognized $0 in unit-based compensation, so the Company did not issue common units to its employees, including the Chief Executive Officer and Chief Operating Officer.

### Convertible Instruments

The Company accounts for convertible instruments in accordance with ASU 2020-06, "Accounting for Convertible Instruments and Contracts in an Entity's Own Equity." This update significantly simplifies the accounting for convertible instruments by eliminating the requirement to bifurcate embedded conversion options from their host instruments, unless the conversion feature independently meets the definition of a derivative under ASC 815, Derivatives and Hedging Activities. Under ASC 815, a conversion feature is treated as a derivative only if its economic characteristics and risks are not clearly and closely related to those of the host contract, and other specific conditions are met.

When it is determined that the embedded conversion options do not require bifurcation, the entire convertible instrument is accounted for as a single liability at amortized cost. Discounts or premiums on convertible instruments are recognized based on the difference between the proceeds received and the principal amount and are amortized over the life of the instrument using the effective interest method.

In the rare instances where a conversion option is bifurcated and accounted for as a derivative, the Company would apply the general extinguishment standards. The debt and equity linked derivatives are removed at their carrying amounts and the units issued are measured at their then-current fair value, with any difference recorded as a gain or loss on extinguishment of the two separate accounting liabilities.

### Fair Value

The carrying values of the Company's notes payables, convertible notes, and accounts payable and accrued expenses approximates their fair values because of the short-term nature of these instruments.

### Basic and Diluted Net Income (Loss) Per Unit

The Company computes net loss per unit in accordance with FASB ASC 260, "Earnings per Share". ASC 260 requires presentation of both basic and diluted earnings per unit ("EPS") on the face of the statement of operations. Basic EPS is computed by dividing net loss available to common unitholders by the weighted average number of common units outstanding during the period. Diluted EPS gives effect to all dilutive potential common units outstanding during the period including stock options, using the treasury stock method, and convertible notes, using the if-converted method. Diluted EPS excludes all dilutive potential common units if their effect is anti-dilutive.

F-9

For the year ended December 31, 2024, 709,176 units underlying convertible notes were excluded from the calculation of diluted loss per share for the years ended December 31, 2024 because their effect was antidilutive. The following summarizes the calculation of basic and diluted income per unit for the year ended December 31, 2024:

|  | Weighted Average Units | | Net Income |
| --- | --- | --- | --- |
| Basic | 89,825,160 | $ | (143,224) |
| Convertible Debt | | $ | (0.00) |

For the year ended December 31, 2025, There were no potentially dilutive units since all convertibles notes fully settled in January 2025, no outstanding as of December 31, 2025. The following summarizes the calculation of basic and diluted income per unit for the year ended December 31, 2025:

|  | Weighted Average Units | | Net Loss |
| --- | --- | --- | --- |
| Basic & Diluted | 91,746,806 | $ | (1,196,184) |
| Net Income Per Common Unit - Basic & Diluted | | $ | (0.01) |

***Income Taxes***

The Company has recorded income taxes in accordance with ASC 740, "Income Taxes," which requires the recognition of deferred tax liabilities and assets for the expected future tax consequences of differences between the carrying amounts of assets and liabilities for financial reporting purposes and their respective tax bases. Additionally, the Company follows the provisions of FASB ASC 740-10, "Uncertainty in Income Taxes," which establishes recognition thresholds for tax positions. Under this standard, an entity may only recognize tax positions that meet a "more-likely-than-not" threshold. As of December 31, 2025 and 2024, the Company does not believe it has any uncertain tax positions that would require recognition or disclosure in the accompanying audited financial statements.

***Recent Accounting Pronouncements***

From time to time, new accounting pronouncements are issued by the FASB or other standard setting bodies that may have an impact on our accounting and reporting. We believe that such recently issued accounting pronouncements and other authoritative guidance for which the effective date is in the future either will not have an impact on its accounting or reporting or that such impact will not be material to its financial position, results of operations, and cash flow when implemented.

In November 2024, the FASB issued ASU 2024-03, Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of Income Statement Expenses. This update aims to enhance transparency for users of financial statements by requiring public business entities to disaggregate specific expense categories. The update mandates disclosures in the notes to financial statements, detailing the composition and trends of key expense categories within major income statement captions. These enhanced disclosures are expected to help investors more effectively assess the entity's performance, understand its cost structure, and make more accurate forecasts of future cash flow. ASU 2024-03 is effective for annual periods beginning after December 15, 2026, and interim periods beginning after December 15, 2027, with early adoption permitted. We are currently evaluating the potential impact of ASU 2024-03 on our financial reporting and disclosures.

In January 2025, the FASB issued ASU 2025-01, Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40), which revises the effective date of ASU 2024-03 (on disclosures about disaggregation of income statement expenses) "to clarify that all public business entities are required to adopt the guidance in annual reporting periods beginning after December 15, 2026, and interim periods within annual reporting periods beginning after December 15, 2027." Entities within the ASU's scope are permitted to early adopt the ASU. The Company is currently evaluating the potential impact of ASU 2024-03 on its financial reporting and disclosures.

In July 2025, the FASB issued ASU 2025-05, Financial Instrument-Credit Losses (Topic 326): Measurement of Credit Losses for Accounts Receivable and Contract Assets. This ASU affects entities that apply the practical expedient and accounting policy election (if applicable) when estimating expected credit losses on current accounts receivable and/or current contract assets arising from transactions under Topic 606, including those assets acquired in a transaction accounted for under Topic 805, Business Combinations. The amendments will be effective for annual reporting periods beginning after December 15, 2025, and interim reporting periods within those annual reporting periods. Early adoption is permitted in both interim and annual reporting periods in which financial statements have not yet been issued or made available for issuance. The Company is currently evaluating the potential impact of ASU 2025-05 on its financial reporting and disclosures.

F-10

**NOTE 3: GOING CONCERN**

The accompanying financial statements have been prepared on a going concern basis, which contemplates the Company will continue to realize its assets and discharge its liabilities in the normal course of business. The Company's financial position and operating results raise substantial doubt about the Company's ability to continue as a going concern, as reflected by the net loss of $1,196,184 for the twelve months ended December 31, 2025, respectively, and the accumulated deficit of $8,790,579 as of December 31, 2025,. The continuation of the Company as a going concern is dependent upon, among other things, the continued financial support from its common unitholders, the ability of the Company to obtain necessary equity or debt financing, and the attainment of profitable operations. These factors, among others, raise substantial doubt regarding the Company's ability to continue as a going concern. However, subsequent to year-end, the Company's financial position significantly improved due to a $3.2 million cash settlement resulting from the parties entering into the Agreement in connection with settlement of all disputes between them, including certain pending litigation identified in the Agreement concerning U.S. trademark 5,486,616 for the mark ELF in International Class 34 for use in connection with "Electronic cigarette lighters; Electronic cigarettes; Smokeless cigarette vaporizer pipe" and U.S. patent number 8,205,622 entitled "Electronic Cigarette".

Based on these subsequent events and company's plans, company has concluded that the substantial doubt has been alleviated and that there is no substantial doubt about the Company's ability to continue as a going concern for a period of at least 12 months from the date these financial statements are issued

The Company expects to meet its current capital requirements through existing operations. However, there can be no assurance that the Company will generate sufficient cash flows to meet all working capital needs. If operating cash flows are insufficient, the Company may need to explore alternative sources of capital to satisfy its liquidity requirements.

**NOTE 4: INTELLECTUAL PROPERTY**

On November 16, 2023, the Company entered into a Bill of Sale and Assignment and Assumption Agreement with CartDub LLC, a Florida Corporation ("Seller"), to purchase certain intangible assets for a total purchase price of $30,000.

On March 20, 2025, the Company and KS Brushes DBA Kief Sweeper LLC ("Kief Sweeper") entered into a Bill of Sale and Assignment and Assumption Agreement (the "Kief Sweeper Agreement"). Pursuant to the terms of the Kief Sweeper Agreement, the Company agreed to purchase, and Kief Sweeper agreed to sell to the Company, subject to the provisions of the Kief Sweeper Agreement, certain assets consisting of certain intellectual property, including but not limited to the trade name "Kief Sweeper", an internet domain, and a patent pending amounting to $16,000.

The Company has allocated the purchase price among the acquired intangible assets based on their fair values at the acquisition date. These intangible assets are considered to have definite lives and will be amortized on a straight-line basis over their estimated useful lives, which are as follows:

| Purchased Asset | December 31, 2025 | | December 31, 2024 | | Useful Life |
|---|---|---|---|---|---|
| Intellectual Property | $ | 31,000 | $ | 15,000 | 15 years |
| Trademarks | $ | 10,000 | $ | 10,000 | 15 years |
| Trade name | $ | 5,000 | $ | 5,000 | 15 years |
| Total Intangible Assets | $ | 46,000 | $ | 30,000 | |

As of December 31, 2025, and 2024, amortization expense related to intangible assets amounted to $2,800 and $2,000, respectively. This expense is recognized within the "Selling, General and Administrative Expenses" line item of the income statement and is included in the Company's financial statements for the fiscal years ending December 31, 2025, and 2024.

The following table presents the future amortization expenses related to the acquired intangible assets:

| For the year ending | Amortization Expense |
|---|---|
| 2026 | 3,067 |
| 2027 | 3,067 |
| 2028 | 3,067 |
| 2029 | 3,067 |
| Thereafter | 28,765 |
| | $ 41,033 |

F-11

4/7/26, 7:56 AM
Case 1:26-cv-00459-GBW    Document 1-6    Filed 04/21/26    Page 73 of 84 PageID #: 108
sec.gov/Archives/edgar/data/1376231/000121390026037425/ea0283694-10k_vprbrands.htm

**NOTE 5: NOTES PAYABLE**

On September 24, 2019, the Company entered a working capital note agreement with Paypal Working Capital ("Paypal Note"), pursuant to which the Company borrowed $37,000, requiring repayment in amounts equal to 30% of sales collections processed through Paypal, but no less than $4,143, every 90 days, until the total amount of payments equals $41,430. The balance of the loan as of December 31, 2025, and December 31, 2024, was $21,797.

*Economic Injury Disaster Loan*

On July 9, 2020 and June 24, 2020, the Company received an Economic Injury Disaster Loan ("EIDL") in the aggregate amount of $159,900, payable in monthly instalments of principal and interest totaling $731 over 30 years beginning in June 2021. The note accrues interest at an annual rate of 3.75%. The loan is secured by all tangible and intangible property of the Company. The balance on the EIDL was $147,237 as of December 31, 2025, and December 31, 2024, which has been classified as a long-term liability in notes payable, less current portion on the accompanying balance sheets.

*Daiagi Note*

On May 18, 2022, the Company issued a promissory note to Sara Daiagi in the principal amount of $250,000 (the "Daiagi Note"). The outstanding principal of the Daiagi Note bears interest at 18% per annum, with interest originally payable monthly. The principal and any accrued but unpaid interest were originally due on the third anniversary of the issue date (May 18, 2025). The Company subsequently renegotiated the repayment terms with Ms. Daiagi. Under the revised schedule, the Company is making weekly periodic payments that apply to outstanding principal and accrued interest. The revised payment schedule commenced on January 28, 2025, and the revised maturity date is January 16, 2029. The Daiagi Note and the amounts payable thereunder are unsecured obligations of the Company and shall be senior in right of payment and otherwise to all indebtedness, as provided in the Daiagi Note. The balance of the Daiagi Note was $207,120 and $250,000 as of December 31, 2025 and December 31, 2024, respectively.

The following is a summary of notes payable activity for the year ended December 31, 2025:

| | | |
|---|---|---|
| Total note payable at December 31, 2024 | $ | 419,034 |
| Repayments of notes payable | $ | (42,879) |
| Balance as December 31, 2025 | $ | 376,155 |
| Current portion | $ | 228,918 |
| Note payable, less current portion | $ | 147,237 |

F-12

## NOTE 6: RELATED PARTY TRANSACTIONS

*Notes Payable Related Parties*

During the year ended December 31, 2024, the Company repaid multiple unsecured promissory notes to Kevin Frija, who serves as its Chief Executive Officer, President, principal financial officer, principal accounting officer, and Chairman of the Board, and is a significant unitholder of the Company. These notes carried an interest rate of 24% per annum and permitted Mr. Frija to make one ACH payment withdrawal of $500, which increased to $1,500 per day for notes still outstanding in October 2023, from the Company's bank account per business day until the principal and accrued interest were fully repaid. The notes were issued on various dates between April 2021 and September 2022. All were due within a year of their respective issuance dates.

For the twelve months ended December 31, 2025, and 2024, the Company incurred interest expense of $0 and $2,504, respectively.

During the year ended December 31, 2024, the Company repaid all outstanding notes totaling $165,810, resulting in a zero balance as of December 31, 2025 and 2024, respectively.

*Issuance of restricted units for compensation*

During the year ended December 31, 2024, the Company issued an aggregate of 1,221,385 common units to the Chief Executive Officer and Chief Operating Officer in exchange for services provided and recognized $205,193 in unit-based compensation related to these issuances. The expense was recognized on the grant date, as the units were fully vested and issued as additional compensation for services already performed. No common units were issued to the Company's executives during the year ended December 31, 2025.

*Other related party transactions*

As of December 31, 2025, and December 31, 2024, the Company owed $6,748 and $2,097, respectively, to two entities in which the Company's Chief Executive Officer holds a 33% ownership interest. The net transactions for the year ended December, 2025 and 2024, were $14,627 and $19,708, respectively. These transactions were conducted in the ordinary course of business, and management believes the terms were no less favorable than those that would have been obtained in arm's-length transactions with unrelated third parties.

As of December 31, 2025, and December 31, 2024, the Company owed $4,184 and $7,251, respectively, for commissions to the Company's Chief Operating Officer. The total commissions paid to the Chief Operating Officer during the twelve months ended December 31, 2025, and 2024, were $23,593 and $41,525, respectively. These transactions were conducted in the ordinary course of business, and management believes the terms were no less favorable than those that would have been obtained in arm's-length transactions with unrelated third parties.

## NOTE 7: CONVERTIBLE NOTES PAYABLE

*Brikor Note*

On February 15, 2019, the Company issued a senior convertible promissory note in the principal amount of $200,000 to Brikor LLC. The principal amount due under the Brikor Note bears interest at the rate of 18% per annum. The principal amount and accrued but unpaid interest (to the extent not converted in accordance with the terms of the Brikor Note) was due and payable on the third anniversary of the issue date. The Brikor Note and the amounts payable thereunder are unsecured obligations of the Company and shall be senior in right of payment and otherwise to all indebtedness, as provided in the Brikor Note.

At any time after the first anniversary of the issue date, the holder may require the Company, upon at least 30 business days' written notice, to redeem all or any portion of the Brikor Note. The portion of the Brikor Note subject to redemption would be redeemed by the Company in cash.

F-13

The Brikor Note is convertible into common units of the Company. Pursuant to the terms of the Brikor Note, Brikor has the right, at its option, to convert any portion of the outstanding and unpaid Conversion Amount (as hereinafter defined) into common units in accordance with the provisions of the Brikor Note at the Conversion Rate (as hereinafter defined). The number of common units issuable upon conversion of any Conversion Amount will be determined by dividing (x) such Conversion Amount by (y) $0.10 (subject to adjustment as set forth in the Brikor Note) (such result, the "Conversion Rate"). "Conversion Amount" means the sum of (A) the portion of the principal balance of the Brikor Note to be converted with respect to which the determination is being made, (B) accrued and unpaid interest with respect to such principal balance, if any, and (C) the Default Balance (other than any amount thereof within the purview of foregoing clauses (A) or (B)), if any. In March 2022, the Company began making monthly payments of principal and interest of $1,860 at the default annual interest rate of 26.4%. During the year ended December 31, 2025, the Company fully paid the outstanding balance of the Brikor Note of $14,452. The balance of the Brikor Note as of December 31, 2025, and December 31, 2024, was $0 and $14,452, respectively.

### Daiagi and Daiagi Note

On February 15, 2019, the Company issued a senior convertible promissory note in the principal amount of $200,000 (the "Daiagi and Daiagi Note") to Mike Daiagi and Mathew Daiagi jointly (the "Daiagis"). The principal amount due under the Daiagi and Daiagi Note bears interest at the rate of 18% per annum. The principal amount and accrued but unpaid interest (to the extent not converted in accordance with the terms of the Daiagi and Daiagi Note) was due and payable on the third anniversary of the issue date. The Daiagi and Daiagi Note and the amounts payable thereunder are unsecured obligations of the Company and shall be senior in right of payment and otherwise to all indebtedness, as provided in the Daiagi and Daiagi Note.

At any time after the first anniversary of the issue date, the holder may require the Company, upon at least 30 business days' written notice, to redeem all or any portion of the Daiagi and Daiagi Note. The portion of the Daiagi and Daiagi Note subject to redemption will be redeemed by the Company in cash.

The Daiagi and Daiagi Note is convertible into common units of the Company. Pursuant to the terms of the Daiagi and Daiagi Note, the Daiagis have the right, at their option, to convert any portion of the outstanding and unpaid Conversion Amount into common units in accordance with the provisions of the Daiagi and Daiagi Note at the Conversion Rate. The number of common units issuable upon conversion of any Conversion Amount will be determined by dividing (x) such Conversion Amount by (y) $0.10 (subject to adjustment as set forth in the Daiagi and Daiagi Note). In March 2022, the Company began making monthly payments of principal and interest of $1,860 at the default annual interest rate of 26.4%. During the year ended December 31, 2025, the Company fully paid the outstanding balance of the Daiagi and Daiagi Note of $12,757. The balance of the Daiagi and Daiagi Note as of December 31, 2025, and December 31, 2024, was $0 and $12,757, respectively.

### Amber Investments Note

On February 15, 2019, the Company issued a senior convertible promissory note in the principal amount of $200,000 (the "Amber Investments Note") to Amber Investments LLC ("Amber Investments"). The principal amount due under the Amber Investments Note bears interest at the rate of 18% per annum. The principal amount and accrued but unpaid interest (to the extent not converted in accordance with the terms of the Amber Investments Note) was due and payable on the third anniversary of the issue date. The Amber Investments Note and the amounts payable thereunder are unsecured obligations of the Company and shall be senior in right of payment and otherwise to all indebtedness, as provided in the Amber Investments Note.

At any time after the first anniversary of the issue date, the holder may require the Company, upon at least 30 business days' written notice, to redeem all or any portion of the Amber Investments Note. The portion of the Amber Investments Note subject to redemption will be redeemed by the Company in cash.

The Amber Investments Note is convertible into common units of the Company. Pursuant to the terms of the Amber Investments Note, Amber Investments has the right, at its option, to convert any portion of the outstanding and unpaid Conversion Amount into common units in accordance with the provisions of the Amber Investments Note at the Conversion Rate. The number of common units issuable upon conversion of any Conversion Amount will be determined by dividing (x) such Conversion Amount by (y) $0.10 (subject to adjustment as set forth in the Amber Investments Note). In March 2022, the Company began making monthly payments of principal and interest of $1,860 at the default annual interest rate of 26.4%. During the year ended December 31, 2025, the Company fully paid outstanding balance of the Amber Investments Note of $12,757. The balance of the Amber Investments Note as of December 31, 2025, and December 31, 2024, was $0 and $12,757, respectively.

F-14

*K& S Pride Note*

On February 19, 2019, the Company issued a senior convertible promissory note in the principal amount of $200,000 (the "K & S Pride Note") to K & S Pride Inc. ("K & S Pride"). The principal amount due under the K & S Pride Note bears interest at the rate of 18% per annum. The principal amount and accrued but unpaid interest (to the extent not converted in accordance with the terms of the K & S Pride Note) was due and payable on the third anniversary of the issue date. The K& S Pride Note and the amounts payable thereunder are unsecured obligations of the Company and shall be senior in right of payment and otherwise to all indebtedness, as provided in the K & S Pride Note.

At any time after the first anniversary of the issue date, the holder may require the Company, upon at least 30 business days' written notice, to redeem all or any portion of the K& S Pride Note. The portion of the K & S Pride Note subject to redemption will be redeemed by the Company in cash.

The K & S Pride Note is convertible into common units of the Company. Pursuant to the terms of the K & S Pride Note, K & S Pride has the right, at its option, to convert any portion of the outstanding and unpaid Conversion Amount into common units in accordance with the provisions of the K & S Pride Note at the Conversion Rate. The number of common units issuable upon conversion of any Conversion Amount will be determined by dividing (x) such Conversion Amount by (y) $0.10 (subject to adjustment as set forth in the K & S Pride Note). In March 2022, the Company began making monthly payments of principal and interest of $1,860 at the default annual interest rate of 26.4%. During the year ended December 31, 2025, the Company fully paid the outstanding balance of the K & S Pride Note of $16,319. The balance of the K & S Pride Note as of December 31, 2025, and December 31, 2024, was $0 and $16,319, respectively.

*Surplus Depot Note*

On February 20, 2019, the Company issued a senior convertible promissory note in the principal amount of $200,000 (the "Surplus Depot Note") to Surplus Depot Inc. ("Surplus Depot"). The principal amount due under the K & S Pride Note bears interest at the rate of 18% per annum. The principal amount and accrued but unpaid interest (to the extent not converted in accordance with the terms of the Surplus Depot Note) was due and payable on the third anniversary of the issue date. The Surplus Depot Note and the amounts payable thereunder are unsecured obligations of the Company and shall be senior in right of payment and otherwise to all indebtedness, as provided in the Surplus Depot Note.

At any time after the first anniversary of the issue date, the holder may require the Company, upon at least 30 business days' written notice, to redeem all or any portion of the Surplus Depot Note. The portion of the Surplus Depot Note subject to redemption will be redeemed by the Company in cash.

The Surplus Depot Note is convertible into common units of the Company. Pursuant to the terms of the Surplus Depot Note, Surplus Depot has the right, at its option, to convert any portion of the outstanding and unpaid Conversion Amount into common units in accordance with the provisions of the Surplus Depot Note at the Conversion Rate. The number of common units issuable upon conversion of any Conversion Amount will be determined by dividing (x) such Conversion Amount by (y) $0.10 (subject to adjustment as set forth in the Surplus Depot Note). In March 2022, the Company began making monthly payments of principal and interest of $1,860 at the default annual interest rate of 26.4%. During the year ended December 31, 2025, the Company fully paid the outstanding balance of the Surplus Depot Note of $12,756. The balance of the Surplus Depot Note as of December 31, 2025, and December 31, 2024, was $0 and $12,756, respectively.

The following is a summary of convertible notes payable activity for the year ended December 31, 2024:

| | |
|---|---:|
| Opening balance on January 1, 2024 | 481,190 |
| Repayments of principal | (412,060) |
| Balance at December 31, 2024 | $ 69,130 |

The following is a summary of convertible notes payable activity for the year ended December 31, 2025:

| | |
|---|---:|
| Balance at January 1, 2025 | $ 69,130 |
| Repayments of principal | (69,130) |
| Balance at December 31, 2025 | $ - |

F-15

**NOTE 8: PARTNERS' SURPLUS**

The Company is authorized to issue 100,000,000 common units with no par value. As of December 31, 2025, and December 31, 2024, the Company had outstanding 91,746,806 common units issued and outstanding.

As of December 31, 2023, the Company had 578,723 common units reflected as issuable pursuant to convertible debt conversions from 2020 that had not yet been issued. During the year ended December 31, 2024, the Company reversed $34,723 from common units to be issued related to these anticipated issuances, as the conversion rights ultimately expired unexercised. The offsetting adjustment was recorded to Accumulated Deficit. This reclassification had no impact on total Partners' Capital.

For the year ended December 31, 2025, the Company did not recognize any unit-based compensation. For the year ended December 31, 2024, the Company recognized $247,193 in unit-based compensation for the issuance of 2,942,771 common units to three employees, including the Chief Executive Officer and Chief Operating Officer in exchange for services provided. The expense was recognized at fair value on the grant date as the units were fully vested and issued as additional compensation for services already performed.

***Amendment to Partnership Agreement***

On January 23, 2020, executed the Second Amendment (the "Second Amendment") to Limited Partnership Agreement (the "partnership agreement") in order to create a new class of Company securities titled Class A preferred units.

Pursuant to Section 5.6 of the Limited Partnership Agreement, as amended (the "Limited Partnership Agreement"), Soleil Capital Management LLC, the Company's general partner (the "General Partner") may, without the approval of the Company's limited partners, issue additional Company securities for any Company purpose at any time and from time to time for such consideration and on such terms and conditions as the General Partner shall determine in its sole discretion, all without the approval of any limited partners, and that each additional Company interest authorized to be issued by the Company may be issued in one or more classes, or one of more series of any such classes, with such designations, preferences, rights, powers and duties as shall be fixed by the General Partner in its sole discretion. Pursuant to Section 13.1 of the Limited Partnership Agreement, the General Partner may, without the approval of any partner, any unitholder or any other person, amend any provision of the Limited Partnership Agreement to reflect any amendment expressly permitted in the Limited Partnership Agreement to be made by the General Partner acting along, therefore including the creation of a new class of Company securities.

The designation, powers, preferences and rights of the Class A preferred units and the qualifications, limitations and restrictions thereof are summarized as follows:

*Number and Stated Value.* The number of authorized Class A preferred units is 1,000,000. Each Class A preferred unit will have a stated value of $2.00 (the "Stated Value").

*Rights.* Except as otherwise set forth in the Limited Partnership Agreement, each Class A preferred unit has all of the rights, preferences and obligations of the Company's common units as set forth in the Limited Partnership Agreement and shall be treated as a common unit for all other purposes of the Limited Partnership Agreement.

F-16

*Dividends.*

Rate. Each Class A preferred unit is entitled to receive an annual dividend at a rate of 8% per annum on the Stated Value, which shall accrue on a monthly basis at the rate of 0.6666% per month, non-compounding, and shall be payable in cash within 30 days of each calendar year for which the dividend is payable.

Liquidation. In the event of a liquidation, dissolution or winding up of the Company, a merger or consolidation of the Company wherein the Company is not the surviving entity, or a sale of all or substantially all of the assets of the Company, each Class A unit will be entitled to receive, prior an in preference to any distribution of any of the assets or surplus funds of the Company to the holders of common units or any other Company securities ranking junior to the Class A preferred units, or to the General Partner, an amount per Class A preferred unit equal to any accrued but unpaid dividends. If, upon such an event and after the payment of preferential amounts required to be paid to holders of any Company securities having a ranking upon liquidation senior to the Class A preferred units, the assets of the Company available for distribution to the partners of the Company are insufficient to provide for both the payment of the full Class A liquidation preference and the preferential amounts (if any) required to be paid to holders of any other

Company securities having a ranking upon liquidation *pari passu* with the Class A preferred units, such assets as are so available shall be distributed among the Class A preferred units and the holders of any other series of Company securities having a ranking upon liquidation *pari passu* with the Class A preferred units in proportion to the relative aggregate preferential amount each such holder is otherwise entitled to receive.

*Conversion Rights.*

Conversion. Upon notice, a holder of Class A preferred units has the right, at its option, to convert all or a portion of the Class A preferred units held into fully paid and nonassessable Company common units.

Conversion Price. Each Class A preferred unit is convertible into a number of common units equal to (x) the Stated Value plus any accrued and unpaid dividends, divided by (y) the Conversion Price (as hereinafter defined). The "Conversion Price" means 85% multiplied by the VWAP (as defined in the Limited Partnership Agreement), representing a discount rate of 15%.

Conversion Limitation. In no event shall a holder of Class A preferred units be entitled to convert any of the Class A preferred units in excess of that number of Class A preferred units upon conversion of which the sum of (1) the number of common units beneficially owned by such holder and its affiliates (other than common units which may be deemed beneficially owned through the ownership of the unconverted Class A preferred units or the unexercised or unconverted portion of any other security of the Company subject to a limitation on conversion or exercise analogous to the limitations contained herein), and (2) the number of common units issuable upon the conversion of all Class A preferred units held by such holder would result in beneficial ownership by the holder and its affiliates of more than 4.99% of the outstanding common units.

F-17

**NOTE 9: COMMITMENTS AND CONTINGENCIES**

*Lease Agreements*

*Warehouse and Office Space*

On May 19, 2022, the Company entered into a 5-year lease of approximately 3,100 square feet of warehouse and office space. The lease requires base monthly rent of $3,358 per month for the first year and provides for a 5% increase in base rent on each anniversary date. At inception of the lease, the Company recorded a right to use asset and obligation of $157,363, equal to the present value of remaining payments of minimum required lease payments.

As of December 31, 2025, and December 31, 2024, right-of-use ("ROU") assets are summarized as follows:

|  | December 31, 2025 | December 31, 2024 |
|---|---|---|
| Warehouse and office lease ROU assets | $ 157,363 | $ 157,363 |
| Less: accumulated amortization | (101,015) | (67,814) |
| ROU assets, net | $ 56,348 | $ 89,549 |

As of December 31, 2025, and December 31, 2024, operating lease liabilities related to the ROU assets are summarized as follows:

|  | December 31, 2025 | December 31, 2024 |
|---|---|---|
| Lease liabilities related to warehouse and office lease ROU assets | $ 61,678 | $ 96,069 |
| Less: current portion of lease liabilities | (41,963) | (34,391) |
| Lease liabilities, net of current portion | $ 19,715 | $ 61,678 |

As of December 31, 2025, the weighted average lease term remaining was 1.4 years and the imputed interest rate was 14%.

The following table presents the maturity of the Company's operating lease liabilities as of December 31, 2025:

| Year ended December 31, | Amount |
|---|---|
| 2026 | 48,013 |
| 2027 | 20,410 |
| **Total minimum non-cancelable operating lease payments** | 68,423 |
| Less: discount to fair value | (6,745) |
| Total lease liability as of December 31, 2025 | $ 61,678 |

The Company amortized $33,200 and $28,890 of the right to use asset during the year ended December 31, 2025, and 2024, respectively.

Rent expense for the year ended December 31, 2025, and 2024, was $67,459 and $65,139, respectively.

F-18

*Legal Matters*

From time to time, we may be involved in litigation relating to claims arising out of our operations in the normal course of business. There are no pending or threatened lawsuits that could reasonably be expected to have a material effect on the results of our operations and there are no proceedings in which any of our directors, officers or affiliates, or any registered or beneficial unitholder, or any member of our General Partner, is an adverse party or has a material interest adverse to our interest.

On April 20, 2023, the Company entered into a Litigation Resolution Agreement (the "Safa Agreement") with Safa Goods, LLC regarding trademark and patent infringements of the Company's branded products. The Safa Agreement provided for payment to the Company of $5,300,197 over an 18-month period. All payments required under the Safa Agreement were received prior to December 31, 2024.

On December 17, 2024, the Company entered into a Settlement Agreement and Release ("Daze Agreement") with 7 Daze, LLC ("Daze") following assertion by the Company of patent infringement of U.S. patent no. 8,205,622 (the "Patent") by Daze's auto draw electronic cigarettes (the "Dispute"). Pursuant to the terms of the Daze Agreement, the parties agreed to settle the Dispute, and the Company granted to Daze and certain of its affiliates a fully paid-up, royalty free, non-exclusive license to practice the invention in the Patent. Pursuant to the terms of the Daze Agreement, Daze agreed to pay the Company the sum of $100,000 according to the following payment schedule:

    (i)   $25,000 on or before December 20, 2024; and

    (ii)  Six monthly payments of $12,500, due on the first day of each consecutive month beginning on February 1, 2025 and ending with the sixth and final payment due July 1, 2025.

As of December 31, 2025, the Company has received all of the amounts due under the Daze Agreement.

On February 17, 2025, the Company entered into a Settlement Agreement and Release (the "Pop Vapor Agreement") with Pop Vapor Co, LLC ("Pop Vapor") regarding Patent (United States Patent No. 8,205,622) infringements of Company branded products. Pursuant to the terms of the Pop Vapor Agreement, Pop Vapor agreed to pay the Company $30,000. The Company received the $30,000 cash payment, which was recognized as settlement income, in April 2025. In addition to the settlement payment, Pop Vapor agreed to pay the Company a royalty of $0.05 per unit of the POP Hit brand devices sold by Pop Vapor from April 1, 2024 until the earlier of the life of the Patent (expires on July 16, 2030) or the invalidity or unenforceability of the Patent. As of December 31, 2025, the Company has received a total of $39,640 from Pop Vapor.

On March 27, 2025, the Company entered into a Settlement Agreement and Release (the "Zaydan Agreement") with Zaydan Innovations, Inc. ("Zaydan") regarding Patent infringements of Company branded products. Pursuant to the terms of the Zaydan Agreement, Zaydan agreed to pay the Company $7,500. The Company received the $7,500 cash payment, which was recognized as settlement income, in April 2025.

On May 5, 2025, the Company entered into a Settlement Agreement and Release (the "Ashh Agreement") with Ashh, Inc. ("Ashh") regarding trademark and patent infringements of Company branded products. Pursuant to the terms of the Ashh Agreement, Ashh agreed to pay the Company $50,000. The Company received the $50,000 cash payment, which was recognized as settlement income, in May 2025. In addition to the settlement payment, once all of the product covered by the current inventory licensed has been sold, Ashh agreed to pay the Company a royalty of $0.03 per unit of the licensed devices sold by Ashh until the earlier of the life of the Patent (expires on July 16, 2030) or the invalidity or unenforceability of the Patent.

On November, 2025, the Company entered into a Settlement Agreement and Release (the "Flumgio Agreement") with Flumgio Technology Inc. (Flumgio) regarding Patent infringements of Company branded products. Pursuant to the terms of the Flumgio Agreement, Flumgio agreed to pay the Company $50,000, to be recognized as settlement income when received. The Company received the $50,000 cash payment, which was recognized as settlement income, in November 2025.

On May 29, 2025, the Company entered into a Settlement Agreement and Release (the "All Rise Agreement") with All Rise Records Inc. ("All Rise") regarding Patent infringements of Company branded products. Pursuant to the terms of the All Rise Agreement, All Rise agreed to pay the Company $30,000, to be recognized as settlement income when received. All Rise agreed to pay the $30,000 settlement amount in monthly installments of $5,000 beginning on June 1, 2025. In addition to the $30,000 settlement payment, All Rise agreed to pay the Company a royalty of $0.05 per unit of the All Rise e-cigarette devices sold by All Rise from June 1, 2025 through the life of the Patent (expires on July 16, 2030). All Rise also agreed to pay the Company a royalty of $0.12 per unit of the All Rise inverter torch lighters sold by All Rise from June 1, 2025 through the life of U.S. patent 11.913.644 (expires on February 27, 2044). As of December 31, 2025, the Company had received $30,000 pursuant to the All Rise Agreement.

F-19

During the year ended December 31, 2025, and 2024, the Company received cash payments pursuant to the above settlements totaling $41,625 and $1,675,492, respectively, net of settlement legal fees. These amounts are included in net settlement income in the accompanying unaudited condensed statements of operations.

On September 10, 2025, the Company entered into a Settlement Agreement and Release (the "Ferrara Agreement") with Ferrara Candy Company (Ferrara) in relation to the '935 Application and the WIPO Registration, and Ferrara has filed Opposition Proceeding before the Trademark and Trial and Appeal Board. Pursuant to the terms of the Ferrara Agreement, Ferrara agreed to pay the Company $1,000, to be recognized as settlement income when received. The Company received the $1,000 cash payment, which was recognized as settlement income, in November 2025.

**NOTE 10: INCOME TAXES**

The Company accounts for income taxes in accordance with ASC 740, "Income Taxes," which requires the recognition of deferred tax liabilities and assets for the expected future tax consequences of differences between the carrying amounts of assets and liabilities for financial reporting purposes and their respective tax bases.

Additionally, the Company follows the provisions of FASB ASC 740-10, "Uncertainty in Income Taxes," which establishes recognition thresholds for tax positions. Under this standard, an entity may only recognize tax positions that meet a "more-likely-than-not" threshold. As of December 31, 2025, and December 31, 2024, the Company does not believe it has any uncertain tax positions that would require recognition or disclosure in the accompanying condensed financial statements.

***Income Tax Expense and Tax Liability Changes***

For the year ended December 31, 2024, the Company recorded net loss before taxes of $66,353 and made tax payments totaling $215,452. The Company recorded a provision for income tax expense of $76,871. As a result, the Company's tax liability decreased from $879,803 as of December 31, 2023, to $741,222 as of December 31, 2024, primarily due to these provisions and payments.

For the year ended December 31, 2025, the Company recorded net loss before taxes of $1,602,592 and made tax payments totaling $14,684. The Company recorded a deferred tax asset of $406,408. As a result, the Company's tax liability decreased from $741,222 as of December 31, 2024, to $726,538 as of December 31, 2025, primarily due to these payments.

<u>Tax Positions and Penalties</u>

The Company's 2023 tax return included the use of net operating losses carryforwards ("NOLs") to offset taxable income. However, due to uncertainty regarding the acceptance of these NOLs and the determination that they do not meet the "more-likely-than-not" threshold, as of December 31, 2024, the Company recorded an estimated liability of $185,700 in non-deductible penalties, representing a permanent difference. In addition, the Company had $52,229 of accrual interest on penalties which created a temporary difference and related tax asset. This liability is included in accounts payable and accrued expenses. The Company also recorded a provision for credit losses of $131,716 as of December 31, 2024, which also creates a temporary difference and related tax asset. This liability is included as a contra asset to accounts receivable.

On December 31, 2024, the Company recorded deferred tax assets of $46,622 related to these deductible temporary differences. However, due to the operating losses and uncertainty regarding the Company's ability to generate sufficient future taxable income, the Company determined that it was not more likely than not that these deferred tax assets would be realized. Accordingly, the Company recorded a full valuation allowance of $46,622 against its deferred tax assets as of December 31, 2024.

For the year ended December 31, 2025, the Company recorded a $25,924 reduction of allowance for expected credit losses against accounts receivable. The Company's allowance for expected credit losses was $105,792 and $131,716 as of December 31, 2025, and December 31, 2024, respectively. For the year ended December 31, 2025, the Company had approximately 1,497,712 of U.S. federal NOL carryovers available to offset future taxable income. In assessing the realization of deferred tax assets, management considers whether it is more likely than not that some portion or of the deferred tax assets will be realized.

F-20

These components of deferred income tax assets as of December 31, 2025, are presented in the following table:

| Component | Temporary Difference | | Tax Effect | |
|---|---|---|---|---|
| Allowance for bad debts | $ | 105,792 | $ | 26,813 |
| Net operating losses carryforward | $ | 1,497,712 | $ | 379,595 |
| Valuation allowance | $ | - | $ | - |
| Total | $ | 1,603,504 | $ | 406,408 |

The components of deferred income tax assets as of December 31, 2024, are presented in the following table:

| Component | Temporary Difference | | Tax Effect | |
|---|---|---|---|---|
| Allowance for bad debts | $ | 52,229 | $ | 13,239 |
| Net operating losses carryforward | $ | 131,716 | $ | 33,383 |
| Valuation allowance | $ | (183,945) | $ | (46,622) |
| Total | $ | - | $ | - |

**Income Tax Provision**

As of December 31, 2025, the Company's statutory federal income tax rate was 21.00%. Due to a net loss in the year ended December 31, 2025, the Company recorded a tax benefit of $406,408.

The Company's income tax expense for year ended December 31, 2025, and 2024, was as follows:

| Components of Deferred Income Tax (Benefit) Expense | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2025 | | 2024 | |
| Deferred income tax (credit) expense at U.S. federal rate | $ | (336,736) | $ | 38,629 |
| Deferred state income tax (credit) expense, net of federal benefit | $ | (69,672) | $ | 7,993 |
| Valuation allowance | $ | - | $ | (46,622) |
| Provision for income tax (credit) | $ | (406,408) | $ | - |

In the year ended December 31, 2025, the Company recorded its deferred tax assets. The Company considers the projected future taxable income in making this assessment. After consideration of all the information available, management believes that no significant uncertainty exists with respect to future realization of the deferred tax assets and has not established a valuation allowance. Therefore, the Company' corresponding effective tax rate for the year ended December 31, 2025, was negative 25.35%, compared to an effective tax rate of 115.85% for the year ended December 31, 2024.

The following table presents the provision for income taxes, statutory federal income tax rate, effective tax rate, and reconciliation for the year ended December 31, 2025, and 2024:

| | Year Ended December 31, | |
|---|---|---|
| | 2025 | 2024 |
| (Credit) tax at statutory federal income tax rate | (21.00)% | (21.00)% |
| State income taxes, net of federal benefit | (4.35)% | 19.86% |
| Permanent differences | - | 58.77% |
| Valuation allowance | - | 58.22 |
| Effective tax rate | (25.35)% | 115.85% |

*Tax Compliance and Examinations*

The Company's income tax returns remain open to examination by tax authorities until the tax filing due date.

F-21

**NOTE 11: SUBSEQUENT EVENTS**

On January 30, 2026, the Company and Elf Brand, LLC, an unaffiliated licensee of the Company ("EBL"), entered into a Litigation Resolution Agreement (the "EBL Agreement") with Shenzhen Weiboli Technology Co, Ltd ("Weiboli"), Shenzhen iMiracle Technology Co. Ltd. ("SIT"), iMiracle (HK) Limited ("iMiracle"), Heaven Gifts International Limited ("Heaven Gifts"), YLSN Distribution LLC ("YLSN"), ECTO World LLC ("ECTO"), D&A Distribution LLC ("D&A"), UNISHOW (U.S.A.), Inc. ("UNISHOW"), SV3 LLC d/b/a MI-POD ("MI-POD"), Kingdom Vapor Inc. ("Kingdom Vapor"), and GD Sigelei Electronic Tech. Co Ltd. ("GD Sigelei"), Waterfall Holding LLC ("Waterfall"), LA Vapor, Inc. ("LA Vapor"), World Wholesale Inc. ("WWI"), G&A Wholesale Distributors Inc. ("G&A"), and Kloud King Distributors, Inc. d/b/a KKSMOKE.COM ("Kloud King" and collectively with Weiboli, SIT, iMiracle, Heaven Gifts, YLSN, ECTO, D&A, UNISHOW, MI-POD, Kingdom Vapor, GD Sigelei, Waterfall, LA Vapor, WWI and G&A, the "Defendants"). The parties entered into the Agreement in connection with settlement of all disputes between them, including certain pending litigation identified in the EBL Agreement (collectively, the "Actions") concerning U.S. trademark 5,486,616 (the "616 Trademark") for the mark ELF in International Class 34 for use in connection with "Electronic cigarette lighters; Electronic cigarettes; Smokeless cigarette vaporizer pipe" and U.S. patent number 8,205,622 entitled "Electronic Cigarette" (the "622 Patent"). The parties to the EBL Agreement deny any other party's allegations and claims in such litigation, do not admit liability, and desire to settle and compromise all disputes between them, including the Actions, on the terms and conditions set forth in the EBL Agreement.

Pursuant to the terms of the EBL Agreement, (i) the Company and the Defendants agreed to dismiss the Actions with prejudice within one business day of receipt by the Company of $5,250,000 (the "Consideration") from the Defendants, and (ii) the Company agreed to dismiss with prejudice any other pending action in the U.S. and worldwide against any Defendant within five business days of receipt of the Consideration. The Company will receive $3,200,000 of the Consideration, after payment of attorneys' fees.

Additionally, the Company irrevocably conveyed, transferred and assigned to iMiracle all of the Company's right, title and interest in and to the '616 Trademark and all U.S. trademark registrations and trademark applications for any elf-formative marks, together with the goodwill of the business connected with the use of, and symbolized by, the Assigned Trademarks (as defined in the EBL Agreement). In furtherance thereof, the Company agreed to transfer, assign, convey and deliver to iMiracle, at no additional consideration, certain tangible and/or intangible assets materially related to and necessary to evidence and preserve the goodwill symbolized by the Assigned Trademarks, and to assign and transfer to iMiracle all of the Company's right, title and interest in the ELF trademarks identified in the EBL Agreement. Pursuant to the terms of the EBL Agreement, within the 75-day period after the effective date of the EBL Agreement, the Company and EBL may sell off existing inventory of ELF branded products already manufactured and in stock as of the effective date of the EBL Agreement. The Company and its affiliates may not manufacture or produce any new products bearing the Assigned Trademarks, including but not limited to, any products branded, labeled, packaged or otherwise identified as "ELF" or any confusingly similar designation, at any time on or after the effective date of the EBL Agreement. The Company also agreed to, and agreed to cause its affiliates to, irrevocably withdraw, dismiss and terminate all ELF Trademark Challenge Proceedings (as defined in the EBL Agreement) within 10 business days following execution of the EBL Agreement.

The Company also agreed to file with the U.S. Patent and Trademark Office, within 14 days of execution of the EBL Agreement, a request for the express abandonment of U.S. Application Serial No. 97834845, and to irrevocably withdraw and abandon the trademark applications identified in the EBL Agreement filed with the European Union

Pursuant to the terms of the EBL Agreement, the Company granted to Defendants a fully paid, worldwide, irrevocable, non-exclusive, perpetual license to the '622 Patent.

The EBL Agreement contains customary representations, warranties and covenants of the Company and the Defendants.

Also on January 30, 2026, the Company entered into a settlement with EBL to terminate its ELF® brand license; the Company paid $150,000, and granted EBL a limited license under U.S. Patent No. 8,205,622 with restricted sublicensing solely to specified third parties, with third-party royalties payable to EBL. Therefore, the Company has no right to the royalty revenue generated pursuant to the sublicense agreement.

F-22

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  |  |
|---|---|---|
|  | **VPR Brands, LP** |  |
|  | By: | SOLEIL CAPITAL MANAGEMENT, LLC, its General Partner |
| Date: March 31, 2026 | By: | */s/ Kevin Frija* |
|  | Name: | Kevin Frija |
|  | Title: | Sole Member, Soleil Capital Management, LLC |
|  |  | Chief Executive Officer, VPR Brands LP |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Title | Date |
|---|---|---|
| /s/ Kevin Frija<br>Kevin Frija | Sole Member of Soleil Capital Management, LLC<br>Chief Executive Officer, VPR Brands LP<br>(principal executive officer, principal financial officer and principal accounting officer) | March 31, 2026 |

58